JAMS ARBITRATION
JAMS Reference
No.1425034873

Gary Greenberg, Art Fund III LLC, Colorado Art Holdings LLC,
GB Fund LLC, Loans On Fine Art LLC, and Lotus Investment Corp.,
Claimants
v.
Ian S. Peck, ACG Arrangement Services LLC, Art Capital Bermuda,
LTD.,
AGC Capital Company, LLC, Modern Art Services, LLC, Patriot Credit
Company LLC, and Pegasus Credit Company LLC
Respondents

## Decision On Damages

On July 1, 2022, I granted Claimant's Motion pursuant to JAMS Rule 18 establishing that Respondents had breached the Settlement Agreement and that Claimants were entitled to judgment on their claims:

> I find that there is no issue of material fact concerning Claimants' right to judgment on their claims for breach of the Settlement Agreement and find that Respondents breached the Settlement Agreement in at least the following ways: Respondents did not present the painting for evaluation by the date specified in the

1

> Settlement Agreement; Respondents did not consign the work for auction by the date specified in the Settlement Agreement; Respondents' representations that they owned or controlled or had a right thereto were false. Decision at page 9.

Having ruled that Respondents were liable for breach of contract, the issue of how much damages was now ripe for decision.

Hearings were held on October 26 and 27 at which testimony was presented from the following witnesses: the Claimant, Mr. Greenberg, the Respondent, Mr. Peck, Claimant's expert witness, Dr. Timothy Hunter and Respondent's expert witness, Dr. Robert Simon. Various documents were received in evidence. Following the hearings, the parties submitted post-hearing briefs on the damages' issues.

Before proceeding to a discussion of the evidence relating to damages it is worthwhile, to recall the background to the Settlement Agreement which was the contract at issue in this arbitration. Prior to entering into the Settlement Agreement, the parties had been involved in factoring operations concerning the financing of art works. Disputes arose and rather than litigating, the parties entered into the Settlement Agreement. The amounts in dispute have not been disclosed to the arbitrator although those amounts have been described as involving millions of dollars. The parties determined that the consideration for settling would be a painting by the Italian Renaissance artist Andrea del Sarto. The Settlement Agreement contains the following description under the heading "Payment":

2

*Artist:Andrea DEL SARTO (1486 - l53P Title: Ottaviano de 'Medici Medium: oil on canvas I Size: 80 x 63 cm; 31.~ x 24.75 inches Date: ca. 152.* Settlement Agreement at section 1 (a).

In the Settlement Agreement Respondents made the following representation: "The Work is an authentic work of art by Andrea Del Sarto, as described above in Section l(a)." Settlement Agreement section 6(e).

The measure of damages for breach of contract is universally recognized to be the value of the benefit of the bargain. Here, Claimant was entitled to a portion of the proceeds of a sale of the painting. Since, for the reasons stated in the decision on liability, it was not possible for Respondents to carry through with a sale, the beginning of the computation of damages is an estimation of the market value of the work of art on the date of the breach.[1] *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 825 (2d Cir. 1990) "[W]here the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages."

As the starting point, the task for the arbitrator is to determine the market value. In carrying out that task a few preliminary observations are useful. First, it is at best ironic, that having agreed that the painting would be the consideration for settling the outstanding disputes, Respondents now seek to denigrate the value by arguing that the painting is in poor condition, that there is no proof that the painting is authentic and that the identification of the sitter is not proven. But they represented that the work was authentic in good condition and that the sitter was Ottaviano de Medici. Those representations are binding. The Respondents provided documents attesting to the good condition of the

---

[1] Claimants argue that under the Settlement Agreement, if there were no sale, they were entitled to receive the unencumbered title to the painting. They argue that the measure of damages should be the full value of the painting on the date of the breach. However, the parties' clear intent was that they would share in the proceeds of the sale. Awarding Claimants the full value of the painting as found by me below would constitute a substantial windfall in contravention of the expressed intent. Therefore, as discussed more fully below the best method for implementing the intentions of the parties is to use the formula they devised for sharing in the proceeds of a sale.

3

painting. One states very plainly that the painting is in fine and stable condition." (Oct. 26, 2022 Tr. 20:9-21:5 (citing Ex. 17 at 23).) In other words, the condition report that Respondents themselves provided "basically . . . says it's in good condition." (Oct. 26, 2022 Tr. 21:18-19.)[2] As to value, Respondents at various times hyped the value of the painting when it was in their interest to do so. For example, after consulting with Nicholas Hall (an art expert), Peck admitted in the preliminary injunction hearing that the painting was worth $10-15 million. (Oct. 26, 2022 Tr. 233:25-234:13.) and told Greenberg that it could be sold for upwards of $25 million. Moreover, the Settlement Agreement contained a so-called waterfall provision that divided the proceeds from a sale between Greenberg and Peck according to an agreed formula that topped out at $30 million. Settlement Agreement section 1(e) provided: that Greenberg would receive the first $4.150 million after deduction of sales expenses and that ACG would receive the next $1.85 million. Proceeds above $6 million were then divided between Greenberg and ACG according to a specified formula up to $30 million. Therefore, as a starting point in considering the expert's opinion on value, I find that the assumptions as to condition and authenticity relied upon by Dr. Hunter are appropriate based on the representations and admissions made by Respondents.[3]

Claimants' proof of damages was based primarily on the report and testimony of Dr. Timothy Hunter. There is no question that by education and professional experience, Dr. Hunter is well qualified to opine on the market value of an Italian Renaissance painting. In making his valuation, Dr. Hunter used typical valuation techniques involving sales or works of art he viewed as reasonable comparable sales. He testified at length as to why the works he selected as comparable were appropriate. See, October

---

[2] A further report on condition authored by Anne Francis Moore (Ex 3) also opined that the work was "structurally stable and in excellent Condition"

[3] Respondents also attack Dr. Hunter's report and testimony on the grounds that he did not view the painting. But the reason he could not view the painting was because Respondents were not in the position to provide access since contrary to their representations they neither owned it nor had access to it.

26, 2022 Tr 32:18-25 and 35:5-51:15. It is not unusual in undertaking a comparable sales analysis to have to rely on works of other artists at different value ranges. These sorts of expert valuations are by definition not an exact science but depend on the knowledge and judgement of a qualified expert. I find that Respondents' criticism of the choice of comparable sales is not valid.

Further, as noted above, Dr. Hunter properly assumed that the work was in good condition and that the work was as described in the Settlement Agreement to be authentic and to be a portrait as represented of Ottiviano de Medci. Respondents may not avoid these representations to attack Dr. Hunter's valuation. In Process Am. Inc. v. Cynergy Holdings LLC, 839 F.3d 125, 141 (2nd Cir. 2016), the court explained the respective burdens for proving damages stating; " Doubts are generally resolved against the party in breach. Therefore, a plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as the result of the breach. At that point the burden of uncertainty as to the amount is on the breaching party."

The principal attack by Respondents on Dr. Hunter's expert opinion is his failure to take into account and disclose as purportedly required by industry valuation standards a prior valuation of the painting done by the Winston Group.

In 2019, one of the principals in the Winston Art Group, Geza von Habsburg, performed a valuation of the painting in issue. That evaluation stated that the painting was valued at $1.5 million. In his report in this arbitration, Dr. Hunter stated that: "the appraiser's analyses opinions and conclusions were developed, and this report has been prepared, in conformity with the 2020-2021 Uniform Standards of Professional Appraisal Practice" (Hunter Appraisal Report at 3.) Dr. Hunter further stated that "the appraiser has not performed services as an appraiser within the three-year period immediately preceding acceptance of this assignment." Id. Dr. Hunter candidly admitted that his assertion that there had been no prior appraisal of the work within the past three

5

years was erroneous. It further appears that the conflicts check undertaken by the Winston Group in connection with accepting the assignment for Dr. Hunter was faulty in failing to discover the prior appraisal.

The 2019 appraisal states: "the Old Masters specialist, Tim Hunter, provided significant personal property appraisal assistance by assisting with the research and valuation for the property that is subject in this report." Id. at 4.

Respondents argue that the failure to acknowledge the 2019 Appraisal done by Winston and the false certification require that I preclude the 2020 Appraisal. They further argue that purposely hiding the prior appraisal was part of an attempted fraud to bamboozle the Arbitrator and the Respondents.

Dr. Hunter testified that he did not recall having worked on the 2019 Appraisal. He stated that he had done 105 valuations for Winston during the two-year period some of those involving multiple works so that he had appraised many works over that period perhaps amounting to 1000. October 26 Tr. 51:21-53:5; 53:20-54:6. He further testified that when recently told about the 2019 Appraisal he recalled only having one or two short phone conversations with Geza von Hapsburg. He testified that he did not do any research or writing, did not review the final draft, did not provide an opinion, was not told the amount of the valuation and was not sent a copy.

Respondents' assertion that the 2019 Appraisal was hidden as part of a fraud makes no sense. Fraud needs a victim. Here, nobody was fooled. The Respondents were provided with a copy of the 2019 Appraisal as was the Arbitrator.[4] Dr. Hunter was cross examined at length about the

---

[4] On several occasions, Respondents requested that I issue a subpoena for the testimony of Geza von Hapsburg and his wife. These requests were denied. On August 24, 2020, Pre-Hearing Order 6 as Amended stated: "Respondents' request that a subpoena be issued for the testimony of Elizabth von Habsburg, a managing director of the Winston Art Group, at the damages

6

2019 Appraisal, including why it differed from his 2020 Appraisal and why he failed to disclose the prior appraisal in his report as required by the industry standards. See, supra.

Respondents accuse Dr. Hunter of lying and being complicit in the fraud that was attempted against the Respondents and the arbitrator. Their arguments on why his explanations are not credible are not convincing. Dr. Hunter has an extraordinary background in fine art. He has taught at Oxford, where he obtained a first-class degree and a Ph.D. He has been a director of Christies where, among other responsibilities, was senior director for Old Masters. I observed Dr. Hunter's testimony and found that he was a compelling witness. He showed no signs that his testimony was not credible. It is unconceivable that he would lie under oath to be complicit in a fraud on an arbitral tribunal.[5] His valuation of $15 million is in the range of the values put forward by Mr. Peck. See supra.

The 2019 Appraisal's conclusions are not pertinent to reaching a determination of the value for assessing damages for breach of the Settlement Agreement. First, that appraisal was done for the purposes of establishing value for loan collateral. The testimony showed that such a valuation will be very conservative. Next, the value for damages must be

---

hearing was denied. Respondents' offer of proof for the proposed testimony showed that it was duplicative of other testimony to be adduced at the hearing, would unduly prolong the hearing and would be sufficiently covered by cross examination of Claimants' expert, Dr. Timothy Hunter." At the close of the October Hearing, Respondents' requested that I adjourn the hearing and issue a subpoena for testimony from the von Hapsburgs. By this time, of course, the 2019 Appraisal had been submitted in evidence and Dr, Hunter had been examined at length about that appraisal, how and why it conflicted with his 2020 appraisal and the reasons for which it had not been disclosed earlier in the arbitration procedure. The request for the testimony of the Hapsburgs was again denied. The facts concerning the 2019 appraisal were fully explored and there was and is no reason to seek duplicative testimony which would as noted back in August, unduly extended the hearing.

[5] The hyperbolic attacks on Dr. Hunter launched by Respondents are ill becoming from a party where the record includes so many examples of outright lies being told to their counterparty. The record is replete with emails from the Respondents attesting to the ownership of the painting knowing full well that they did not own the painting. Over and over they assured Mr. Greenberg that he or his designee could view the painting when Mr. Peck knew that he did not have access to and could not obtain access to the painting.

determined on the date of the breach not two years earlier. Third, the 2019 Appraisal relies on assumptions which were properly not taken into consideration by Dr. Hunter, such as condition and authenticity because of the representations and admissions concerning those issues made by Respondents. It would be totally unfair to find that the painting was not in good condition when Respondents represented that it was and by lying about whether they owned or had access to the painting making it impossible for Dr. Hunter to examine the painting.

Respondents retained Dr. Robert Simon to be their expert. However, they did not ask Dr. Simon to value the painting.[6] Instead, his report and testimony was limited to criticizing a few aspects of Dr. Hunter's report on valuation. For example, Dr. Simon criticized Dr. Hunter for not viewing the painting. But as constantly emphasized in this decision, Dr. Hunter could not view the painting because Mr. Peck did not own it or have access to it as he had repeatedly affirmed to Mr. Greenberg that he did. However, it is useful to recall what Dr. Simon testified to regarding the overall work done by Dr. Hunter: "Dr. Hunter's appraisal was properly prepared." "He prepared a fine appraisal." October 27, 2021, Tr. 57:23-24; 58:3-4.

Respondents point to the eventual sale of the painting by Sotheby's for $2.198 million to argue that the value is orders of magnitude less that Dr. Hunter's $15 million valuation. However, the Sotheby's sale does not provide a good valuation benchmark because it was carried out when Respondents had a lawsuit pending against the seller claiming that they had a claim on the painting. It is undisputed that Sotheby's was duty bound to disclose the existence of that lawsuit to potential bidders. Dr. Hunter testified to the obvious: the pendency of a lawsuit putting in question the ability of the seller to convey title would have a disastrous impact on the sale. October 26 Tr. 78:5-13.

---

[6] It is curious that Dr. Simon, who is clearly qualified to give such an opinion and had seen the work at issue was not asked for a valuation opinion. Speculating why is not useful.

To recapitulate, the record contains the following possible valuations of the painting:
1. Dr. Hunter's valuation of $15 million;
2. Mr. Peck's testimony that the painting could be worth $10-15 million or sell for up to $25 million, see, supra.
3. The waterfall provision which posited possible values up to $30 million.
4. The 2019 Winston Group valuation of $1.5 million.
5. The Sotheby's sale at $2.198 million.

As already discussed, the 2019 Winston Group valuation was done for the purpose of establishing loan value not for establishing a sales price and was done based on the then condition of the painting. Dr. Hunter properly and mandatorily assumed that the condition of the painting was as represented by Respondents. Similarly, the Sotheby's sale does not provide a good basis for establishing expectation damages because clear title to the painting was under attack in a lawsuit.

Dr. Hunter's valuation of $15 million appears to be the most accurate estimate of value.[7] It falls within the range of values testified to by Mr. Peck[8] and is within the possible waterfall distribution amounts.

Therefore, I find that there is a stable basis for deciding that the value of the painting is $15 million. The question remains, however, whether the amount of damages to be awarded should take into account the waterfall provision in the Agreement. Since the goal of awarding contract damages is to put the non-breaching party in the position it would have

---

[7] Dr. Hunter testified after being questioned about the 2019 Winston Group valuation which was, among other things, based on the view that the painting was not in good condition, that he might have to "temper" his view of valuation. However, he never was asked nor ever explained what he meant. It is argued that having now learned that in 2019 the painting was not in good condition contrary to his valuation assumptions, "tempered" meant that he would reduce his valuation. However, as discussed at length above, Dr. Hunter's assumptions about condition and authenticity were dictated by the representations made by the Respondent's in the Settlement Agreement. His reliance on these representations was appropriate. Respondents cannot seek an advantage based on their false representations.

[8] It bears repeating, that the painting was being used by Mr. Peck as the currency to settle substantial claims asserted by Mr. Greenberg arising out of their prior business relationships.

9

been in if the contract had not been breached, it is appropriate to assume that the painting would have been sold for $15 million and that it was the intent of the parties to the Settlement Agreement that they would share in those proceeds according to the formula found in Section 1(c) of the Settlement Agreement which sets forth the so-called waterfall. In implementing the formula, I find that no deduction should be made for "sales expenses." Applying the Section 1(c) formula for distributing the proceeds for a sale results in Claimants being entitled to a damage award of $5,273,150

Respondents have raised a number of other arguments to escape liability. First, they cite to section 6 of the Settlement Agreement which provides that "In the event any such representation is materially false, GB shall have the option to cancel this Agreement and pursue all legal claims against ACG in binding arbitration before JAMS under the arbitration provision set forth in Section 13 below." Based on this provision, Respondents argue that since Claimants asserted that there were materially false representations, they should have cancelled the Settlement Agreement and pursued the pre-existing claims. But that provision only provided an option to renew the claims that were being settled-it was not a mandatory requirement. Claimants chose to pursue claims under the Settlement Agreement which they had the perfect right to do.

Respondents did not pay their share of the arbitration fees. In order to proceed with the arbitration, the Respondents' share of JAMS fees were advanced by Claimants who seek to be reimbursed as part of the award. Respondents argue that they are not responsible because Claimants could have terminated the arbitration for failure of the Respondents to pay their share of the fees, citing Section 13 of the Settlement Agreement which provides:

> In such an arbitration, if either party fails to pay its invoiced arbitration fees by the thirty-day due date for such payment, the other party <u>may</u> provide notice that if payment is not made by the other party within fifteen days of such notice,

10

> that the notifying party shall exercise its option to terminate the arbitration and to pursue the adjudication of the dispute in state or federal court (emphasis added.)

The operative word in this provision is "may", doing so was not mandatory. Pursuant to JAMS Rule 6(c) "If one Party advances the payment owed by a non-paying Party, the Arbitration shall proceed, and the Arbitrator may allocate the non-paying Party's share of such costs, in accordance with Rules 24(f) and 31(c). Therefore, in accordance with these rules, I award to Claimants the amounts of JAMS fees advanced on behalf of the Respondents.

Claimants seek attorneys' fees and costs related to the cost of defending against the counterclaims which were dismissed for lack of merit. The Settlement Agreement provides in Section 13:

> EACH PARTY SHALL BEAR THEIR OWN ATTORNEY'S FEES AND COSTS (FOR CLARITY THE ARBITRATION AWARD SHALL NOT AWARD ATTORNEY'S FEES OR COSTS TO THE PREVAILING PARTY).

This provision is consistent with the American Rule. Therefore, no attorney fees or costs other than the JAMS' fees advanced by Claimants because of the failure of Respondents to pay their share of the arbitration fees as required both by their agreement and by JAMS Rules, will be awarded.

I have considered all of the testimony and documentary evidence submitted by the Parties. To the extent that any argument advanced by either of the Parties has not been specifically addressed in this Decision, such arguments have been considered and are rejected.

Conclusion:

1. Based on all of the evidence, I conclude that that the value of the painting at issue is $15 million.
2. That to carry out the intent of the parties, it is to be assumed that the painting sold for $15 million and that the proceeds of the sale would be distributed in accordance with Section 1(c).
3. Implementing the profit-sharing formula of Section 1(c) results in a damage award to Claimants of $5,272,150.
4. Claimants are also awarded the amount of JAMS' fees paid in respect of the JAMS' fees which were advanced by Claimants because the fees were not paid by Respondents. Claimants are to document the amount of such fees by affidavit to be filed within seven days of this decision.
5. Respondents' arguments and defenses against the award of damages are found to be without merit and are dismissed.
6. The Final Award will entered promptly after the Arbitrator receives the affidavit referred to in 4 above.

Dated: New York, N.Y  
      February 20, 2023  

_____  
Kenneth M. Kramer, Arbitrator