*Execution Copy*

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), dated as of January 20, 2021 (the "Effective Date") is entered into by and between Gary Greenberg individually, Art Fund III LLC, a Colorado limited liability company, Colorado Art Holdings LLC, a Colorado limited liability company, GB Fund LLC, a Colorado limited liability company, Loans on Fine Art LLC, a Colorado limited liability company, and Lotus Investment Corp., a Colorado corporation (collectively, "GB" or the "GB Parties") on the one hand, and, on the other hand, Ian S. Peck individually, ACG Arrangement Services, LLC, a Delaware limited liability company, ACG Capital Company, LLC, a Delaware limited liability company, Modern Art Services, LLC, a Delaware limited liability company, Patriot Credit Company LLC, a Delaware limited liability company, and Pegasus Credit Company LLC, a Delaware limited liability company (collectively, "ACG" or the "ACG Parties"), both of which shall be collectively referred to as the "Parties" and individually as a "Party" where appropriate.

## WITNESSETH

**WHEREAS**, at various times over the past several years, the Parties have entered into various transactions relating to direct or indirect investments in works of fine art or in participations of loans;

**WHEREAS**, the Parties have disagreements with each other related to those investments; and

**WHEREAS**, while continuing to maintain their respective positions regarding such disagreements, the Parties have determined to settle their disputes rather than to bear the costs, risks, and distractions of potential litigation.

**NOW, THEREFORE**, for and in consideration of the foregoing premises, the mutual benefits and covenants hereunder and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. <u>Payment</u>:

    a. <u>Evaluation and Consignment of Work</u>.

        i. ACG will arrange evaluation of the below artwork (the "Work") by Christie's or a comparable firm (the "Auctioneer"), on or before February 12, 2021, which evaluation the Auctioneer will send directly to GB, followed by the entry of a consignment agreement with the Auctioneer on or before February 19, 2021, that requires the Work to be delivered to the Auctioneer and auctioned or sold by private sale on or before May 31, 2021, and that requires the Auctioneer to pay directly to GB all proceeds due to GB under this Agreement; provided, however, that the evaluation, consignment and auction dates are subject to scheduling changes by the Auctioneer and advice regarding the sale date



from the Auctioneer, or from Robert Simon or another comparable expert.

| | |
|---|---|
| Artist: | Andrea DEL SARTO (1486 – 1530) |
| Title: | *Ottaviano de'Medici* |
| Medium: | oil on canvas |
| Size: | 80 x 63 cm; 31.5 x 24.75 inches |
| Date: | ca. 1525 |

ii. GB has the right to terminate this Agreement, in its sole discretion, if the Auctioneer provides a low-end estimate for the Work that is less than $4 million, unless the Auctioneer obtains a minimum guarantee for the work equal to or greater than $4 million. Such right shall be waived unless it is exercised in writing by GB within seven (7) calendar days of GB's receipt of notice of such low-end estimate by the Auctioneer. If GB terminates this Agreement in these circumstances, the Parties agree to adjudicate their respective claims in binding arbitration before JAMS under the arbitration provision set forth in Section 13 below.

iii. At ACG's election, ACG shall have the right to pay GB the sum of $3.6 million at any time within sixty days of the execution of this Agreement or the day before the auction or sale of the Work under Paragraph 1(a) above, whichever is later so long as the date occurs before the day of the auction (the "Advance Payment"), which Advance Payment shall be in full satisfaction of all of ACG's payment obligations under this Agreement.

b. Upon execution of this Agreement, GB will introduce ACG to the Christie's representative who has been communicating with GB about the Work. ACG will then be the exclusive point of contact with Christie's with respect to communications that are necessary for ACG to perform its obligations under this Agreement. Neither GB nor any of GB's investors will contact Christie's or any other sales agent directly or indirectly, or attempt to interfere in any way with the sales or marketing of the Work. However, ACG will ensure that GB is apprised in writing of all material developments and communications between ACG and Christie's regarding the Work. In the event that GB requires clarification of any major decision concerning the timing of an auction, or other matters that materially affect GB's rights under this Agreement, GB's counsel may contact ACG's counsel and obtain representations and any appropriate documentation sufficient to respond to GB's concerns. If, after first obtaining such disclosures from ACG's counsel, GB requires further clarification, GB's counsel may participate in joint communications with Christie's along with ACG's counsel.

c. GB shall receive payment from the sale of the Work at sale or auction calculated as follows:

i. First, at any price level, each and every dollar collected from the Sales Price shall be applied to pay sales expenses ("Sales Expenses"),



      calculated at ten percent of gross Sales Price, which shall be payable to ACG;

  ii. Second, after Sales Expenses, first $4.150 million of sales proceeds is payable to GB, paid directly by the Auctioneer;

  iii. Third, sales proceeds up to $6 million (plus Sales Expenses) shall be paid to ACG;

  iv. Fourth, any amount in excess of $6 million plus Sales Expenses ($6.6 million), GB shall receive the following amounts, as set forth in the accompanying spreadsheet in Exhibit B, with the remainder to ACG:

      1. $6.0 million plus Sales Expenses to $9.99 million plus Sales Expenses: $150,000 + 30% of net profits, after deduction of 25% owed to third party.

      2. $10 million plus Sales Expenses to $14.99 million plus Sales Expenses: 22% of net profits, after deduction of 25% owed to third party.

      3. $15 million plus Sales Expenses to $19.99 million plus Sales Expenses: 11% of net profits, after deduction of 25% owed to third party.

      4. $20 million plus Sales Expenses to $29.99 million plus Sales Expenses: 5% of net profits, after deduction of 25% owed to third party.

      5. $30 million plus Sales Expenses and up: No additional payment beyond above profit sharing.

d. If the Work is not purchased at Auction, then ACG and the Auctioneer will agree to offer the Work at a public or private sale within six months or less, unless the Auctioneer recommends otherwise.

e. If the Work remains unsold after being offered at a second auction or private sale, GB has the right to permit further sales efforts or to receive full, unencumbered title to the Work, as consideration under this Agreement, which shall be deemed to have a valuation of $2 million by virtue of such prior history.

    f. Any Payment due to GB under this Agreement shall be made in U.S. Dollars and by wire transfer of immediately available funds to the account reflected in Exhibit A.

    2. <u>Releases</u>: In exchange for and in consideration of the promises, covenants and agreements set forth herein, upon execution of this Agreement, GB, on the one hand, and ACG,



on the other, as to themselves and, as applicable, for and on behalf of their respective present, former, and future parent entities, subsidiaries, divisions, and affiliates, their respective officers, directors, employees, agents, investors, subrogees and insurers, and their respective successors, predecessors, assigns, heirs, executors, administrators, attorneys, servants, agents and representatives, hereby and forever release, acquit, and discharge one another and, as applicable, their respective present, former, and future parent entities, subsidiaries, divisions, and affiliates, their respective officers, directors, employees, agents, subrogees and insurers, and their respective successors, predecessors, assigns, heirs, executors, administrators, attorneys, servants, agents and representatives, from any and all claims, causes of action, debts, suits, rights of action, dues, sums of money, accounts, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, variances, executions, demands or obligations of any kind or nature whatsoever, matured or unmatured, liquidated or unliquidated, absolute or contingent, known or unknown, suspected or unsuspected, arising out of, or relating to the agreements or investments in which GB has a direct or indirect interest from the beginning of the world to the Effective Date of this Agreement (the "Released Claims"); ***provided***, however, that nothing in this Agreement shall act to release any rights created by this Agreement or claims arising from any violation of this Agreement. Each of GB and ACG represents and warrants to each other that it has not assigned or otherwise transferred any right or interest in or to any of the Released Claims.

       3.      <u>Release as Defense</u>. Each Party acknowledges and intends that this Agreement shall be effective as a bar to each and every one of the Released Claims and further agrees that, in the event any Party, as applicable, should bring a Released Claim, this Agreement shall serve as a complete and absolute defense to such claim. This Agreement shall in all respects bind the successors and assigns of each Party.

       4.      <u>Ownership of Claims</u>. Each Party expressly warrants, represents, and covenants, for the benefit of the other Party, that such Party is the legal and equitable owner and holder of its Released Claims, and it has never assigned, transferred or granted any rights or interests in, any such claims to any person or entity.

       5.      <u>Releases by GB's Investors</u>. GB will obtain general releases from its investors in the transactions that are the subject of this Agreement. Such releases shall be held by ACG's counsel, and will be deemed attorney's eyes only and therefore will not be shown to ACG or any third party, except in the case of any claim or conduct by the investors within the scope of a release, in which case the applicable release may be disclosed to ACG with five business days' advance notice to GB. The releases will release all claims the investors may have regarding the transactions, including any and all claims against ACG, its affiliates and personnel. GB will indemnify ACG in the event that any GB investor brings any released claim against ACG, its affiliates or personnel.

       6.      <u>Representations by ACG.</u> ACG represents the following facts to be true:

          a.  ACG has the right to consign the work to the Auctioneer for sale consistent with the terms of this Agreement and the right to perform all obligations set forth in this Agreement.



4

    b. ACG has the right to pay to GB the proceeds of the sale of the Work consistent with the terms of this Agreement.

    c. To the knowledge of ACG, the work is not subject to any claims or rights, either potential, threatened, or pending, that could prevent ACG from performing the terms of this Agreement or that could result in a clawback of any proceeds paid to GB under the terms of this Agreement.

    d. ACG is authorized to enter into this Agreement and, to ACG's knowledge, by entering into this Agreement ACG is not in violation of any contracts, agreements, rights, or other obligations that it may have to any other party.

    e. The Work is an authentic work of art by Andrea Del Sarto, as described above in Section 1(a).

In the event any such representation is materially false, GB shall have the option to cancel this Agreement and pursue all legal claims against ACG in binding arbitration before JAMS under the arbitration provision set forth in Section 13 below.

7. <u>Representations by GB</u>. GB representations the following facts to be true:

    a. GB has not filed any lawsuits against ACG.

    b. GB has not made any complaints about ACG to any criminal or regulatory authorities.

    c. GB has not responded or cooperated with any investigation of ACG by any criminal or regulatory authority, or by any other claimant.

    d. GB has not instigated any other party to bring claims against ACG, or to make any complaints about ACG to any criminal or regulatory authority.

    e. GB has not shared facts or conclusions regarding its transactions with ACG with any other person, except as was necessary for GB to confidentially and discretely ask questions of witnesses with knowledge of the facts to investigate the circumstances that gave rise to this dispute.

In the event that any representation in subsections a-d above is false, or any representation in subsection e above is materially false, GB shall not be entitled to, and shall remit, any payment received pursuant to this agreement.

8. <u>Force Majeure</u>. Neither party will be responsible for any failure or delay in its performance under this Agreement due to causes beyond its reasonable control, including, but not limited to, labor disputes, strikes, lockouts, shortages of or inability to obtain labor, energy, raw materials or supplies, war, acts of terror, riot, acts of God, or governmental action. The parties are not currently aware of any facts or circumstances that would constitute a force majeure.

5



9. <u>No Admission</u>. This Agreement is not intended to be and shall not be construed as an admission by any Party of any liability by such Party.

10. <u>Confidentiality</u>. Each of the Parties agrees that, from and after the Effective Date, neither it, nor its attorneys, shall: (a) divulge to any person or entity the allegations or any of the claims giving rise to this Agreement, fact of or the terms and conditions of this Agreement, any payments made pursuant to this Agreement and/or the negotiations relating thereto; or (b) make any public statements concerning, or otherwise publicize, the Released Claims that are the subject matter hereof or have any discussions of such matters with any person or entity. Notwithstanding the foregoing, nothing herein shall prohibit any Party from making disclosures: (i) to such Party's attorneys, employees, officers, directors, auditors, accountants, tax advisors, financial sources and/or financial advisors; provided it is necessary and such persons agree to keep said information confidential and not disclose it to others except as required by law or regulatory inquiry; (ii) as may be necessary for purposes of tax or other reporting required by law and/or any regulatory inquiry; (iii) in response to court order, administrative order, subpoena or other legal process or otherwise as required by law; (iv) in connection with an action or proceeding to enforce this Agreement; and/or (v) with the express written permission of the other Party. In the event that a Party concludes that it must make disclosure pursuant to subsection (iii) of this Section 10, then, except as prohibited by law, that Party shall, as soon as reasonably practicable after reaching that conclusion and in any event at least five Business Days before making such disclosure, provide written notification to the other Party that such disclosure has been requested. Moreover, to the extent that a Party believes that disclosure of this Agreement is necessary pursuant to subsection (iii) and (iv) of this Section 10, the disclosing Party shall take reasonable steps, including, if reasonable, seeking appropriate protective and/or sealing orders, to maintain the confidentiality, and avoid public disclosure, of this Agreement. The Parties agree that irreparable damage would occur if this Section 10 of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, including seeking an injunction to enforce this Section 10, in addition to any other remedy to which they are entitled at law or in equity.

11. <u>Non-Disparagement</u>: Each Party agrees and represents that, from and after the Effective Date, it will not make or issue, or cause to be made or issued, either directly or indirectly, any communication to any third party that disparages, criticizes or otherwise reflects adversely or encourages any adverse action against the other Party related to the transactions that are the subject of this Agreement. This provision shall not be construed as limiting either Party's obligation to testify truthfully under oath pursuant to a valid subpoena or court order, or from communicating with their attorneys. For the avoidance of doubt, neither ACG nor GB shall issue any press release or other public statement related to this Agreement (or the fact that the Parties entered into the Agreement). If asked about any matters covered by this Agreement, the Parties shall respond only that "the matter has been resolved."

12. <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of New York (other than its rules of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby).



13. <u>Dispute Resolution</u>. THE EXCLUSIVE FORUM FOR RESOLUTION OF DISPUTES OR CAUSES OF ACTION UNDER OR DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT SHALL BE CONFIDENTIAL ARBITRATION BEFORE A SINGLE ARBITRATOR SELECTED THROUGH AND UNDER THE RULES OF JAMS IN NEW YORK COUNTY, NEW YORK. THE PARTIES SHALL SHARE EQUALLY IN THE COSTS OF SUCH ARBITRATION AND EACH PARTY SHALL BEAR THEIR OWN ATTORNEY'S FEES AND COSTS (FOR CLARITY, THE ARBITRATION AWARD SHALL NOT AWARD ATTORNEY'S FEES OR COSTS TO THE PREVAILING PARTY). EACH PARTY CONSENTS TO PERSONAL JURISDICTION IN AND EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS SITTING IN NEW YORK COUNTY, NEW YORK TO ENFORCE ARBITRATION AND RECEIVE ANCILLARY RELIEF RELATING THERETO, INCLDUING WITHOUT LIMITATION TEMPORARY, PRELIMINARY, OR PERMANENT INJUNCTIVE RELIEF RELATING THERETO. THIS PROVISION SHALL BE DEEMED TO BE A PART OF AND CONDITION TO THE SUBSTANTIVE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER AND SHALL BE APPLIED TO ANY LEGAL ACTION BROUGHT BY ANY PERSON AGAINST A PARTY UNDER OR DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT. In such an arbitration, if either party fails to pay its invoiced arbitration fees by the thirty-day due date for such payment, the other party may provide notice that if payment is not made by the other party within fifteen days of such notice, that the notifying party shall exercise its option to terminate the arbitration and to pursue the adjudication of the dispute in state or federal court.

14. <u>Waiver of Jury Trial</u>. THE PARTIES HEREBY VOLUNTARILY AND OF THEIR OWN FREE WILL WAIVE THE RIGHT TO TRIAL BY JURY IN ANY CIVIL ACTION ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY CLOSING DELIVERABLE.

15. <u>Certification Regarding Documents.</u>

a. Upon ACG's full payment to GB due under this Agreement, ACG will certify that it has destroyed any dossiers, notes, files, communications, emails and recordings between ACG and GB from inception of the relationship, except any documents ACG might be required to retain by any regulatory agency, such as tax authorities, and that counsel may be required to retain under the ethical rules governing lawyers' retention of documents. All documents and materials that may remain in the possession of ACG's attorneys' or any third party will be designated confidential settlement material that may not be used for litigation or any other purpose except archival purposes.

b. Upon ACG's full payment to GB due under this Agreement, GB will certify that GB and its investors have destroyed any dossiers, notes, files, communications, emails, and recordings relating to interactions between ACG and GB from inception of the relationship, except any documents GB might be required to retain by any regulatory agency, such as tax authorities, and that counsel may be required to retain under the ethical rules governing lawyers' retention of documents. All documents and materials that may remain in the possession of GB's attorneys' or any third party will be designated confidential settlement material that may not be used for litigation or any other purpose except archival purposes.



   c. The Parties are not aware of any laws or court orders that would prevent the destruction of the above information. If the destruction of any information would violate any laws or court orders, however, then the Parties are not required to destroy any information that would result in a violation of law or court order, and the enforceability of this Agreement shall not be impacted if these circumstances arise for reasons out of the Parties' control.

  16. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior agreements and understandings, both written and oral, of the Parties regarding the subject matter hereof and thereof.

  17. <u>No Third Party Beneficiaries</u>. This Agreement shall be binding upon and inure solely to the benefit of the Parties hereto (and any beneficiaries of the releases in Section 2) and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other individual, corporation, partnership, limited liability company, trust, unincorporated association, governmental authority or other entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

  18. <u>Amendment</u>. No provision of this Agreement may be amended or modified except by an instrument or instruments in writing signed by the Parties.

  19. <u>Captions</u>. The captions used in this Agreement are intended for convenience of reference only, shall not constitute any part of this Agreement and shall not modify or affect in any manner the meaning or interpretation of any of the provisions of this Agreement.

  20. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. This Agreement may be executed and delivered via facsimile, electronic mail or PDF by the Parties hereto, which shall be deemed for all purposes as an original.

  21. <u>Severability</u>. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or illegal, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

  22. <u>Non-Assignment</u>. The parties may not assign any rights or obligations under this Agreement without the written consent of all other parties, which may be denied in their sole discretion.



GREENBERG_000008

IN WITNESS WHEREOF, the Parties hereto have executed and delivered, or caused the execution and delivery of, this Agreement as of the date first written above.

Gary Greenberg

By: *[signature]*
Name: Gary Greenberg

Art Fund III LLC

By: *[signature]*
Name: Gary Greenberg
Title: Sole Managing Member

Colorado Art Holdings LLC

By: *[signature]*
Name: Gary Greenberg
Title: Sole Managing Member

GB Fund LLC

By: *[signature]*
Name: Gary Greenberg
Title: Sole Managing Member

Loans on Fine Art LLC

By: *[signature]*
Name: Gary Greenberg
Title: Sole Managing Member

Lotus Investment Corp.

By: *[signature]*
Name: Gary Greenberg
Title: Sole Shareholder

GREENBERG_000009

Ian Peck

By: _____
Title:

ACG Capital Company, LLC

By: _____
Name:
Title:

Modern Art Services, LLC

By: _____
Name:
Title:

Patriot Credit Company LLC

By: _____
Name:
Title:

Pegasus Credit Company LLC

By: _____
Name:
Title:

10

GREENBERG_000010

Ian Peck

By: _____

Title:

ACG Capital Company, LLC

By: _____
Name: Ian Peck
Title: Member

Modern Art Services, LLC

By: _____
Name: Ian Peck
Title: Member

Patriot Credit Company LLC

By: _____
Name: Ian Peck
Title: Member

Pegasus Credit Company LLC

By: _____
Name: Ian Peck
Title: Member

10

GREENBERG_000011