JAMS ARBITRATION

- - - - - - - - - - - - - x

GARY GREENBERG, et          :

al,                         :

       Claimants,          :    JAMS Reference No.

    v.                      :    1425034873

IAN S. PECK, et al.,        :

       Respondents.        :

- - - - - - - - - - - - - x


Taken Before:

Arbitrator Kenneth Kramer

New York, New York

Wednesday, October 26, 2022

9:59 a.m.


Job No.:  6251236

Pages:  1 - 253

Arbitration
October 26, 2022

**Page 2**

1    Reported By:  Leonora L. Walker, Court Reporter
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1        Proceeding held at the offices of:
2
3
4        JAMS
5        620 8th Avenue
6        New York, New York 10018
7
8
9
10
11        Pursuant to notice, before Leonora L. Walker,
12    Court Reporter, Notary Public in and for the State
13    of New York.
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1            A P P E A R A N C E S
2    ON BEHALF OF CLAIMANTS:
3        LUKE NIKAS, ESQUIRE
4        PAUL MASLO, ESQUIRE
5        QUINN EMANUEL
6        51 Madison Avenue, 22nd Floor
7        New York, New York  10010
8        212.849.7000
9
10    ON BEHALF OF RESPONDENTS:
11        MATTHEW PRESS, ESQUIRE
12        PRESS KORAL LLP
13        641 Lexington Avenue, 13th Floor
14        New York, New York  10022
15        212.922.1111
16
17
18    ALSO PRESENT:
19    Dr. Timothy Hunter
20    Dr. Robert Simon
21    Ian Peck
22
23
24
25

**Page 5**

1            C O N T E N T S
2    EXAMINATION        WITNESS            PAGE
3    DIRECT:
4    By Mr. Nikas        Dr. Timothy Hunter    7
5                Gary Greenberg        160
6                Ian Peck            219
7
8    CROSS:
9    By Mr. Press        Dr. Timothy Hunter    90
10                Gary Greenberg        191
11
12    RE-DIRECT:
13    By Mr. Nikas        Dr. Timothy Hunter    152
14                Gary Greenberg        216
15    RE-CROSS
16    By Mr. Press        Dr. Timothy Hunter    158
17            E X H I B I T S
18    EXHIBITS ADMITTED                PAGE
19    Exhibit No. 1 - Settlement Agreement    200
20    Exhibit No. 2 - Appraisal            70
21    Exhibit No. 3 - Moore Report        70
22    Exhibit No. 4 - General Lot Information    80
23    Exhibit No. 5 - Sotheby's Page Long Version  83
24    Exhibit No. 17- Dr. Hunter's Report    66
25    (Exhibits Retained.)

Arbitration
October 26, 2022

Page 6

1         P R O C E E D I N G S
2   T I M O T H Y   H U N T E R, called as the witness,
3   having been duly sworn by a Notary Public, was
4   questioned and testified as follows:
5         ARBITRATOR KRAMER:  State your full name
6   for the record, please?
7         THE WITNESS:  Yes.  My name is Timothy
8   John Hunter.
9         MR. PRESS:  Before we proceed, I need to
10  put something on the record.  This is Matthew
11  Press, on behalf of the respondents.
12        During the course of discovery in this
13  matter, as you may recall, the respondents learned
14  of the prior expert report that had been prepared
15  by Winston Art Group of the same painting at issue
16  in this procedure.  And we made requests for some
17  discovery concerning the -- first of all, from --
18  testimony from Geza von Habsburg, who is the
19  author of that report, and also from Elizabeth von
20  Habsburg, who I believe is the wife of Geza, who
21  participated in Mr. Hunter's -- Dr. Hunter's
22  report, and also discovery concerning how it is
23  that the prior report wasn't disclosed in
24  Dr. Hunter's report.  And we asked for discovery
25  concerning that, and you denied the request.

Page 7

1         We also requested that those two
2   individuals be brought in as witnesses in this
3   hearing so that we can find out, first of all, to
4   discuss the prior expert evaluation by Mr. Geza
5   von Habsburg and to understand how that report was
6   not acknowledged.
7         And so at this time, I am requesting that
8   this proceeding either be adjourned so that
9   discovery may be obtained or that the hearing
10  remain open and that the discovery that was
11  requested be provided and that we have the
12  opportunity to hear the testimony of those two
13  witnesses.
14        ARBITRATOR KRAMER:  I've denied those
15  requests before.  I did so in writing in
16  connection with the -- I forget which number it
17  was.  And I will deny them again.
18        MR. PRESS:  Okay.
19        ARBITRATOR KRAMER:  I'll just say one
20  thing, you have been arguing for a long time that
21  it was fraud committed in the report because it
22  wasn't disclosed.  Now, my understanding of fraud
23  is that -- one of the elements of fraud is
24  detrimental reliance.  I take it that I'm the
25  target of the fraud.  And since you have the

Page 8

1   report and you're going to be cross-examining
2   Dr. Hunter, I don't understand how the target of
3   the fraud has been misled, so let's just move on
4   from there.
5         MR. PRESS:  Okay.
6         MR. NIKAS:  Thank you, sir.  May I
7   proceed?
8         ARBITRATOR KRAMER:  Yes.
9          D I R E C T   E X A M I N A T I O N
10  BY MR. NIKAS:
11     Q  Good morning, Dr. Hunter.
12     A  Hi.
13     Q  Now, if you could tell us, please, your
14  educational background after you graduated with
15  high school.
16     A  Right.  Well, I went to Oxford University,
17  Moreland College, where I read modern history for
18  my B.A., which I got a first honors in 1988, and
19  then I stayed on to do postgraduate work.  First
20  of all, I did a diploma in the history of art
21  where I got a distinction, and that was my M.A.,
22  and then I stayed on to do my doctorate, DPhil we
23  call it in Oxford, or a PhD elsewhere, and that
24  was in medieval art and literature.
25     Q  And when did you receive your doctorate?

Page 9

1      A  In 1993, I think it was.
2      Q  And in the course of your studies, did you
3   study Old Master works and artists?
4      A  Yeah, well, my thesis was on medieval arts
5   and literature, many of the 12th and 13th Century,
6   so, yeah, early Old Master period.  But while I
7   was writing my doctorate, I got a job at the
8   Ashmolean Museum as the junior curator there, and
9   there was a great collection of Old Master there.
10  I was working in the department of western art.
11     Q  Let's move to your you post degree
12  professional career.
13     A  Sure.
14     Q  If you could, tell us what jobs you had
15  following receipt of your doctorate, including
16  some more detail on the one you just described,
17  and then walk us through to the present day of
18  your professional jobs.
19     A  Okay.  It's quite a lot.  Well, I started
20  as a lecturer and I taught undergraduates at
21  Oxford.  Then as I said, I got this job at the
22  Ashmolean Museum as a junior curator, and I worked
23  in the department of western art.  I did a number
24  of roles there that I was working particularly on
25  the picture collection and on the silver

Arbitration
October 26, 2022

Page 10

1    collection.
2          And then I -- I have been in Oxford a long
3    time at that point, so I decided to move to London
4    and I got a job at Christie's, in London.  And at
5    Christie's I had a long and very enjoyable career.
6    I was there for 16 years.  I did number of things.
7    I started in the valuation department where I
8    became the associate director and then director of
9    the firm.  I was a general valuer, providing
10   valuations for all sorts of things, sort of
11   different houses around the country.  And then
12   from the valuation department, I moved into the
13   picture department, and I was a director in the
14   Impressionist and Modern Department.  I became
15   head of 19th Century European January, and then
16   finally I moved into the Old Masters Department,
17   which is kind of where my natural inclination was,
18   and I became the senior director in the Old
19   Masters Department for several years.
20         Then in 2009, so after 16 years, I decided
21   to leave Christie's, and I got a job at a smaller
22   firm called Gurr Johns, that's G-u-r-r Johns,
23   which is an art advisory and a valuation firm, and
24   I was a director a board member there.  And I did
25   a lot work in there; in particular, in America I

Page 11

1    came over to New York and traveled around America
2    a lot.  We negotiated several pictures to major
3    museums here, and I did that until 2014.  When I
4    left Gurr Johns, I started my own art advisory
5    company, which I call Venator Fine Art.  And at
6    the same time I was also head hunted, if you like,
7    by a sitting firm in London who wanted to set up
8    an art financing division, a finance firm, called
9    Falcon Fine Art.  And I accepted that offer.  I
10   kept my own company going in the background, but I
11   was able to -- I became vice president of that
12   Falcon Fine Art.  And we provided art financing
13   for clients in the UK and around Europe.  And I
14   did that for about four years.  And eventually
15   they decided to sell that division, and I -- at
16   that point I left Falcon, and I just went back to
17   running my own business, and that's what I still
18   do today, I run Venator Fine Art.  And I have
19   numerous clients.  I do appraisals for them.  I
20   buy and sell works of art on behalf of clients.
21   And I act as a senior consultant for Winston Art
22   Group, who are based here in New York.
23     Q  While holding those positions, did you
24   appraise works of art throughout those many years?
25     A  I did, yes.

Page 12

1      Q  And did you appraise works of art by Old
2    Masters?
3      A  I did, yes.
4      Q  Could you estimate for us approximately
5    how many works by Old Masters you appraised across
6    that professional career?
7      A  Wow.  So I've been doing this now for
8    30 years.  And I started in the valuation
9    department at Christie's.  I've now valued
10   thousands of pictures over that time.
11     Q  In the course of your professional career,
12   have you bought and sold works on behalf of
13   clients that were painted by Old Masters?
14     A  Yes, I have.
15     Q  In the course of your professional career,
16   have you advised individuals with respect to art
17   financing when Old Masters works were going to be
18   used as the collateral for those finances?
19     A  Most definitely, yes.  And particularly
20   when I was at Falcon Fine Art, yes.
21     Q  In the last few years, can you estimate
22   how many works you've appraised?
23     A  Well, it's a huge number.  It's hard to be
24   precise.  I mean, I valued -- I think I calculated
25   that I've done -- just for Winston Art Group and I

Page 13

1    also act for other people, but just for Winston, I
2    have done around 170 appraisals, maybe pushing 200
3    now.  Many of those appraisals consist of multiple
4    pictures.  Some appraisals number hundreds of
5    pictures actually.  So it will be well over a
6    thousand pictures for just the Winston Art Group,
7    I should mention.
8      Q  Have you ever been hired as an expert
9    witness before?
10     A  Yes, I have.
11     Q  Have I ever hired you as an expert
12   witness?
13     A  You have never hired me until now, but I
14   have been hired by other lawyers, yes.
15     Q  Have you ever given testimony in a court
16   proceeding as an expert witness?
17     A  Yes, I have.
18     Q  Have any courts qualified you as an expert
19   witness to testify with respect to appraisal?
20     A  I don't quite understand that question.
21     Q  Sure.  Have you ever been accepted as an
22   expert in your profession to testify in a court
23   proceeding?
24     A  Oh, I see.  Yes, I have.
25     Q  Did you prepare an expert report in this

Arbitration
October 26, 2022

Page 14

1  case?
2      A  I did, yes.
3      Q  If you could please turn to that binder
4  you have in front of you, Exhibit 17.
5      A  Yes, I am there.
6      Q  If you could please turn to page 46.
7      A  Yes.
8      Q  On pages 46 and 47, this section appears
9  to be a CV of yours; is that accurate?
10     A  Yes, it's accurate.  I mean, a couple -- I
11 probably have another publication to add and
12 another expert witness court case to add, but
13 otherwise it's accurate.
14     Q  Does this accurately and generally
15 describe your professional experience and
16 background?
17     A  In an abbreviated form, yes.
18        MR. NIKAS:  Mr. Kramer, I'd offer
19 Mr. Hunter as an expert witness to testify in this
20 case.
21        MR. PRESS:  No objection.
22        ARBITRATOR KRAMER:  Mr. Hunter is accepted
23 as an expert witness.
24 BY MR. NIKAS:
25     Q  Now, Dr. Hunter, if you can go back to

Page 15

1  first page of Exhibit 17, please.
2      A  Yes.
3      Q  Could you tell us generally what this
4  document is?
5      A  This is an appraisal, fair market value,
6  for litigation purposes, that I produced for the
7  matter at hand that we're here to discuss today.
8      Q  On the first page of this report, it lists
9  April 30th, May 1st, and October 31st, 2021.
10        Could you tell us what those dates mean,
11 please?
12     A  Yes.  Well, as part of the assignment
13 instructions, we were asked to provide a value for
14 the work of art on these three separate dates.
15 It's slightly unusual, but that's not uncommon.
16     Q  Now, what was the fair market value in
17 your opinion of the Andrea del Sarto work that's
18 the subject of this litigation?
19     A  Well, as you can see there on first page,
20 my valuation was $15 million.
21     Q  On page 6 of your report, Dr. Hunter, it
22 says that you made certain assumptions with
23 respect to that valuation; is that correct?
24     A  That is correct.
25     Q  Did you assume the work was authentic in

Page 16

1  connection with your valuation?
2      A  Yes, I did.
3      Q  Did you assume that the sitter, the man
4  whose portrait is portrayed in the del Sarto, was
5  correctly identified as part of this report?
6      A  Yes, I did.
7      Q  Did you assume that the del Sarto was in
8  good condition for its age?
9      A  Yes, I did.
10     Q  Are you aware that Dr. Robert Simon
11 criticizes your report for making these
12 assumptions?
13     A  Yes.  I've read Dr. Simon's report, and
14 I'm aware of that, yes.
15     Q  If you could please look at Exhibit 18 in
16 your binder.
17     A  Yes.
18     Q  This is identified as the report of Robert
19 Simon.  If you go to the third page -- they're not
20 numbered -- there is a title called authorship
21 attribution; do you see that?
22     A  I do see that.
23     Q  Now, this section says that you rely
24 solely on the letter supporting the attribution by
25 Dr. Sydney Freedberg; do you see that?

Page 17

1      A  I do see that.
2      Q  And the ultimate conclusion of this
3  section is that the work has not been fully
4  confirmed as a del Sarto.
5         Do you see that criticism?
6      A  Yes, I do.
7      Q  Could you tell us please why you assumed
8  as part of your report that the del Sarto you
9  valued was authentic or fully confirmed?
10     A  Well, that was an assumption that I was
11 asked to make when I prepared the report.
12     Q  Do you know the basis for that assumption?
13        MR. PRESS:  Objection.
14        ARBITRATOR KRAMER:  Pardon me?
15        MR. PRESS:  Objection.
16        ARBITRATOR KRAMER:  What is the issue of
17 the objection?
18        MR. PRESS:  He made an assumption.  Why
19 does he have to know the basis or argument?
20        ARBITRATOR KRAMER:  Overruled.
21        MR. PRESS:  Okay.
22        THE WITNESS:  Yes, it was explained to me
23 that the respondent had represented this was the
24 case in the settlement agreement that was entered
25 into in January of 2021.

Arbitration
October 26, 2022

1  BY MR. NIKAS:
2      Q  If you will look at Exhibit 1, please --
3      A  One?
4      Q  -- in your binder.
5      A  Yes, I'm here.
6      Q  Please go to the Section 6E.
7      A  6E, yes, I see it.
8      Q  Section 6E, the title of that,
9  representations by ACG -- that's the respondent --
10 ACG represents the following facts to be true.
11     "E" on the next page, the work is an
12 authentic work of art by Andrea del Sarto as
13 described above in Section 1A.
14     Do you see that?
15     A  I do see that.
16     Q  If you'll go to Section 1A, it's on the
17 second page, identifies the artist as Andrea
18 del Sarto?
19     A  Yes.
20     Q  The title of it is Ottaviano de' Medici --
21     A  Yes.
22     Q  -- the sitter?
23     Medium oil on canvas; identifies the size
24 and the date; do you see that?
25     A  I do see that.

1      Q  Is that the basis of the assumption you
2  were just referring to earlier?
3      A  Yes, that's correct.
4      Q  Okay.  Now, in Dr. Simon's report, he also
5  criticizes you for assuming the sitter is correct
6  or confirmed.
7      What was the basis for your assumption
8  that the sitter was identified properly or
9  correctly?
10     A  Well, again, I was asked to assume that as
11 part of my assignment.
12     Q  And were you told the basis for that
13 assumption?
14     A  Yes.  It was similar to the previous one.
15 It was represented by the respondent in the
16 settlement agreement.
17     Q  Okay.  Now, Dr. Simon also criticizes you
18 for assuming the condition of the painting was
19 good for its age and for not yourself personally
20 inspecting the painting.
21     Are you aware of that?
22     A  I am aware of that, yes.
23     Q  Now, why didn't you inspect the work in
24 person?
25     A  Well, we asked to go and see the work, but

1  it was not available to be seen.
2      Q  Do you understand -- were you told why it
3  was not available to be seen?
4      A  Well, it was slightly unclear, but it
5  seemed that the respondent didn't have possession
6  of the work.  It wasn't made available for us.  I
7  mean, I would have wanted to see it.  I still want
8  to see this work, but it hasn't been available.
9      Q  Now, did you have any documents that were
10 provided to you from the respondents related to
11 the condition of the work?
12     A  Yes, I did.  I had a condition report and
13 some photographs.
14     Q  Now, go to page 23 of your report, please.
15     A  That's Exhibit 17?
16     Q  That's Exhibit 17.
17     A  What page is that?
18     Q  That's page 23.
19     A  Twenty-three, yes.
20     Q  Is this the condition report that you
21 understood was provided by the respondents to the
22 claimants?
23     A  That is correct, yes.
24     Q  Could you please tell us the conclusion
25 that this condition report reached with respect to

1  the condition of the work?
2      A  Well, it states very plainly the painting
3  is in fine and stable condition and it has been
4  restored.  And they say the restoration is going
5  well.
6      ARBITRATOR KRAMER:  What are the blackout
7  portions?
8      MR. NIKAS:  This report is provided by the
9  respondents to the claimants in advance of the
10 settlement to confirm the condition was good.  So
11 I don't have a copy without the redacted
12 components.  Those were not done by us.
13     ARBITRATOR KRAMER:  Do you have a copy
14 that was signed by somebody?
15     MR. NIKAS:  I do not.  This is what we
16 received from the respondents.
17     ARBITRATOR KRAMER:  Okay.
18     THE WITNESS:  So basically it says it's in
19 good condition.
20 BY MR. NIKAS:
21     Q  The condition report also goes on to say
22 that the del Sarto's artistic concept and the
23 vitality of his original paint surface are, once
24 again, apparent of the original canvas support,
25 and it's super fine and exquisite grounds and

Arbitration
October 26, 2022

Page 22

1  paint layer and stabilized by implementations of a
2  constant structure -- and it goes on.
3       Did you reach any conclusions about
4  whether the work may be in good condition as a
5  result of this condition report?
6       A  Well, it was one of the assumptions that
7  the condition report was accurate, and so I,
8  therefore, assumed the picture was in good
9  condition.
10      Q  Did you have any evidence that the
11 respondents had been deceptive when they provided
12 this condition report for review to the claimants?
13      A  I didn't have any -- no, I didn't have any
14 reason to think that, no.
15      ARBITRATOR KRAMER:  Will there be
16 testimony about the receipt of this letter?
17      MR. NIKAS:  Yes, there will be, sir.
18 BY MR. NIKAS:
19      Q  Turn to page 20, please, of your report.
20      A  Twenty, yes.
21      Q  So far you've told us you didn't have
22 access to the work but you had this condition
23 report.  Now, I want to look at page 20 which is
24 an image of the del Sarto.
25      A  Indeed, yes.

Page 23

1       Q  Now, did you review this image on page 20
2  of the del Sarto in connection with your expert
3  report?
4       A  Yes, indeed.  Not being able to see the
5  work, this was all I had to go on, is the picture
6  of it.
7       Q  And is there anything that you saw on the
8  face of the photograph that gave you concern about
9  the condition of the work?
10      A  No.  I mean, there's a very limited amount
11 you can tell from the photograph, but nothing gave
12 me cause to panic about the condition, no.
13      ARBITRATOR KRAMER:  Will there be
14 testimony about the provenance of this photo?
15      MR. NIKAS:  Likewise, it was part of the
16 original package, so yes.
17 BY MR. NIKAS:
18      Q  Dr. Hunter, on page 21 there is another
19 picture of the work, and this one to my non expert
20 eye looks a little less flowing than the one on
21 the left.
22      So if you could tell us whether on review
23 of this image you developed any concerns about the
24 condition that would be helpful for us to
25 understand.

Page 24

1       A  Sure.  This picture is a photograph of the
2  painting in what we call a stripped print, when
3  the varnish has been taken off and all the later
4  retouching and repainting has been taken off.  And
5  so this is during the course of restoration.
6       And to the non specialist, these
7  photographs of pictures that are being stripped
8  are quite difficult to interpret.  I mean, it
9  looks like, wow, there's lots of damage on it.
10 But you have to bear in mind this is a picture
11 that's 500 years old, and you expect to see
12 certain amounts of, you know, wear, abrasion,
13 paint loss.  This is quite normal.  In fact, if it
14 had no paint loss, you'd be rather suspicious
15 actually.
16      So to me, this doesn't look particularly
17 bad.  I've seen many paintings in far worse state
18 than this for this age.  There's areas of paint
19 loss of course, but nothing terrible, nothing
20 that's really disfiguring.  The face is in pretty
21 good condition.  The beautiful sleeve and the --
22 his cloak is in pretty good condition.  I think
23 that to me -- I mean, without seeing it, it's very
24 difficult to say for sure, but that doesn't raise
25 any alarm bells to me.  That's consistent with

Page 25

1  being in good condition.
2       ARBITRATOR KRAMER:  So you assume that
3  looking at this, the painting was being restored?
4       THE WITNESS:  Oh, yes, that shows me that
5  photograph is taken by the restorer while it was
6  being restored, so it had been stripped.  All the
7  later retouching was taken off and then the
8  restorer would apply new retouching, better
9  retouching to those areas and a final varnish
10 layer to get it to this stage.
11      ARBITRATOR KRAMER:  Do you know what date
12 the picture on page 21 was taken and what date the
13 picture on page 20 was taken?
14      THE WITNESS:  Well, that's a good
15 question.  I don't know the date, but I would say
16 this is fairly recent.
17      ARBITRATOR KRAMER:  Okay.
18 BY MR. NIKAS:
19      Q  Now, the condition report that we just
20 reviewed indicated that there a restoration of the
21 work and that the restoration was successful?
22      A  Yes, it does say that.
23      Q  Are these two pictures, the one on the
24 left, the one on the right, consistent with your
25 experience with what a restoration would look like

Arbitration
October 26, 2022

Page 26

1  in stages?
2      A  Yes, it is.
3      Q  Now, the picture on the left, page 20 --
4      A  Yeah.
5      Q  Strike that.
6          So in connection with your report, you had
7  the condition report and these two images, do you
8  have any other evidence with respect to the
9  condition of the work in your possession?
10     A  No, not to my knowledge, no.
11     Q  And in order to make a final conclusion
12 with respect to the condition, is it -- do I
13 understand you correctly that the only other thing
14 you would have needed was access to the work
15 itself?
16     A  Well, that's a prerequisite, yes, I would
17 need to see it.  I mean, the condition of
18 renaissance paintings in general is quite a
19 complicated issue.  And it may have been necessary
20 having seen the picture to talk to a qualified
21 restorer to get a qualified restorer to look at it
22 as well, that's quite possible, but that wasn't
23 available to us, so I had to work with what I had.
24     Q  Please turn to Exhibit 3.  Now, are you
25 aware that following your submission of the expert

Page 27

1  report in this case, we were informed by the
2  respondent that there was another report that
3  Winston had prepared regarding this del Sarto
4  report?
5      A  Yes, I was told that.
6      Q  Were you also told that in addition to
7  that Winston report there was another report that
8  put a $30 million valuation in that file at
9  Winston?
10     A  Yes, I was informed of that as well.
11     Q  Now, Exhibit 3 is the $30 million
12 appraisal.
13     A  Yes.
14     Q  Did you review appraisal after you learned
15 about it in connection with this case?
16     A  I did, yes.  I mean, not in detail.
17         ARBITRATOR KRAMER:  This is the Freedberg?
18         THE WITNESS:  This is Anne Frances Moore.
19         MR. NIKAS:  This is the Anne Frances
20 Moore.
21         THE WITNESS:  I did read through it, yes.
22 BY MR. NIKAS:
23     Q  Now, did you see in that report where Anne
24 Frances Moore concluded that the work was in good
25 and stable condition?
26     A  I did notice that, yes.

Page 28

1      Q  Did you see anything else in that report
2  that related to the condition of the work?
3      A  I don't think so.  I mean, I don't
4  remember, to be honest.  I don't think so.
5      Q  When the report reached the conclusion
6  that it was in good and stable condition, did you
7  have any evidence that that conclusion was
8  inaccurate?
9      A  I didn't have any evidence, no.
10     Q  Now, page 17 of 33 on this report, it says
11 condition, structurally stable and in excellent
12 condition for its age.
13         Do you see that?
14     A  Yes, I do see that, yes.
15     Q  And, again, do you have evidence that that
16 was inaccurate?
17     A  I didn't have evidence that it was
18 inaccurate, no.
19     Q  Now, if you could go -- talk for a moment
20 about the $1.5 million appraisal --
21     A  Yes.
22     Q  -- that Winston Art Group prepared,
23 Exhibit 2.
24     A  Two, yes.
25     Q  Now, this report on page 8 says that there

Page 29

1  is a question as to whether the condition may be
2  more complex than is presented.
3          Did you read that language in the Winston
4  report?
5      A  I did read that, yes.
6      Q  And upon reading the report, was it your
7  view that the report reached a conclusion about
8  the condition of the work?
9      A  No.  I mean, it says it's more complex
10 than the condition report states, but it doesn't
11 really come down and say either way to be honest.
12     Q  So when you read that as a professional in
13 this field, did you read that as saying it was in
14 good condition?
15     A  I -- neither good nor bad; it was saying
16 it's complicated.
17     Q  And in those circumstances, what evidence
18 would one need in order to sort out whether it's
19 in fact -- the work is, in fact, in good condition
20 or bad condition?
21     A  Well, first of all, you'd need to see the
22 work and examine it yourself, and then I think you
23 would probably need to get a qualified restorer to
24 have a look at it and then you discuss it with the
25 restorer.

Page 30

1    Q  So following your expert report where you
2  had no access to the work but a condition report,
3  you then reviewed these two reports, and my
4  question to you is, did either of those reports in
5  your view cause you to change or undermine your
6  assumption that the work was in good condition?
7    A  Well, no, not really.  I mean, to be
8  honest, I don't have really have an opinion on the
9  condition of the picture.  I haven't seen the
10  picture, so I can't form my own conclusion on
11  that.  Obviously I've been given -- provided with
12  documents that say it's in good condition.  And
13  nothing that I've seen from -- later on from these
14  other reports or from the condition repeat or from
15  photographs would lead me to think that it's in
16  bad condition.  But my opinion has to be qualified
17  because I haven't seen it, so I don't know for
18  sure.
19    Q  Now, I want to talk about the standards
20  governing your appraisal for a moment.
21    With respect to authenticity, which
22  Dr. Simon criticizes you for assuming, is there an
23  appraisal rule or standard that would require you
24  to disregard an assumption that the work was
25  authentic even when the respondent in a legal case

Page 31

1  has represented that the work is authentic?
2    MR. PRESS:  Objection; this is
3  argumentative.
4    ARBITRATOR KRAMER:  I'm not sure I
5  understood the question either.
6    MR. NIKAS:  Sure.
7  BY MR. NIKAS:
8    Q  You assume -- if Dr. Simon criticizes you
9  for assuming the work was authentic --
10    A  Yes.
11    Q  -- or fully confirmed?
12    And my question is, is there a rule
13  governing your profession, appraiser rule or
14  standard, that says you're required to disregard a
15  contractual promise that the work is authentic
16  when valuing the work?
17    MR. PRESS:  Same objection; this is
18  argumentative.
19    ARBITRATOR KRAMER:  It's overruled.
20    THE WITNESS:  No, there is no such rule
21  that says that, no.
22  BY MR. NIKAS:
23    Q  With respect to the sitter, Dr. Simon
24  criticizes you, that the sitter hasn't been fully
25  confirmed or identified, same question, is there

Page 32

1  an appraisal rule that says that you are required
2  to disregard a contractual promise that the sitter
3  is accurately identified in a work?
4    MR. PRESS:  Objection; argumentative.
5    ARBITRATOR KRAMER:  Overruled.
6    THE WITNESS:  No, there is no such rule.
7  BY MR. NIKAS:
8    Q  Now, with respect to the condition, again
9  Dr. Simon criticizes you for assuming the
10  condition is good, same question, is there an
11  appraiser rule that says you're required to
12  disregard a representation that a work is in good
13  condition when forming your appraisal?
14    MR. PRESS:  Same objection.
15    ARBITRATOR KRAMER:  Overruled.
16    THE WITNESS:  No, there's no such rule.
17  BY MR. NIKAS:
18    Q  Now, let's talk about the $15 million
19  valuation that you provided in this report that
20  we've received in the case.
21    Could you, please, tell us the method, the
22  methodology that you used to reach the conclusion
23  that the work is worth $15 million?
24    A  Yes.  I used the comparable sale method to
25  arrive at my appraisal value.

Page 33

1    Q  Could you please explain to us what the
2  comparable sale method is?
3    A  Yes.  So you look for similar works by the
4  artist; or if they're not available, similar works
5  by other artists of same sort of stature or
6  standing as this artist, and you have to compare
7  those comparables with the work and you come to a
8  conclusion about, you know, the value based on
9  these other sales.
10    Q  Where do you look for the comparables you
11  ultimately choose to provide evidence of value?
12    A  You look in auction sales and sometimes
13  private sales when it's published when you know
14  the price.
15    Q  And how do you access information about
16  auction sales?
17    A  Well, they are readily available on sites
18  such as Artnet.  They -- you can search for
19  auction sales from all the main auction houses all
20  around the world and I also frequent the main
21  auctions and Old Master paintings.  Regularly, I
22  go to the views and I have the catalogs and I look
23  at the catalogs online, so it's my research, plus,
24  you know, very useful tool like I Artnet.
25    Q  And are those sources regularly used by

Arbitration
October 26, 2022

Page 34

1  experts in your field?
2      A  Absolutely, they're used all the time.
3      Q  Now, how about the comparable sales method
4  of valuation, is that a method that's used
5  regularly by experts in your field?
6      A  Yes, it would be the most common method I
7  would say.
8      Q  And when you use that method and select
9  comparable sales, generally speaking, how do you
10  use those comparable sales to reach an estimate of
11  value?
12      A  You have to use your judgment, you need to
13  decide on the merits of each particular
14  comparable, whether they're better than the
15  picture you're valuing or whether they're worse or
16  are there mitigating circumstances, are there --
17  you know, is it comparable in terms of condition,
18  is it comparable in terms of attribution, is it as
19  commercial as -- as commercial as the work you're
20  valuing?  You have to weigh all these factors and
21  then you come to your conclusion about the value
22  of the picture that you're, you know, meant to be
23  valuing.
24      Q  And that's so based on drawing those
25  inferences from the comparables?

Page 35

1      A  Yes.
2      Q  Now, did you identify comparables to the
3  del Sarto at issue in this case?
4      A  Yes, I did, and I put them in my report.
5      Q  If you could go to pages -- starting on
6  page 28, pages 28 to 30.
7      A  Yes, here they are.
8      Q  Are these the comparables that you
9  identified?
10      A  Yes, that's correct.
11      Q  Could you please -- let's go work by work.
12  If you one at a time for us to break up the
13  testimony, starting with the Botticelli at the
14  beginning, can you tell us please why you identify
15  this work as a comparable?
16      A  Yes, of course.  Well, Botticelli was a
17  very recent work.  It came up in 2021 January and
18  made it a phenomenal price, it made $92 million.
19  And I included this not because I think that the
20  Andrea del Sarto was worth a comparable amount.  I
21  don't.  I think it's worth less.  But this picture
22  shows the strength of the market for high-quality
23  Renaissance portraits.
24          This is a portrait from about 1480.  It
25  has a very good provenance going back to the 18th

Page 36

1  Century.  It was quite a well-known picture.  I
2  mean, it was in all the Botticelli books.  It's
3  one of Botticelli's rare portraits.  I mean,
4  portraiture in general in this period was a fairly
5  recently phenomenon.  I mean, humanists have known
6  that portraiture have been practiced by the ages,
7  but the genre of portraiture didn't really fit in
8  the Middle Ages in the way that we think of it
9  now.  And it was resurrected in Florence actually
10  in the 1460s and slightly later in Venice.  And
11  Botticelli is one of the earliest -- it's not the
12  earliest, but he's one of the earliest exponents
13  of portraiture.  He painted about a dozen
14  portraits.  This is a really, really good example
15  of it.
16          So this is a really highly important,
17  early portrait from the 1480s.  It was
18  quintessentially quatrogenito production by one of
19  the greatest Florentine painters.  It was in
20  fantastic condition for its age, and, you know, it
21  made this fantastic price.  I included it to
22  really -- because it's more important than the
23  current picture that we're talking about.  It just
24  shows you when all the stars are aligned, you can
25  get these new, fantastic prices.

Page 37

1      Q  Now, did you think that work was relevant
2  the valuation of the del Sarto?
3      A  Well, it's relevant in the sense that --
4  I'm saying it's not -- this is better, so this is
5  an upper limit of what you can get for a great
6  Renaissance portrait.
7      Q  Now, one question about condition, which
8  you've mentioned a few times.
9          Were you able to review any of the
10  comparable works in person when preparing your
11  expert report?
12      A  Not when I prepared the report, no.  But I
13  had seen many of these comparables previously when
14  they were up at sale or an exhibition.  I hadn't
15  seen that one.
16          I mean, also the other interesting thing
17  about Botticelli, it sold during the COVID
18  lockdown.  I mean, it was in January 2021.  I
19  couldn't come to New York to see the sale.  I
20  didn't see this picture.  But it's remarkable how
21  well it did considering it was in the middle of
22  lockdown.
23      Q  Now, if we could go to the next work, the
24  Bronzino.
25      A  Yes.

Arbitration
October 26, 2022

Page 38

1    Q  And if you could please explain to us why
2  you selected that work as a comparable for the
3  del Sarto.
4    A  Yes.  Well, this is a very interesting
5  work.  And I think this work is a much more
6  personate comparable, and so I relied quite a lot
7  on this particular piece.  This is an interesting,
8  very beautiful portrait by Bronzino, but it wasn't
9  always thought to be by Bronzino.
10      This picture first appears in the Corsini
11  collection in 1842.  And the inventory of the
12  Corsini collection actually attributes the
13  picture to del Sarto.  This is thought to be by
14  del Sarto.  And for all of the 19th Century this
15  work was regarded as a del Sarto.
16      And then in the early 20th Century, that
17  view changed and people decided to give it instead
18  to Pontormo.  Now, Pontormo was del Sarto's
19  greatest student.  And it was also a fantastic
20  portrait, among other things.
21      But this attribution to Pontormo also
22  didn't really convince everybody.  And there
23  was -- in the 20th Century, people were beginning
24  to think it was not really by del Sarto, not by
25  Pontormo; they didn't really know who this picture

Page 39

1  was by.  And it kind of was under the radar for a
2  bit.  It was in the early literature, but it
3  wasn't really talked about.  And then it was kind
4  of rediscovered in the later -- in about -- I
5  don't know exactly when it was, but it was in the
6  later 20th Century.  And when it was rediscovered,
7  it was reappraised, probably cleaned, and people
8  then recognized that it was work by Bronzino.
9      Now, Bronzino was Pontormo's student, so
10  you have a direct line from del Sarto; del Sarto
11  trained Pontormo and Pontormo trained Bronzino.
12  So there's a distinct line of portraiture starting
13  from del Sarto.  It was recognized by Bronzino.
14  It's published by Falciano.  It's going to be in
15  the Capital of Resonay and it was -- in the
16  catalog it was authenticated by Janet Mira Cox as
17  well.
18      So there's an academic consensus now that
19  this work is by Bronzino.  It's got a nice, old
20  provenance.  It's a beautiful portrait.  It's very
21  comparable.
22      Now, there are two things that limit the
23  value of this picture.  It was on panel, and the
24  panel cracked in numerous places.  And one of the
25  cracks ran down from the top through the left

Page 40

1  cheek of the sitter's face; that would've
2  necessitated retouching, repainting, and that's a
3  limiting factor on the condition.
4      And the second thing was that this picture
5  had a financial -- the auction house, Christie's,
6  had a financial interest in the picture as well,
7  and that was declared at the sale.  That can
8  sometimes limit the price the artwork makes.  So
9  those are two limiting factors.
10      And this, as you can see, was estimated at
11  eight to $12 million, and it made 9.1.  That's
12  with premium.  It probably made the lowest in the
13  eight million, which is probably reserve.  It
14  could have made more if it was in better
15  condition.  It's a very beautiful portrait.
16      Now, my reasoning goes -- this is -- it's
17  a very comparable portrait, half-length man seated
18  at the table, very similar to the portrait we're
19  looking at.  Bronzino is a fantastic portrait
20  painter, but he's the student of the Pontormo,
21  who, himself, was a student of del Sarto.  Now, a
22  del Sarto picture, it's much earlier, it's the
23  High Renaissance.  del Sarto, you know, is one of
24  the greatest -- you're talking the last greatest
25  of the High Renaissance, and I would say that a

Page 41

1  del Sarto portrait is rarer than a Bronzino and,
2  therefore, is more valuable, so this a key
3  comparable I would say.
4    Q  Now, the next work, the Delaporta --
5    A  Or Fra Bartolomeo, as we call it.
6    Q  Yes, we do.  If you could please tell us
7  why you identified this as a comparable and the
8  relevance to your valuation.
9    A  Yes, indeed.  Well, Fra Bartolomeo was
10  another great figure of the High Renaissance and
11  he was ten years older than del Sarto.  And
12  del Sarto was very heavily influenced actually by
13  Fra Bartolomeo.
14      This is a fairly early work by
15  Fra Bartolomeo from the 1490s.  Very beautiful
16  work.  Incredibly close actually to Donatello.  So
17  Fra Bartolomeo was looking at Donatello's work.
18  Donatello was a great sculptor.  And there's a
19  wonderful relief, the Pazzi Madonna, that
20  Donatello carved where it follows exactly this
21  pose, you know, the profile of the Madonna and the
22  Christ Child.  Very, very close.  The Pazzi
23  Madonna is on the cover of the current Donatello
24  exhibition that's in Berlin at the moment.  And
25  it's fascinating how Fra Bartolomeo is looking at

Arbitration
October 26, 2022

Page 42

1  earlier work, Bartolomeo is earlier, and this was
2  influencing artists up to the late quatrogenito.
3      Now, this picture is -- I remember seeing
4  it, but I don't remember seeing -- I don't
5  remember the condition. It looks like it's in
6  quite good condition from the photograph.
7      This is -- it's a religious work. It's
8  from the portrait of course, but I thought it was
9  relevant because, you know, it's in the same --
10 little bit early, but it's a similar period, and
11 this is an artist who was very influential on
12 del Sarto; they worked in the same ambiance. This
13 made 12.9 million, almost $13 million back in
14 2013. I think this is the sort of price area that
15 we're look at with a del Sarto.
16     Q  Now, the next work is Raphael.
17        Can you tell us why you selected that as a
18 comparable --
19     A  Yes.
20     Q  -- and the relevance to your opinion?
21     A  Yes. Well, this is quite a well-known
22 portrait by Raphael. I remember this portrait
23 very well because it was sold when I was at
24 Christie's, so I played my role in cataloging it,
25 and I was there for the sale, and then I've seen

Page 43

1  it subsequently because it was exhibited in the
2  recent Raphael exhibition in the National Gallery.
3      This is quite a complicated picture
4  actually. This was sold -- this was in the trade,
5  this picture. It was well known. It was not
6  fresh to the market. But it had a good, old
7  provenance. It's -- it's a slightly -- it's
8  slightly -- for Raphael, it's slightly weak in
9  places. I mean, the face is a little bit weak,
10 it's a bit worn; there is some abrasion and some
11 retouching there. The costume is very good and
12 the right hand is actually rather good, but there
13 are some weaknesses in the composition. There's
14 also quite a formal pose. Raphael painted this
15 for Lorenzo de' Medici's marriage into the French
16 royal family. It was probably a sort of official
17 portrait that was given as a gift, so it's
18 slightly formal. It doesn't have the intimacy of
19 Raphael's -- some of these other portraits like
20 the famous Castiglione portrait, which is a great
21 masterpiece.
22     And the fact that it came from the
23 trade -- you know, I think there are other Raphael
24 portraits that if they came onto the market, would
25 make substantially more than this figure of

Page 44

1  37 million. I mean, Raphael drawings can make
2  40 million plus. So this is a fairly low figure,
3  I would say, for a great Raphael portrait.
4      So it's relevant in our case; Raphael is a
5  more highly regarded artist than del Sarto. They
6  were almost exact contemporaries, but Raphael, you
7  know, is a more lauded artist. But I thought it
8  relevant. I'm pitching the value of the del Sarto
9  below this level because I think he's not as
10 important as Raphael. This Raphael portrait
11 itself, you know, is not the best Raphael
12 portrait.
13     Q  You have another Raphael portrait next as
14 a comparable?
15     A  I do. I go to this portrait. I say that
16 this is not particularly relevant. I mean, I --
17 not every portrait, not every work I've included.
18 Sometimes you put them in to discount them, you
19 see.
20     And this is a -- I put this in to show
21 that even a tiny little -- about this size, it's
22 really small -- by Raphael can make 3.2 million.
23 Not every Raphael makes unbelievable amounts of
24 money. It was a fairly small, little thing. It
25 was from the Taubman sale. It didn't have a huge

Page 45

1  literature attached to it. I'm saying this is
2  not -- I mean, it's another Raphael portrait, but
3  it's not comparable to our picture.
4      Q  Okay. You have two del Sartos next.
5  Could you tell us --
6      ARBITRATOR KRAMER: Three actually.
7  BY MR. NIKAS:
8      Q  Three drawings as well; two paintings
9  next?
10     A  Yes.
11     Q  Could you please walk us through those two
12 paintings and why you think they --
13     A  Indeed. Well, obviously when you're using
14 the sale, comparable sale method, you hope to find
15 a very comparable work like the artist you're
16 dealing with. Sadly, there are no portraits by
17 del Sarto that have come on the market, you know,
18 in recent times, so I couldn't use one of those.
19 That's what you ideally would like to find. But
20 there have been some del Sartos that have been on
21 the market. And these two paintings have come up.
22 Now, both of them failed to sell, and that was
23 because they both came from the trade and were
24 overly --
25     ARBITRATOR KRAMER: Coming from trade

Arbitration
October 26, 2022

1    means what?
2         THE WITNESS:  So they belong to members of
3    the art trade.  They were dealer's pictures.  They
4    weren't from private collections.  And so when
5    they're from dealers, they've probably been on the
6    market previously, so they've been -- they tried
7    to sell them, they couldn't sell them, and now
8    they put them into auction.  They're not fresh to
9    the market.  And in Old Master paintings, there's
10   quite a premium on pictures that are fresh to the
11   market from private sources.
12        So these both in their own different ways
13   suffered.  The first one, actually that had been
14   up for sale previously.  On the next page, it
15   appears again.  It was up in sale in 2000.  It
16   came up again in 2011.  It was -- in the meantime
17   being owned by the trade.  It was known about.  It
18   had quite a punchy estimate from that perspective
19   and it didn't sell.
20        The second one, I know well because when I
21   was at Gurr Johns we consigned that picture to the
22   Sotheby's sale.  This picture had an attribution
23   issue.  In Freedberg's catalog, it was described
24   as a copy.  And in fact, in Shearman's catalog,
25   which came a couple years after Freedberg, these

1    are the two great catalogs of del Sarto, Freedberg
2    '63 and Shearman '65, two volume works each, they
3    listed this picture as a copy, so it wasn't
4    accepted.  And then it was -- it was, you know,
5    cleaned and some work was done and they -- it was
6    re attributed to -- full to del Sarto.  I think
7    the fact that it had been published as wrong
8    counted against it and also came from the trade,
9    from Gurr Johns, and it didn't sell.
10        So I'm using those examples to show that
11   not every del Sarto sells.  It has to have the
12   right factors, and, you know, you need to
13   interpret these things quite carefully.
14        ARBITRATOR KRAMER:  Was there a reason why
15   you only looked at comparable sales in the 21st
16   Century, going back before 2000?
17        THE WITNESS:  No.  I think if I found a
18   good comparable from earlier, I would have used
19   it.  The further you go back, the more out of date
20   the price is and it doesn't count as very
21   comparable.  And you have to think, well, what
22   would that picture make now?
23        Even a picture that's sold in 2013, now, I
24   think, you know, if it's a good picture, it would
25   make even more now.  You try and keep it as close

1    to the sale date that you're looking at as
2    possible, otherwise you get into problems of how
3    the market has moved in the meantime.
4         ARBITRATOR KRAMER:  Okay.
5    BY MR. NIKAS:
6         Q  Now, the next work that you've identified
7    is a del Sarto that sold for 11.4 million.
8         Could you please tell us why you
9    identified that as a comparable and how it's
10   relevant to your analysis?
11        A  Yes.  Well, I think this is the third of
12   the really good comparables I'm relying on.  This
13   is by del Sarto.  It's a drawing.  He was a
14   wonderful draftsman.  There are around 150, maybe
15   a few more, drawings that are fully attributable
16   to del Sarto in existence.  There would have been
17   many more, but they haven't survived.
18        del Sarto generally made drawings as
19   preparatory studies for his works, and this is a
20   preparatory study.  It's the head of Joseph from
21   the beautiful Holy Family, which is commissioned
22   by the Bracci family in 1523, which is the Pitti
23   Palace today.  And this the head study for Joseph.
24   It had a fantastic provenance.  It was owned by
25   Vasari, who was the great art historian, 16th

1    Century art historian.  And Vasari, in fact, was
2    also a student of del Sarto.  And Vasari was an
3    artist of some distinction and he was a great
4    collector.  And the fact that this was in Vasari's
5    collection is really amazing.  And it's a very,
6    very beautiful head study in black and red chalk,
7    which is quite unusual.  There are very few
8    drawings by del Sarto of this quality left in
9    private hand.  I mean, it would be half a dozen
10   probably.  So it was highly sought after.  Made a
11   fine price, $11.4 million.
12        I thought this was crucial because this is
13   a sketch of a head for a painting.  Now, if you
14   have a real del Sarto portrait in the 1520s, you
15   know, that would -- you would expect to make even
16   more than a head study, even a great head study
17   like this.  So this was another very, very useful
18   comparable.
19        Q  And this indicates that the sale was in
20   2005, 11.426 million.
21        Would you expect that price to increase
22   over time?
23        A  I think for such a rare, beautiful head
24   study like that, yes, it would be worth more now.
25        Q  The last page of your list of comparables,

Page 50

1 page 30, you identify del Sarto that reflects an
2 earlier sale from the sale reference on the prior
3 page?
4     A  Yes, that's correct.  It's not entirely
5 clear.  The photographs when they are in color,
6 they look slightly different, but I think that's
7 the same as the one on the previous page that sold
8 again -- offered again in 2011, so it sold in 2000
9 for just over a million.  It was offered again and
10 didn't sell.  So it had been on the market and
11 that counted against it.
12     Q  And the comments you made with respect to
13 that work when they discussed earlier are the same
14 comments you'd make about this particular entry in
15 the comparable list?
16     A  Yes, that's correct.
17     Q  Now, could you tell us, how did you use
18 all of those different figures from the 92
19 million, 9.1, 11.4 to determine an ultimate value
20 of 15 million?
21     A  Well, I -- to put it simply, it's not in
22 the same league as a Botticelli, so I'm
23 discounting that.  It's in the Bronzino league.
24 It's better than Bronzino, so I'm saying it would
25 be more than nine million.  It's in the realms of

Page 51

1 Fra Bartolomeo, which is 12.9, but this a
2 religious picture and we're dealing with a secular
3 portrait which is more commercial probably,
4 inching up a bit higher.  It's not as much as the
5 Raphael even though the Raphael is complicated as
6 we discussed.  Certainly not like the smaller
7 Raphael.
8     The two del Sartos that were unsold during
9 the trade -- and there are reasons for that, as
10 I've described.  The head study which made 11.4,
11 this is in the right realm again, but I think a
12 portrait is worth more than this head sketch.  So
13 in balance, I weighted up, and I came to the view
14 that I think this picture is worth $15 million
15 fair market value.
16     Q  Now, you're aware that the respondents
17 have complained that Winston did not produce an
18 earlier appraisal that was prepared by a different
19 appraiser at the company?
20     A  Yes, I'm aware of that.
21     Q  Now, could you tell us, please, what your
22 involvement was -- let's go to the report.  Go to
23 Exhibit 2, the fair market value appraisal,
24 collateral of loan, 1.5 million.
25     Do you see this?

Page 52

1     A  I do, yes.
2     Q  Were you aware that -- do you recall that
3 this report had been prepared when you prepared
4 your expert report in this case?
5     A  No, I did not recall it, no.
6     Q  Did you -- in connection with this report,
7 did you do any research, this earlier report?
8     A  No, I did not do any research.
9     Q  Did you draft any components of it?
10     A  No, I did not.
11     Q  Did you review a draft of any portions of
12 this report before it was finalized?
13     A  No, I did not.
14     Q  Did you review the final draft of this
15 report after it was prepared by Winston?
16     A  No, I didn't.
17     Q  Were you informed about the ultimate value
18 that the other appraiser had reached in connection
19 with this report?
20     A  No.
21     Q  Did you ever receive the final copy of
22 this report after it was prepared and put it in
23 your files?
24     A  I didn't at the time.  I mean, I have been
25 sent it since, but at the time, no, I was not sent

Page 53

1 this report.
2     Q  And you said you have been sent it since.
3 Is that after you prepared your expert report in
4 this case?
5     A  That's correct.
6     Q  Did you have access to this report as a
7 consultant of Winston through your access to files
8 of the company?
9     A  No.  I'm an consultant of Winston.  I
10 don't have access to their files.  I can't search
11 their database, no.
12     Q  Do you have any -- did you take any notes
13 about any research or value in connection with
14 this report at the time it was prepared?
15     A  Well, when it was brought to my attention,
16 I looked through my files and I couldn't find any
17 notes about it, no.
18     Q  Now, was there a conflict check -- let me
19 ask another question.
20     Between this report, in October of 2019,
21 and November of 2021, so two years between the two
22 reports, how many works had you appraised?
23     A  Well, I counted 105 separate appraisals I
24 did for Winston, just for Winston, during that
25 period.  And as I said before, those appraisals

Arbitration
October 26, 2022

Page 54

1  can be multiple works. Some of them run into
2  hundreds. Most of them are less than that. Most
3  of them are a few works, but I mean, I would have
4  valued many, many hundreds, possibly over a
5  thousand that's conceivably works during that
6  period, individual works.
7      Q  Do you remember every single work that you
8  appraised out of the thousands?
9      A  No, that would be impossible, no.
10     Q  Did you remember this one?
11     A  No, I didn't remember this one, no.
12     Q  Now, with this report, it says that you
13 provided assistance.
14        Could you, please, tell us what role you
15 had in connection with this report back in October
16 of 2019?
17     A  Well, I had a phone conversation with
18 Geza, possibly one or two conversations with him.
19        ARBITRATOR KRAMER:  With whom?
20        THE WITNESS:  With Geza von Habsburg. He
21 was the appraiser here. I had a telephone
22 conversation with him and we discussed -- we would
23 have discussed it in that.
24 BY MR. NIKAS:
25     Q  Can you remember specifically what you

Page 55

1  said to him on that phone call about this work?
2      A  Well, no, I can't remember specifically,
3  no.
4      Q  How about generally?
5      A  Well, yes, I mean, in -- now that I see
6  the report, and I see the owner's name attached to
7  it, I did recall talking about this issue with
8  Geza, but it was owned by a person called Bonito.
9  It's an unusual name. And I remember this name
10 because Virginia Bonito, Professor Bonito, had
11 approached me previously when I was working at
12 Falcon Fine Art. She had a sculpture by Jacopo
13 Sansovino that she wanted to finance. She wanted
14 a loan against it. So I looked into that. And I
15 remember she -- I had never met here, but we had
16 phone conversations and her agents used to call me
17 quite a lot, and I said to her this looks
18 interesting, but we can't do just one work. We
19 need a second work. And she told me, ah, I have a
20 fantastic portrait by Andrea del Sarto that I
21 jointly own with someone else. And the trouble is
22 I knew that wasn't going to work because jointly
23 owned artworks are a nightmare to deal with when
24 it comes to financing. The due diligence is much
25 more complicated and there are many, many, many

Page 56

1  more pitfalls, and I just knew this wasn't going
2  to work, so we declined it. We declined the whole
3  deal. Sorry, we're not going to be able to do
4  this.
5         So when Bonito's name came up in
6  association with this appraisal, I told -- I would
7  have told Geza be careful here because this is an
8  ownership -- the ownership is complicated here.
9  And if you're doing an appraisal for a collateral
10 loan, you've got to be really careful when it's
11 joint ownership involved. So I would have
12 counseled him to be cautious.
13     Q  So I'll get to the substance of the report
14 in a moment, but let me ask, was a conflict check
15 run by Winston when this -- when you brought this
16 matter to the firm?
17     A  Yes. So when this issue came up, I said
18 to my counterparts at Winston, you know, why
19 didn't we find this appraisal? And they said,
20 well, we ran the checks, the conflict checks,
21 which we do for every appraisal, but the protocol
22 they used is to check names of the owners for each
23 appraisal, to check to see if there's a conflict,
24 and in this case, there was -- all the names that
25 were associated with the current appraisal did not

Page 57

1  appear in this appraisal.
2         Now, the reason they don't use artists
3  names is because you just get so many hits. I
4  mean, if you put Warhol Marilyn in, you get, you
5  know, thousands, you know, many, many versions of
6  that over the years, and you just get too many
7  hits, so it's not meaningful to check through. So
8  when they do their conflict check, they check the
9  names of the owners. That's why this one didn't
10 appear. I mean, because the owners' names didn't
11 match.
12        ARBITRATOR KRAMER:  So the database
13 includes the artist and the title of the painting?
14        THE WITNESS:  Yes. That's a good
15 question. It does, but I've been told they're on
16 separate databases. So there's a database with
17 names of all the clients that require appraisals,
18 and there's a database of the art which they use
19 when they're trying to find, you know, to sell
20 someone.
21        They didn't crosscheck those. I think in
22 the light of this, they've now changed the
23 protocol, and they do another check on the artist
24 now.
25 BY MR. NIKAS:

Arbitration
October 26, 2022

Page 58

1    Q  And so the conflict check was run, to make
2  sure I understand, using all of the parties in
3  this case; is that right?
4    A  That's correct.  And none of the names
5  showed up.
6    Q  That's my next question.
7    Did any of the names from any of the
8  parties in this case show up in their conflict
9  database?
10    A  They tell me no, they didn't.  I mean, I
11  didn't these checks, but I've asked and they told
12  me that none of the names came up.
13    Q  Okay.  Now, when Winston searched its file
14  after being alerted to this report there was
15  another report, Exhibit 3, that was located for
16  $30 million.
17    Are you aware of that?
18    A  Yes, I'm aware of that.
19    Q  Did you recall -- did you know that
20  Winston's file in addition to 1.5 million report
21  had a $30 million valuation of the work?
22    A  No, I didn't know about that.
23    Q  So you didn't know about either report?
24    A  No.
25    Q  Now, we've got these three reports.  Only

Page 59

1  one of them is submitted as your report in this
2  case.  Between the three, 1.5, your 15, and the
3  30, which one most closely approximates, in your
4  opinion, the value of this del Sarto?
5    A  Well, in my opinion, it's the $15 million.
6    Q  All right.  Now, let's go to the 1.5.  Can
7  you tell us why -- that's Exhibit 2?
8    A  Yes.
9    Q  -- why the 1.5 appraisal does not closely
10  approximate the value of the work under the
11  condition required by the settlement?
12    MR. PRESS:  Objection to form.
13    THE WITNESS:  Well, they both -- these two
14  appraisals are done under very different
15  assumptions.  The $1.5 million appraisal is an
16  appraisal for fair market value for collateral
17  purposes and no other purpose.  It states that in
18  the appraisal.
19    And collateral appraisals always take
20  necessarily the low end, the lowest possible end
21  of what the fair market value could be.  I mean,
22  you are taking, as it were, the worst case
23  scenario because people are lending money against
24  the value of the artwork.  So the lender, who is
25  your client normally, requires you to be

Page 60

1  conservative in your appraisal, and this was
2  certainly the case here.  I mean, there are other
3  factor as well, I mean, which lead on from that
4  because you don't just assume.  You can't assume
5  the work is in good condition.  In fact, as Geza
6  states in his appraisal, the condition is more
7  complicated than that.  He doesn't say it's in bad
8  condition, but he says it's complicated.  So if
9  it's complicated, you would assume the worst case
10  scenario here, that it's in compromised condition.
11    He makes an issue about the -- he raises
12  these points in the note.
13    ARBITRATOR KRAMER:  Can I have a copy of
14  that, please?
15    MR. NIKAS:  Sure.
16    THE WITNESS:  So on page 8 of the
17  appraisal, which is where he writes his write-up,
18  he makes the point about the attribution and
19  authenticity.  It's not published, this work,
20  although Freedberg did write his letter, and that
21  is actually quite important.  I mean, Freedberg
22  was a major expert in del Sarto, a very serious
23  scholar, but it's the only one.  And what Geza is
24  saying in this report is, from a collateral point
25  of view, you would like to see a consensus of

Page 61

1  academic opinion supporting the attribution; that
2  doesn't exist here.
3    So you would have to -- and what he says
4  is, therefore, there's work to do.  So there's the
5  condition, he does not assume as good.  The
6  authenticity he does not assume as being settled,
7  and I think also you need to take into account
8  those two del Sartos that were offered by the
9  trade that were unsold in relatively recent years,
10  that would also give a lender a pause for thought.
11    So for all those reasons, and finally, and
12  crucially, the conversation that I had with Geza
13  was about the ownership issue.  You can't
14  guarantee this work has a straightforward
15  ownership, which, again, would lead you to be
16  very, very cautious.
17    So for all these reasons, as engagements
18  come down on a very cautious -- on the lowest end
19  of what you would give a fair market value for
20  $1.5 million.
21  BY MR. NIKAS:
22    Q  Now, page 5, in addition to all of the
23  issues you just identified, which were different
24  from the assumptions you made, page 5 says at the
25  top, the appraiser was asked to prepare a fair

Arbitration
October 26, 2022

Page 62

1    market value appraisal from inspection for
2    collateral loan purposes.  This report is not
3    valid for any other purposes.
4         Do you see that language?
5         A  Yes, I do.
6         Q  Have you used language like that in a
7    report before?
8         A  Oh, yes, yes.
9         Q  And why do you include language limiting
10   the validity of the report to collateral loan
11   purposes in these circumstances?
12        A  Because it's a very specific type of
13   appraisal.  It's for -- as we say, it's for
14   collateral purposes, and there are specific
15   factors that limit the appraisal of -- for
16   collateral purposes.  That doesn't exist in any
17   other fair market appraisals, so that's why it's
18   specifically for this purpose and no other
19   purpose.
20        ARBITRATOR KRAMER:  Is there a recognized
21   percentage of actual value which is used by a
22   potential lender to decide how much he'll lend?
23        THE WITNESS:  Yes.  The answer is yes.  It
24   depends on the firm.  When we were at Falcon --
25   when I was at Falcon Fine Art, we would lend,

Page 63

1    generally speaking, 40 percent of the appraised
2    value, so we would do a further discount, if you'd
3    like, from the appraisal.  The appraisal already
4    was conservative, and then we would lend
5    40 percent of that appraisal.
6         ARBITRATOR KRAMER:  Is that a reasonable
7    standard in the art market for loans?
8         THE WITNESS:  I think it is.  From my
9    experience at Christie's, they would lend around
10   30 to 40 percent.  I've heard some lenders lend up
11   to 50 percent, but we would be -- at Falcon Fine
12   Art we didn't do that.  I think that's fairly
13   standard, 40 percent.
14   BY MR. NIKAS:
15        Q  Now, under this report you just indicated
16   that the authenticity was not assumed; to the
17   contrary, there were issues of authenticity.
18        Could that have an impact or does that
19   have an impact on the value of the work?
20        A  Yes, most definitely it does.
21        Q  You identified issues potentially that the
22   report discusses regarding condition.
23        If the work is in poor condition, could
24   that effect the value of an appraisal for
25   collateral loan purposes?

Page 64

1         A  Yes.  It could have a massive effect on
2    the appraisal.
3         Q  Now, the report doesn't make any
4    assumptions about the sitter contrary to your
5    report.
6         Could the uncertain -- could an
7    uncertainty about the sitter impact the value of a
8    work under the collateral loan report?
9         A  Yes, it could.  I don't think that's the
10   most important consideration because with these
11   earlier renaissance portraits it's sometimes hard
12   to work out who the sitter is.  They're many
13   examples I can think of.
14        But if you do know the sitter, it adds to
15   the -- it would be a premium -- it would give a
16   premium on the picture.  So it would have an
17   effect, yes.
18        Q  Now, Exhibit 3, if you'll refer to Tab 3,
19   it's the $30 million appraisal.  You just told us
20   that your $15 million is accurate.  The 1.5
21   doesn't apply in this case.  You also said the
22   $30 million is not the right number.
23        Could you explain to us why this
24   $30 million report is not the accurate number for
25   this portrait.

Page 65

1         A  Yes.
2         ARBITRATOR KRAMER:  Can you remind me
3    whether you've seen the $30 million appraisal
4    before you did your appraisal?
5         THE WITNESS:  I had not.  If I had, I
6    didn't remember it.
7         Well, this is an appraisal for retail
8    replacement level, and the retail replacement
9    level is the highest level you could justify that
10   you think the picture would make in all the right
11   circumstances.  So it's the other extreme, if
12   you'd like.  So if the fair market value
13   collateral figure is as low as you think you can
14   reasonable go, this appraisal at retail
15   replacement level is as high as you think you can
16   feasibly go.  So it's necessarily at the high end.
17   BY MR. NIKAS:
18        Q  Now, in your view, is this figure $30
19   million an attainable sale figure notwithstanding
20   the fact that it's much higher than your estimate
21   of the reasonable value?
22        A  Well, for the reasons I've given in my
23   report, I would regard this as a pretty high
24   figure, but I don't think it's completely mad.  I
25   mean, if you think about -- well, let's take

Arbitration
October 26, 2022

Page 66

1  Pontormo, for example.  We've already mentioned
2  Pontormo, del Sarto's student and a very fine
3  portrait painter.  I can think of two portraits by
4  Pontormo that have both made over $30 million, but
5  the famous picture portrait of the Halberdier,
6  which is in the Getty Museum, sold at Christie's
7  in 1989 and made a world record price for an Old
8  Master, and it made $35 million, that would be
9  worth even more today.  And then there was a more
10 recent sale of a Pontormo portrait of a man in a
11 red cap that sold privately for well over 40
12 million, $46 million I think it was, in 2015.
13 That was subject to an export stop from the UK.
14       So yes, it is possible in the right
15 circumstances for renaissance portraits of this
16 period, those Pontormos were 1520s, 1530s, mainly,
17 it's perfectly possibly that it can attain prices
18 in the 30 million, or even slightly more.  So I
19 don't regard it as a completely crazy price, but I
20 think -- I think it's at the high end for this
21 particular work.
22       MR. NIKAS:  Now, before I move on to
23 address the Sotheby's sale of the work and the
24 Christie's sale, as a matter of housekeeping I'd
25 like to offer Exhibit 17 from our pretrial exhibit

Page 67

1  list the report of Dr. Hunter as an exhibit in
2  this case, sir.
3       MR. PRESS:  No objection.
4       ARBITRATOR KRAMER:  Admitted.
5       (Whereupon, Exhibit 17 was admitted into
6  evidence.)
7       THE WITNESS:  That's 17?
8       MR. NIKAS:  17 is your report.
9       THE WITNESS:  17 is my appraisal.
10      MR. NIKAS:  That's right.
11      ARBITRATOR KRAMER:  Is Ms. Moore someone
12 you have ever heard of.
13      THE WITNESS:  No, she's not familiar, no.
14 BY MR. NIKAS:
15      Q  Now, after Ms Moore's name it says "AAA."
16      Could you tell us what that means?
17      A  That's the Appraisal Association of
18 America or the American Appraisal Association.
19      Q  And what does that signify?
20      A  She is a member of the recognized trade
21 body of appraisers in America, which is quite a
22 prestigious body.  It's a good sign.
23      Q  And on page 5 of the report it says that
24 she wrote a report in complete compliance with the
25 2016 or 2017 uniformed standards of professional

Page 68

1  appraisal practice written by the appraisal
2  standards board of the Appraisal Foundation in
3  Washington, D.C.
4       Do you see that?
5       A  Which page are we on?
6       Q  That's page 5.
7       A  Page 5 of Exhibit 3?
8       Q  That's right.
9       A  Yes, yes, I see it.
10      Q  Now, could you, please, tell us what those
11 standards are, generally speaking?
12      A  Yes.  So the uniform standards of
13 professional appraisal practice, we abbreviate
14 that to USPAP.  All appraises in America should be
15 subject to USPAP standards and regulations.  You
16 really should take the USPAP exam, which is a day
17 long -- actually, it's a two-day course, and at
18 the end of it you do an exam, you pass ultimately,
19 and then you become USPAP compliant for that
20 two-year period, and then you have to do a
21 refresher course every two years to keep your
22 standards at that -- you know, keep it up to date.
23 And this is what -- this is common practice among
24 my profession of appraisers that if you're doing
25 appraisal's in America, you are expected to be

Page 69

1  USPAP compliant as we say.
2       Q  And so is this report under the same
3  standard that governs the profession as you're
4  saying?
5       A  Yes.
6       MR. PRESS:  Objection.  How do you know?
7       ARBITRATOR KRAMER:  Pardon me?
8       MR. PRESS:  It says it there, but how can
9  you attest to -- basically, there's no foundation.
10      ARBITRATOR KRAMER:  What was your
11 question?
12      MR. NIKAS:  I said was this report --
13      ARBITRATOR KRAMER:  His report?
14      MR. NIKAS:  The Moore report, I asked him
15 if he's read it; he said he's read it.  I asked
16 was it prepared under the standards that also
17 govern the report that Dr. Hunter prepared in this
18 case.
19      ARBITRATOR KRAMER:  It purports that he
20 has no way of knowing whether, in fact, it was.
21      MR. PRESS:  That's my point.
22      ARBITRATOR KRAMER:  I'm sustaining that
23 objection.
24 BY MR. NIKAS:
25      Q  Following your review of this report, did

Arbitration
October 26, 2022

Page 70

1  you come across any language or conclusions in it
2  that, in your view, violated the standards
3  governing your profession?
4      A  No, I did not.
5      MR. NIKAS:  Now, before again moving onto
6  Sotheby's and doing some housekeeping, I'd like to
7  offer what we've identified as Exhibit 3, the
8  Moore Report as evidence in the case.
9      ARBITRATOR KRAMER:  That's accepted as
10  well.
11      MR. NIKAS:  And also Exhibit 2 for the
12  purposes we've used it as the 1.5 report.
13      ARBITRATOR KRAMER:  I didn't wait for
14  Mr. PRESS.
15      MR. PRESS:  I don't know that we have
16  testimony as to how we received that report.
17      ARBITRATOR KRAMER:  Pardon me?
18      MR. PRESS:  I don't know if there's a
19  foundation for how Winston Art Group received the
20  Anne Francis Moore report.  I'm not sure that --
21  he said he didn't look at it in connection with
22  his report.  I'm not sure that it's relevant at
23  all.
24      ARBITRATOR KRAMER:  Overruled.  It's
25  accepted also.

Page 71

1      MR. NIKAS:  Thank you.
2      (Whereupon, Exhibits 2 and 3 were admitted
3  into evidence.)
4  BY MR. NIKAS:
5      Q  Now --
6      A  Mr. Nikas, can we have a small break?
7      ARBITRATOR KRAMER:  I was going to do
8  that.  We've been going for about two hours.  Why
9  don't we take a mid-morning break.
10      How long do you want?
11      MR. PRESS:  Ten minutes is fine.
12      MR. NIKAS:  That's fine.
13      (Whereupon, a break was taken at
14  11:23 a.m.)
15      ARBITRATOR KRAMER:  Back on the record.
16  BY MR. NIKAS:
17      Q  Dr. Hunter, since your report was issued,
18  are you aware that the del Sarto in this case was
19  sold at Sotheby's?
20      A  Yes, I am aware of that.
21      Q  Are you aware that the respondents have
22  used that sale to criticize your estimate of the
23  work's value?
24      A  Yes.
25      Q  Have you reviewed the lot information

Page 72

1  published on Sotheby's website regarding the sale
2  of that work?
3      A  Yes, I did.
4      ARBITRATOR KRAMER:  Which website was
5  that?
6      THE WITNESS:  Sotheby's website.  They
7  have their sales -- you can search, you know,
8  previous auctions.
9  BY MR. NIKAS:
10      Q  If you could, please, turn to Exhibit 4.
11      A  Yes.
12      Q  This page indicates that the Andrea del
13  Sarto was sold at Sotheby's on January 27th, 2022,
14  for $2.198 million.
15      Do you see that?
16      A  I do see that.
17      Q  It indicates portrait of a man,
18  Ottaviano de Medici, question mark, wearing a
19  large hat, with a box over the wax seals resting
20  on a ledge before him.
21      Do you see that?
22      A  Yes, I do.
23      Q  Do you believe that is the work that's at
24  issue in this case?
25      A  Yes.

Page 73

1      Q  Now, could you tell the whether the sale
2  of this work a Sotheby's for $2.198 million
3  changes your view that the work is worth 15?
4      A  No, because -- well, I think there were
5  reasons why it sold for a lowish, as I would
6  regard it, a low figure in that set.
7      Q  In comparison to your evaluation?
8      A  Yes.
9      Q  Could you, please, tell us what the
10  reasons were why this work sold at Sotheby's for
11  $2.198 million instead of the higher value that
12  you attribute to the work under the conditions set
13  forth in the settlement agreement?
14      A  Well, there were a number of reasons, but
15  the main reason is that, as I understand it, there
16  was a lawsuit pending that said the owner of the
17  del Sarto did not have a proper title to it, and,
18  therefore, could not sell it in the sale.  That
19  was my understanding.
20      Q  So if we could look at Exhibit 7, please.
21      A  Yes.
22      Q  Exhibit 7 is a Supreme Court summons and
23  complaint indicates it was filed by Matthew Press
24  on January 24, 2022, three days before the
25  auction.

Arbitration
October 26, 2022

Page 74

1     Do you see that?
2     A  Yes, I do.
3     Q  The case was captioned Empire Chesapeake
4  Holding, Chelsea Art Holdings against Virginia
5  Anne Bonito and Bottom Line Exchange Company.
6     Do you see that?
7     A  Yes, I do.
8     Q  I'd like to turn --
9     ARBITRATOR KRAMER:  Can I have a copy?
10     MR. NIKAS:  Of course, sir.
11  BY MR. NIKAS:
12     Q  Now, if you will, turn to page 23 of 23
13  marked in the bottom right corner.
14     Do you see that document?
15     A  Yes.
16     Q  Who signed the verification that
17  accompanies this complaint?
18     A  Ian Peck signed this.
19     Q  Okay.  This was filed three days before
20  the auction; do you see that?
21     A  Yes, I do.
22     Q  If you go to paragraph 5, please.
23     A  Of which page?
24     Q  It's on page -- it's got two page numbers.
25  Let's use the one on the bottom right corner?

Page 75

1     A  Yes.
2     Q  It says five of 23.
3     A  Five of 23, yes.  Which paragraph?
4     Q  Paragraph 5.  It's at the top of the page.
5     A  Yes.
6     Q  I'm going to read three paragraphs from
7  this document, and then I'm going to ask you if
8  they could have any impact on the value of a
9  picture that's being offered for sale while the
10  lawsuit for these allegations is pending.  Let's
11  start with five.
12     Five says, in October and November 2021,
13  plaintiffs placed Bonito and Bottom Line, as well
14  as Sotheby's auction house, on notice of their
15  claims and rights under the parties' agreement as
16  extended.  Nevertheless, Bonito purported to sell
17  the painting to Bottom Line, and Bottom Line
18  purported to purchase the painting in violation of
19  plaintiff's rights and interests.  And Bottom Line
20  purported to consign the painting to Sotheby's for
21  auction on January 27, 2022, without acknowledging
22  plaintiff's partial ownership interests, exclusive
23  right to purchase the painting, right of first
24  refusal, and attempted liens against the painting.
25     Thus, Bonito and Bottom Line hoped to sell

Page 76

1  the painting and abscond with the entire proceeds
2  and circumvention of plaintiff's rights.
3     Do you see that?
4     A  I do.
5     Q  If you'll go down to paragraph 7 on that
6  same page.  It says, as set forth below, the court
7  should declare Bonito's purported sale of the
8  painting to Bottom Line null and void and order
9  Bonito to specifically perform her promise to sell
10  the painting exclusively to plaintiffs.
11     In addition, the court should enforce
12  Bonito's promise to grant plaintiff's a direct
13  pro rata ownership interest in the painting in
14  proportioned to the amount of the advances
15  plaintiff's made to Bonito and the expenses
16  plaintiffs incurred in reliant upon Bonito's
17  promises.
18     Do you see that?
19     A  Yes, I do.
20     Q  If you could also please turn to page 16
21  of 23, paragraph 52 of the complaint.
22     A  Yes, I see it.
23     Q  52 says, by letter dated November 29,
24  2021, plaintiffs notified Sotheby's of their
25  claims and rights in connection with the painting.

Page 77

1  Plaintiffs wrote, quote, 2020 and 2021, Empire
2  Chesapeake advanced certain amounts to Virginia
3  Bonito towards the purchase of the work and
4  incurred certain expenses.  These amounts are
5  secured by the attached UCC lien on the working.
6  As part of the agreement, based upon the amounts
7  already advanced, Ms. Bonito granted Empire
8  Chesapeake a pro rata direct ownership interest in
9  the subject painting by Andrea del Sarto, which
10  Empire Chesapeake calculates to be 13 percent of
11  the work.
12     Furthermore, to induce Empire Chesapeake
13  to make advances, Ms. Bonito promised Empire
14  Chesapeake the exclusive right to purchase the
15  work.  Please be advised that Empire Chesapeake
16  objects to the sale of the work by Sotheby's in
17  any auction or private transaction until Empire
18  Chesapeake can be assured that its rights in
19  connection with the work will be satisfied.
20     Please confirm receipt and contact me at
21  your earliest convenience to discuss this matter.
22     Do you see those allegations that I've
23  just read to you?
24     A  Yes, I do.
25     Q  When a lawsuit is pending three days

Arbitration
October 26, 2022

Page 78

1  before an auction containing these allegations and
2  demands, in your professional experience, does
3  that have an impact on the value and salability of
4  the work?
5      A  Yes, it has a catastrophic impact on the
6  sale and the value of the work.
7      Q  Why is that, sir?
8      A  Well, the auction house would need to
9  disclose this information to any prospective buyer
10  of the painting, which effectively says you may
11  not have good title to this picture if you buy it
12  in the sale, and that would put off almost every
13  single person bidding on it.
14      And, in fact, in these situations,
15  normally, the auction house withdraws the lot.
16  This is just too complicated.  This is a mess.
17  And you would withdraw the lot, ask the parties to
18  sort out who the owner is, come back to us when
19  you've sorted it out and we can offer it then
20  because this is just really bad.
21      ARBITRATOR KRAMER:  Do you have any
22  information about why Sotheby's went ahead with
23  the sale?
24      THE WITNESS:  Well, that is a very good
25  question, and I don't know, but I noticed there

Page 79

1  was an irrevocable bid on this picture which means
2  that there was a -- prior to the sale, a client,
3  often the dealer -- often dealers do this, they
4  make an irrevocable bid which is published so that
5  the auction house can say this picture is going to
6  sell.  It's a like a form of guarantee sort of.
7  And they would have to have gone to the person or
8  dealer who had put the irrevocable bid in and
9  explain the situation to them.  The person who put
10  the irrevocable bid must have said I'm okay with
11  it.
12      ARBITRATOR KRAMER:  Sure.  You don't have
13  any -- it's your --
14      THE WITNESS:  This is what I assume, and
15  then Sotheby's said okay, we'll go ahead with the
16  sale, and clearly no one else bid.
17      ARBITRATOR KRAMER:  Okay.  You don't --
18  from personal knowledge you don't know what
19  particularly happened?
20      THE WITNESS:  No, but they would have to
21  have told that person this is the case.  They
22  would have to have done it.  No one else bid.  It
23  was sold to the irrevocable bid.  That's what
24  happened.
25  BY MR. NIKAS:

Page 80

1      Q  So when you say a lawsuit like this is
2  catastrophic to value, in your -- from your
3  professional experience, does it surprise you that
4  the work still sold for 2.198 million?
5      A  Yes.  I think it's a small miracle that it
6  sold at all.  I think in a way it's testimony to
7  the quality and importance of this work that did
8  sell in these circumstances.
9      ARBITRATOR KRAMER:  You don't one way or
10  the other whether the irrevocable bid -- do you
11  know whether the irrevocable bid was at
12  2.19 million?
13      THE WITNESS:  Well, it would have --
14  that's with the premium, so it would have had to
15  have been at -- it would have had to have been at
16  the -- at or before the reserve.  Sotheby's would
17  have sold it at the reserve if there was no other
18  bid.
19      ARBITRATOR KRAMER:  Do you know whether
20  the irrevocable bid was made before or after
21  Sotheby's learned about the lawsuit?
22      THE WITNESS:  Well, it was published in
23  the catalog, so it must have been before.
24      ARBITRATOR KRAMER:  It was in the catalog?
25      THE WITNESS:  Yes.  No, wait.  Hold on a

Page 81

1  second.  I don't know about the catalog.  It was
2  published on online.
3      ARBITRATOR KRAMER:  Before the auction?
4      THE WITNESS:  Before the auction.
5      ARBITRATOR KRAMER:  Okay.  Do we have that
6  page?  I think we looked at it.  I'm not sure I
7  saw it.
8      MR. NIKAS:  Yes.  I'm coming back to it.
9      ARBITRATOR KRAMER:  Okay.  Continue with
10  your examination.
11      MR. NIKAS:  Thank you.
12  BY MR. NIKAS:
13      Q  Let's go the page -- we've got a few of
14  them.  We've got Exhibit 4, and this is the
15  general lot information.
16      A  Yes, that's abbreviated.  I mean, that's
17  the list of the work sold, I think.
18      Q  Now, when you reviewed --
19      MR. NIKAS:  And I offer Exhibit 4 as the
20  general lot information.
21      ARBITRATOR KRAMER:  Mr. Press, are you
22  okay with that?
23      MR. PRESS:  Yes.  No objection.
24      ARBITRATOR KRAMER:  It's admitted.
25      (Whereupon, Exhibit 4 was admitted into

Arbitration
October 26, 2022

Page 82

1  evidence.)
2  BY MR. NIKAS:
3      Q  You told us that a lawsuit can be
4  catastrophic to the sale price.  I see in the
5  description of this, it says, Ottaviano de Medici,
6  question mark.
7         Do you see that?
8      A  Yes, I do.
9      Q  Do you know why a question mark would be
10  included in an auction listing in your experience
11  at auction houses?
12     A  Yes, because they don't know for sure that
13  it's a Ottaviano de Medici.  They're mainly
14  suggesting that it might have been.
15     Q  Now, could that have an impact on the
16  value of the picture as well?
17     A  Well, if you knew for sure it was a
18  Ottaviano de Medici, it would have a premium, so
19  yes, it would affect it.
20     Q  Now, Dr. Simon's report says that the work
21  was not fully confirmed as authentic because only
22  Dr. Freedberg's letter was referenced as opposed
23  to a much broader group of historians.
24        From your review of the Sotheby's page,
25  did you see anyone other than Freedberg giving an

Page 83

1  opinion about authenticity of the work?
2      A  Yes.  The -- Sotheby's employed or
3  contracted an academic called Linda Wolk Simon,
4  W-O-L-K, who is a visiting professor at New York
5  University, I think, and she wrote the essay in
6  the catalog.  It's a quite good essay, actually,
7  but in that essay she does not mention any other
8  academic or curator who supports the attribution.
9      Q  Does the fact that there was only one
10  expert identified as opposed to the much broader
11  group that would be necessary to fully confirm it
12  have a potential impact on the value of the
13  picture?
14     A  Yes.  I mean, as we saw previously with
15  that other Andrea del Sarto where the attribution
16  was questioned, it was published as copy, and then
17  it was reattributed to del Sarto.  Yes, that has
18  an affect on it.  I mean, if works are not fully
19  attributed, that could have an affect on value,
20  yes.
21     Q  If you could go to respondent's Exhibit 5.
22     A  Oh, yes.  Okay, yes.
23     Q  And you mentioned that when you reviewed
24  the Sotheby's lot there was an indication that
25  there was an irrevocable bid?

Page 84

1      A  Yes.
2      Q  Is that the reference on the second page
3  of the first document that you were talking about?
4      A  Yes.
5         ARBITRATOR KRAMER:  I'm sure what exhibit
6  it is.
7         MR. NIKAS:  The respondent's Exhibit 5.
8  It's the longer version of the Sotheby's page.
9         THE WITNESS:  So yes, this is a sale room
10  notice.  Please note there was an irrevocable bid
11  on this lot.
12        MR. NIKAS:  And I'll offer respondent's
13  Exhibit 5 to make record clear that we've got the
14  entire file.
15        MR. PRESS:  No objection.
16        ARBITRATOR KRAMER:  Admitted.
17        (Whereupon, Exhibit 5 was admitted into
18  evidence.)
19  BY MR. NIKAS:
20     Q  Now, you have told us about lawsuit
21  impact, the authenticity impact, the sitter
22  impact.
23        Is there anything else about the sale, the
24  Sotheby's sale, that you believe materially lowers
25  that sale price compared to the fair market value?

Page 85

1      A  All those things that you just mentioned
2  can have a catastrophic affect on the sale price.
3  I guess the additional factor would be the
4  condition.  As we -- I don't have an opinion on
5  the condition.  I haven't seen the picture, but
6  people that saw the picture may have come to their
7  own conclusions about the condition of the work.
8  I don't know.
9      Q  Now, in Mr. Peck's preliminary injunction
10  testimony, months and months ago now, he testified
11  that it would be important to sell a work like
12  this under a consignment agreement where the work
13  it marketed around the world, given significant
14  PR, and the painting was traveled around the world
15  and shown to collectors.  And the respondents,
16  likewise, testified that they would agree with
17  that approach, and failing to do that would impact
18  value.
19        Do you see any of that activity done in
20  connection with this Sotheby's sale?
21        MR. PRESS:  Objection.  You can't just
22  characterize his testimony.  I think you really
23  need to show it.  I mean, I think it
24  mischaracterizes testimony from the hearing.
25        MR. NIKAS:  I can read the testimony.

Arbitration
October 26, 2022

Page 86

1    ARBITRATOR KRAMER: Can you do that?
2    BY MR. NIKAS:
3    Q  Exhibit 6, from Mr. Peck's testimony,
4    page 81:
5        "QUESTION:  Is it a given that you've
6    given an agreement that was satisfactory to ACG --
7    one of the respondents -- with Christie's?
8        "ANSWER:  No.
9        "QUESTION:  What would the consigning
10   agreements with Christie's potentially look like?
11   What were some important terms that would be
12   relevant to an agreement like that?
13       "ANSWER:  Well, we would want them to have
14   provided possibly a loan, an advanced loan against
15   the consignment, a loan which would have been
16   repaid by the sale of the painting.  We may have
17   wanted them to provide a minimum guarantee for the
18   sale price, which is a common product at this
19   level of the market.
20       We would have wanted to have an extensive
21   list of requirements for them to market the paint,
22   which would have included a substantial amount of
23   money spent on marketing PR and publicity, as well
24   as a commitment on their part to physically take
25   the painting wherever they would need it to go to

Page 87

1    be shown to collectors."
2        Do you see any evidence from the Sotheby's
3    sales that the work was treated in the way that
4    the parties would have wanted it to be treated
5    under the settlement agreement?
6        A  I don't see any evidence -- I didn't see
7    the picture in London.  I don't think they showed
8    in London.  I don't think they showed it anywhere.
9        Q  Did you see any marketing or PR in
10   connection with the picture?
11       A  No, I did not.
12       Q  And do you agree with Mr. Peck that that
13   could have a significant impact on value?
14       A  Yes.  I agreed with Mr. Peck that this is
15   a sort of picture that requires special treatment
16   from the auction houses of major work of a high
17   renaissance.  You would expect them to do proper
18   marketing for it.  Yes, I would expect that.
19       Q  In light of what you told us, do you think
20   the Sotheby's sale is a reasonable indication of
21   the work's fair market value under the conditions
22   required by the settlement agreement?
23       A  No, I don't.  I think it was under sold
24   significantly.
25       Q  Now, the respondents have also criticized

Page 88

1    your report for not accounting for the April 20,
2    2021, Christie's sale of Old Master works.
3        Are you familiar with the fact that
4    they've criticized you for that reason?
5        A  Yes.
6        Q  Now, Christie's sale in April of 2021, did
7    that sale include any del Sartos?
8        A  No, it didn't.  It included a Sebastiano
9    del Piombo, P-I-O-M-B-O, who is another high
10   renaissance artist, but no other works by Andrea
11   del Sarto, no, not that you can expect from that.
12   That's rare.
13       Q  Now, in the auction, did you see any
14   comparable works that were sold that were
15   comparable to the work at issue in this case, del
16   Sarto.
17       A  Well, the Sebastiano was comparable.  I
18   mean, there was a Cranach.  There were other
19   works.  I mean, nothing exactly comparable, no,
20   but there were -- like all sales, I mean, like all
21   Old Master sales they some good works and some not
22   so good works in the sale.
23       Q  I noticed you didn't identify any
24   comparables in your report from the Christie's
25   April 2021 report, was there a reason for that?

Page 89

1        A  Well, I didn't think there were any
2    particularly relevant comparables in that.
3        Q  Now, when an auction occurs that doesn't
4    include the work at issue and doesn't include any
5    comparables, is it appropriate under the standards
6    that govern your profession to use that auction as
7    measure of a work's value?
8        A  No, no.  That wouldn't make sense, no.
9        Q  Now, the respondents also argued that if
10   the del Sarto were included it would be exposed,
11   or one of the most prominent works, and therefore
12   it could yield a lower value than it would
13   otherwise yield with greater works alongside it.
14       Is that true in every case?
15       A  I have heard this argument put forward
16   many times when I worked in the auction rooms and
17   when I worked at Gurr Johns actually, when we were
18   consigning pictures for sale.  And I'm never
19   really that convinced by this argument.  I mean,
20   some sales have lots of high value works in them,
21   and they do well or not, if the case may be, on
22   individual circumstances.  Other sales have one
23   really extensive work and not many others.  It's
24   hard to generalize.
25       I mean, just to take the example we've

Arbitration
October 26, 2022

Page 90

1  already seen, the Botticelli, in the Sotheby's
2  sale in January of 2021, the one that made $92
3  million, that was way, way out there in that sale.
4  I mean, that was the most expensive singular sale
5  by a country mile. Nothing else came close to it.
6  In fact, the whole sale, that sale in January
7  2021, made $114 million, so 80 percent of the sale
8  was in the Botticelli. This happens sometimes.
9      I mean, I can think of another example.
10 The July sale in 2021, in London, Christie's July
11 sale, also had a similarly expensive -- not
12 expensive as the Botticelli, but it had a very,
13 very nice Bellotto, a view of Verona that sold for
14 10 million pounds, $14 million. Again, way way
15 out there, way in advance of anything else in the
16 sale. The next highest price was $3 million, I
17 think it was.
18     So sometimes sales have one style lot;
19 sometimes if you're lucky you'll get a sale where
20 there's lots of style lots. It doesn't really --
21 you can't extrapolate from that whether the
22 picture would have sold or not. It doesn't work
23 like that.
24     Q  Can you predict from looking at the works
25 that were ultimately included in the lot, or in

Page 91

1  the sale, can you predict, looking at the
2  Christie's sale, what the del Sarto would have
3  sold for in that auction?
4      A  No, that's impossible.
5          MR. NIKAS: I have no further questions
6  for Dr. Hunter.
7          ARBITRATOR KRAMER: And Mr. PRESS, would
8  you like to cross examine Dr. Hunter?
9          MR. PRESS: Give me one second.
10         C R O S S - E X A M I N A T I O N
11 BY MR. PRESS:
12     Q  Dr. Hunter, directing your attention to
13 your report which, I believe, is Exhibit 17.
14     A  Yes, I'm there.
15     Q  Okay. It says on the cover of your report
16 that it's a fair market value appraisal; do you
17 see that?
18     A  Yes, I do.
19     Q  And "fair market value" that has a
20 specific meaning to you, right?
21     A  Yes.
22     Q  If you turn to the -- if you would turn to
23 page 8 of your report it says type of valuation?
24         ARBITRATOR KRAMER: Page what? I'm sorry.
25 I didn't hear you. What page number?

Page 92

1          MR. PRESS: This is page 8 of his report.
2  BY MR. PRESS:
3      Q  Do you see that?
4      A  I do.
5      Q  It says type of valuation?
6      A  Yes.
7      Q  Okay. And it says fair market value; do
8  you see that?
9      A  I do.
10     Q  And I'm just going to read this into the
11 record. It says, the fair market value defined by
12 the IRS as stated in the treasury regulations
13 Sections 20.2031-1B, as the price at which the
14 property would change hands between a willing
15 buyer and a willing seller neither being under any
16 compulsion to buy or sell and both having
17 reasonable knowledge of relevant facts.
18         Did I read that correctly?
19     A  Yes, you did.
20     Q  Is that the standards of a fair market
21 value appraisal?
22     A  That is the definition of a fair market
23 value, yes.
24     Q  Okay. Now, returning to the first page of
25 Exhibit 17 of your report.

Page 93

1      A  Yes.
2      Q  Okay. It says, this appraisal is for
3  litigation purposes, right?
4      A  Yes.
5      Q  Okay. That's just the purpose of the
6  appraisal, right?
7      A  That's the purpose of the appraisal.
8      Q  Okay. You didn't change your definition
9  of fair market value on account of it being for
10 litigation purposes?
11     A  No.
12     Q  Okay. Now, returning to page 8 of your
13 report, okay, Exhibit 17. Now, it says type of
14 appraisal and USPAP complaint; do you see that?
15     A  Yes, I do.
16         ARBITRATOR KRAMER: What page are we
17 looking at?
18         MR. PRESS: Page 8 of Exhibit 17, his
19 report.
20         ARBITRATOR KRAMER: Got it.
21 BY MR. PRESS:
22     Q  Okay. It says, this report is considered
23 an unrestricted appraisal according to rules of
24 USPAP of 2021.
25         Do you see that?

Arbitration
October 26, 2022

Page 94

1    A  Yes, I do.
2    Q  So in preparing this report you sought to
3  comply with the USPAP rules and guideline; is that
4  correct?
5    A  That's correct.
6    Q  Okay.  And turning to page 3 of your
7  report.
8    A  Yes.
9    Q  Okay.  And your signed certification?
10    A  Yes.
11    Q  Okay.  Now, at the top you say, I, the
12  undersigned, on behalf of Winston Art Group being
13  duly sworn, hereby depose and certify.
14      Did I read that correctly?
15    A  You did.
16    Q  Okay.  And so you were use issuing this
17  report on behalf of Winston Art Group, correct?
18    A  Correct.
19    Q  Okay.  And towards the bottom of this page
20  is a bullet, it says the appraiser's analysis,
21  opinions, and conclusions were developed, and this
22  report has been prepared in conformity with 2021,
23  USPAP appraisal practice, correct?
24    A  Correct.
25    Q  Okay.  I contracted it a bit, but

Page 95

1  otherwise, that's correct.
2      And you said a couple bullets up, okay,
3  you stated that the appraiser has not performed
4  service as an appraiser, or in any other capacity
5  for the property that is subject of this report
6  within the three-year period immediately preceding
7  acceptance of this assignment.
8      Do you see that?
9    A  I do see that.
10    Q  And you now agree that that certification
11  is not true, correct?
12    A  Yes.
13    Q  Okay.  Now, under USPAP rules, are you
14  familiar with the requirement of record-keeping?
15    A  Yes.
16    Q  Okay.  And you understand that under USPAP
17  there's actually a rule called the record-keeping
18  rule.
19      Are you familiar with that rule?
20    A  Yes, I am.
21    Q  Okay.  And that rule requires an appraiser
22  to maintain something called a work file, right?
23    A  Yes, that's correct.
24    Q  Okay.  And what is the contents of the
25  work file?

Page 96

1    A  It's the research that you've undertaken,
2  if you've spoken to people you might, you know,
3  make a note of what they told you.  It's anything
4  to do with the appraisal or the valuation you've
5  done, you would keep records of that in your file.
6    Q  You would agree that it would be important
7  to keep anything material to an appraisal in the
8  work file, right?
9    A  Yes.
10    Q  Okay.  And in the work file, one of the
11  purposes of the file under USPAP rules is to
12  enable an appraiser or an appraising company to
13  comply with the ethical rules of USPAP, right?
14    A  Yes.
15    Q  Okay.  And now you said -- you testified
16  that you provided information to Geza von Habsburg
17  in connection with his 2019 appraisal of the
18  painting, correct?
19    A  That's correct.
20    Q  And you said that the information you gave
21  him was information that you believe was material
22  to the value of the painting, right?
23    A  Yes, I think it helpful to him.  I mean,
24  he clearly felt it was helpful.  He put my name in
25  the appraisal as somebody who helped him.

Page 97

1    Q  And actually, when he put your name in the
2  appraisal that's actually something that's
3  required under USPAP guidelines if somebody makes
4  a contribution to a report, right?
5    A  Yes.  It would include anyone that gave
6  him material assistance in writing the report.
7  That's what Geza put in the report, yes.
8    Q  He wouldn't have put you in there if he
9  did not believe that you provided material
10  assistance to his appraisal, correct?
11    A  Yes, that's correct.
12    Q  Okay.  And in fact, we can look at it if
13  you would like, but your resume, rather CV, is
14  attached as an exhibit to the 2019 appraisal,
15  right?
16    A  Yes.  Whenever you give any assistance, if
17  you're mentioning somebody that gave assistance,
18  you would -- Winston would normally put that
19  person's CV in the appraisal as well.
20    Q  Okay.  Now, in your appraisal report,
21  okay --
22    A  Yeah.
23    Q  -- the 2021 appraisal.
24    A  Yes.
25    Q  On page 4, it states that the managing

Arbitration
October 26, 2022

Page 98

1  director of Winston Art Group, Elizabeth von
2  Habsburg, provided significant, personal appraisal
3  assistance by reviewing the values and cataloging
4  for the property that is subject of this report.
5       Do you see that?
6    A  Yes, I do.
7    Q  And likewise -- well, strike that
8  question.
9       And that disclosure is included here on
10  grounds of the USPAP rules that we just discussed,
11  correct?
12    A  Yes.
13    Q  And because she made the significant
14  contribution to the report, she needed to be
15  disclosed in the report itself, correct?
16    A  Yes, correct.
17    Q  Okay.  And what was the actual work that
18  Elizabeth von Habsburg did in connection with the
19  2021 appraisal?
20    A  It states it there.  She reviewed values
21  and the catalog.  She didn't provide me with any
22  research and she didn't have any input into the
23  process of making the report.  She really reviewed
24  it after I had done it.
25    Q  Okay.  And what does that mean, if you can

Page 99

1  break that down for those of us who are not
2  practicing appraisers?  What does reviewing the
3  values and catalogs mean?
4    A  Sure.  So she would have got my report,
5  she would have looked through it, she would have
6  read it through, looked at my conclusions, and she
7  would have either agreed with them or not agreed
8  with them, but in this case, she agreed with them,
9  didn't change anything that she felt having
10  reviewed it, she should go in the report as well.
11    Q  Okay.  The review she did was before the
12  report was issued; is that fair to say?
13    A  Yes.  It would be after the report that's
14  been prepared by me, but before it's issued to the
15  client, yes.
16    Q  And Ms. von Habsburg, she's the -- her
17  title is managing director of Winston Art Group,
18  right?
19    A  That's correct.
20    Q  Is she, in fact, the chief executive of
21  Winston Art Group?
22    A  I don't know.  I think she's the managing
23  director.
24    Q  Is there somebody senior to her in the
25  hierarchy?

Page 100

1    A  No, she's the most senior person.
2    Q  And does she have jurisdiction over all
3  the appraisals that are done by Winston Art Group?
4    A  Yes.  I think her position in the company
5  would be -- that would be true, yes.
6    Q  Okay.  And Ms. von Habsburg, she and Geza
7  von Habsburg are husband and wife, correct?
8    A  That's correct.
9    Q  Did you discuss -- did Ms. von Habsburg
10  mention to you at any point that Geza had done a
11  valuation of the same painting?
12    A  No, she didn't.
13    Q  Now, you said that in your testimony just
14  now, that in connection with the 2019 appraisal,
15  okay, you provided information to Geza concerning
16  the fact that Virginia Bonito was a partial owner
17  of the painting, correct?
18    A  Yes.  This was discussed in a phone
19  conversation.
20    Q  And you said, I believe what your
21  testimony was that you should be careful of
22  Virginia Bonito, correct?
23    A  Yes, because I remembered her name from
24  this previous occasion I had dealings with her,
25  yes.

Page 101

1    Q  And so when you said you did a conflict
2  check, did you not check Virginia Bonito in
3  connection with this painting?
4    A  No, because Winston -- first of all, I
5  didn't do the checks.  The checks are done by --
6  in the office of Winston.
7    Q  Okay.
8    A  And they would have checked the names of
9  the people associated with this appraisal, and
10  Virginia Bonito's name doesn't appear there.
11  That's why it didn't show up.
12    Q  Now, we looked at, and we'll be discussing
13  it more later, the Anne Frances Moore report,
14  insurance inventory purposes report?
15    A  Yes.
16    Q  Now, you said that was found in the files
17  of Winston Art Group, correct?
18    A  Yes.
19    Q  At what point did you find that?
20    A  When they alerted to me to the -- to
21  Geza's appraisal.  That must have been in
22  Geza's -- in the files for his appraisal for the
23  2019 appraisal.
24    Q  Okay.  And that report states that it's
25  prepared for Virginia Anne Bonito, right?

Arbitration
October 26, 2022

Page 102

1     A  Yes, I think so.  I mean, it's in -- what
2  number is it?  It's three, wasn't it?  Let me just
3  check that.
4         ARBITRATOR KRAMER:  Yes, prepared for
5  Virginia Anne Bonito.
6         THE WITNESS:  Yes, there you go.  Prepared
7  for Virginia Anne Bonito, that's correct.
8  BY MR. PRESS:
9     Q  Now, I want to direct your attention to
10  your -- to the 2019 appraisal --
11     A  Yes.
12     Q  -- which is Exhibit 2.
13     A  Yes.
14     Q  All right.  Now, that appraisal states
15  that it's a fair market value appraisal, correct?
16     A  Yes.
17     Q  Okay.  And if I direct your attention to
18  page 7 of Exhibit 2 --
19     A  Yes.
20     Q  Let's wait until the arbitrator gets
21  there.
22         It says type of valuation there, correct?
23     A  It does, yes.
24     Q  Okay.  And it says fair market value?
25     A  Yes, it does.

Page 103

1     Q  Okay.  And I'm not going to burden the
2  record with this, but do you agree that the
3  definition in the language there concerning fair
4  market value is the same as the language that came
5  from your expert report?
6     A  Yes, it's exactly the same.
7     Q  And that's because the definition of fair
8  market value is the same, correct?
9     A  Yes.
10     Q  Okay.  You're not contending in this case
11  that there's a different fair market value in the
12  context of litigation versus in some other
13  context, are you?
14         MR. NIKAS:  Objection.
15  BY MR. PRESS:
16     Q  You can answer.
17         ARBITRATOR KRAMER:  Overruled.
18         THE WITNESS:  Fair market value -- fair
19  market values are a range of values.  It's not
20  just one value.  So it definitely depends on the
21  purpose of the valuation.  You could be at the low
22  end of a fair market value or the high end of a
23  fair market value.  Yes, it can be vary.
24  BY MR. PRESS:
25     Q  But the standard described in both these

Page 104

1  reports is the same, correct?
2     A  Correct.
3     Q  Now, turning to page 4 of the 2019 expert
4  report.
5     A  Yes.
6     Q  Now, it says the Old Master specialist Tim
7  Hunter provided significant, personal property
8  appraisal assistance by assisting with the
9  research and valuation for the property that is
10  the subject of this report.
11         Did I read that correctly?
12     A  You did.
13     Q  Now, it says you provided significant
14  appraisal assistance; do you see that?
15     A  I do.
16     Q  And it also says that you did research and
17  valuation; do you see that?
18     A  No, it doesn't say that.  It says I
19  assisted with research and valuation.
20     Q  Okay.  All right.  And assisting with
21  research would indicate that you performed
22  research on comparable works, correct?
23     A  No, it doesn't suggest that.
24     Q  It doesn't mean -- did you perform
25  research in connection with the attribution of the

Page 105

1  work?
2     A  No.
3     Q  No.  And as for valuation, this indicates
4  that you did work on the valuation of that
5  property?
6     A  No, it doesn't, no.
7     Q  No?
8     A  No.
9     Q  Okay.  But the assistance Mr. von Habsburg
10  found to be significant, correct?
11     A  Yes.  I'm flattered that Geza found my
12  assistance significant.  I mean, this is standard
13  wording, I have to say, and had I seen that, I was
14  not shown the final -- I was not shown a draft of
15  the appraisal.  I think I would have --
16         ARBITRATOR KRAMER:  I think you've
17  answered he question.
18  BY MR. PRESS:
19     Q  Turning back to page 3 of the Exhibit 2.
20     A  Yes.
21     Q  Now --
22         ARBITRATOR KRAMER:  Which page are we
23  looking at?  I'm sorry.
24         MR. PRESS:  Page 3.
25  BY MR. PRESS:

Page 106

1    Q  That's the sign certification, okay.
2  Mr. von Habsburg, he also signed this report on
3  behalf of Winston Art Group, correct?
4    A  That's correct.
5    Q  Okay.  And he said -- in the second bullet
6  he said this appraisal represents the appraiser's
7  best judgment and opinion as to the fair market
8  value of the subject property.
9       Do you see that?
10    A  Yes, I do.
11    Q  And you don't have any reason to disagree
12  with that statement, do you?
13    A  No, I don't.
14    Q  Now, at the bottom of this page it states
15  that the appraiser has made a personal inspection
16  of the property that is the subject of this
17  report, correct?
18    A  Yes.
19    Q  Okay.  So Mr. von Habsburg actually
20  physically inspected the painting, correct?
21    A  That's correct.
22    Q  And in fact, if you turn to page 5, it
23  states that he -- that he and an appraisal
24  associate named Andrea Lander inspected the
25  property in the Bronx on October 4, 2019.

Page 107

1       Do you see that?
2    A  Yes, I do.
3    Q  Now, I think -- I believe what you said is
4  you said you spoke to Mr. von Habsburg, I think
5  you mentioned two phone calls; do you recall that?
6    A  Yes.
7    Q  Okay.  So one phone call you said you told
8  him to be careful of Ms. Bonito, correct?
9    A  Yes.
10    Q  What about the other phone call?
11    A  I don't remember what we discussed in that
12  phone call.
13    Q  Okay.  Did you have any e-mail
14  communications with Mr. von Habsburg in connection
15  with the 2019 appraisal?
16    A  I don't remember.
17    Q  Okay.  You haven't checked?
18    A  I did a check, but I couldn't find
19  anything.
20       ARBITRATOR KRAMER:  You did check or
21  didn't check?
22       THE WITNESS:  I did check, yes.
23  BY MR. PRESS:
24    Q  Did you ever have any discussion with
25  Andrea Lander concerning the property?

Page 108

1    A  Not that I can remember.  I mean, it would
2  be doubtful that I would have discussed it with
3  Andrea.
4    Q  And it says further on on page 5, it says
5  the examiner examined the property with a
6  flashlight and under available daylight in situ.
7       Do you see that:
8    A  Yes.
9    Q  And it also says, whenever necessary items
10  were examined -- whenever necessary items were
11  examined, it was with a magnifying lens.
12       Do you see that?
13    A  Yes, I do.
14    Q  And it says a black light was used to
15  examine the fine art for the presence of signs of
16  any visible condition issues had been noted in the
17  narrative when applicable.
18       Do you see that?
19    A  Yes, I do.
20    Q  And you weren't able to do any of those
21  things in connection with the 2021 appraisal,
22  correct?
23    A  Sadly, I wasn't able to do that.
24    Q  Now, it also says at the bottom of that
25  paragraph that a -- that the client provided a

Page 109

1  condition report; do you see that?
2    A  Yes, I do.
3    Q  Do you know who the client was?
4    A  No, I didn't know who the client was.
5    Q  Do you know where the client got the
6  condition report from?
7    A  So we're talking about the 2019 appraisal?
8    Q  Yes.
9    A  No, I don't.
10    Q  Now, you believe that the del Sarto could
11  be worth $15 million?
12    A  I do believe that.
13    Q  That's a significant painting, correct?
14    A  It's a significant painting?
15    Q  That would be a significant painting?
16    A  It would be a significant painting, yes.
17    Q  And you testified that you've simply
18  forgotten any involvement in the appraisal of that
19  painting in 2019?
20    A  Yes, because my input was so small.  I
21  didn't -- I didn't research it.  I didn't give
22  valuation for it.  I didn't see it.  I had a phone
23  conversation with Geza.  It was very minimal, my
24  input into that.
25    Q  Yet Geza thought it material to include a

Arbitration
October 26, 2022

Page 110

1 consultation with you in the 2019 report?
2      A  He did, and --
3          ARBITRATOR KRAMER:  Try to just answer.
4          THE WITNESS:  Yeah, I did.
5 BY MR. PRESS:
6      Q  Now, you mentioned that the conflict check
7 was done on the painting, right?
8      A  No, on the appraisal.
9      Q  On the appraisal?
10     A  Yeah.
11     Q  When you say that -- I'm sorry.
12         The conflict check was done concerning
13 whether the -- whether Winston Art had appraised
14 the painting before, correct?
15         MR. NIKAS:  Objection.  That's not his
16 testimony.
17         ARBITRATOR KRAMER:  I think I understand
18 that the conflict check, and procedures apparently
19 have changed, is based on the seller, not on the
20 painting itself.
21 BY MR. PRESS:
22     Q  There is a three-year rule in USPAP rules
23 that you cite in your report, correct, Dr. Hunter?
24     A  Yes, that's correct.
25     Q  And that rule states that any appraisal,

Page 111

1 any prior appraisal of the same work needs to
2 be -- within the past three years needs to be
3 disclosed, correct?
4      A  That's correct.
5      Q  And that's the rule that you cite to in
6 your signed certification, right?
7      A  That's correct.
8      Q  Okay.  And your testimony -- strike that.
9         Now, the condition of an Old Master
10 painter is an important factor in its valuation,
11 right?
12     A  Yes.
13     Q  Okay.  Is it fair to say it's one of the
14 most important factors?
15     A  It's one of the important factors, yes.
16     Q  And you concede you never saw the
17 condition of the painting yourself, correct?
18     A  That's correct.
19     Q  And you never hired a conservator to
20 examine the painting?
21     A  No, I didn't.
22     Q  And you've never been able to assess the
23 state of the restoration of the painting, correct?
24     A  That's correct, I haven't been able to.
25     Q  Everything you received has been second or

Page 112

1 third hand, is that fair to say, concerning the
2 condition of the painting?
3      A  Yes, that's correct.
4      Q  Now, you respect the professionalism of
5 Geza von Habsburg, don't you?
6      A  Yes, I do.
7      Q  He's a capable appraiser of Old Master
8 paintings, isn't he?
9      A  Yes, he is.
10     Q  Okay.  Do you have any reason to doubt
11 Geza von Habsburg's determination concerning the
12 condition of the painting in 2019?
13     A  I don't doubt it.  Geza viewed the picture
14 himself and he stated that he finds the condition
15 complicated.  I think that's a perfectly
16 reasonable position to hold.
17     Q  Okay.  I mean, turning to his report,
18 which is Exhibit 2.
19     A  Yes.
20     Q  He -- just directing your attention to --
21 sorry, that's on page 8.
22     A  The photo.
23     Q  That's for the arbitrator.
24        It says -- he says that a condition report
25 accompanies the work?

Page 113

1      A  Say that again.
2      Q  If you turn to page 8.
3      A  A condition report accompanies the work.
4 Yes, I see that.
5      Q  Do you know what the condition report was
6 that he had looked at?  Did you ever see that?
7      A  No, I don't think that he included it in
8 the report so I have no idea.
9      Q  Okay.
10         ARBITRATOR KRAMER:  I didn't hear that
11 question.  I'm sorry.
12         MR. PRESS:  The question was:  Did you --
13 have ever seen the condition report that's
14 referenced here.
15         ARBITRATOR KRAMER:  Okay.
16 BY MR. PRESS:
17     Q  Now, he says -- Geza says, an examination
18 of a pre-restoration X ray shows that apart from
19 the obvious paint loss only a very thin paint
20 surface is survived from the original.
21        Do you see that?
22     A  Yes.
23     Q  Okay.  And that would be -- that's a
24 negative statement about the condition of the
25 work, isn't it?

Arbitration
October 26, 2022

Page 114

1    A  So if you could just point out that
2  sentence again.
3    Q  Sure.  It's in the middle.  An examination
4  of the pre-restoration X ray shows that apart from
5  the obvious paint losses, only a very thin paint
6  surface survived from the original.
7        Do you see that?
8    A  Yes, I do.  Yes, that's mildly negative.
9    Q  But that's a negative statement about the
10  condition?
11    A  Yes, if it's a decaying paint surface.  I
12  mean, it depends how the artist intended to -- I
13  mean, some paint surfaces are thin, so it's not
14  necessarily negative, but it could be construed as
15  that, yes.
16    Q  And it says that there's little or no
17  report about the recent restorations in the newest
18  varnish layer, including the present surfaces?
19    A  Yes, I see that.
20    Q  And that lack of information was of
21  concern, isn't it?
22    A  It could be, yes.
23    Q  Okay.  And then he says, in this
24  appraiser's opinion the subject is not as stated
25  in the appraisal of Anne Frances Moore in

Page 115

1  excellent condition for its age.
2        Do you see that?
3    A  I see that.
4    Q  Geza does not think that the painting is
5  in excellent condition, does he?
6    A  That's how I would read that.
7    Q  And further down he says, compared to
8  other well-preserved 16th Century works with
9  intact original surfaces, the present work, albeit
10  optically very pleasing and accepted by Sydney
11  Freedberg as an autographed painting by del Sarto,
12  seems to lack the immediacy of his other
13  masterpieces and appears flat in comparison.
14        Do you see that?
15    A  I do see that.
16    Q  Okay.  And that is also a negative
17  statement about the condition of the painting;
18  isn't it?
19    A  That would be negative, yes.
20    Q  Now, further down in the discussion of
21  attribution --
22    A  Can we pause for a loo break?
23        ARBITRATOR KRAMER:  Sure.
24        (Whereupon, a break was taken at
25  12:34 p.m.)

Page 116

1        ARBITRATOR KRAMER:  All right, Mr. Press.
2  BY MR. PRESS:
3    Q  All right.  We're still on page 8 of the
4  2019 appraisal?
5    A  Yes.
6    Q  And there's a -- just taking it from the
7  top of attribution to authenticity?
8    A  Yes.
9    Q  It says, Dr. Virginia Anne Bonito had done
10  extensive research on the subject work.
11  Unfortunately, the list of expert opinions implied
12  by Dr. Bonito fall short of what serious
13  collectors would require in order to feel that
14  this work is accepted as confirmed to be by the
15  artist in the market.
16        Do you see that?
17    A  I do.
18    Q  And do you have any disagreement with
19  Geza's observation?
20    A  No.  I think it's a fair observation.
21    Q  Okay.  And further down it says that, you
22  know, that Dr. Freedberg's certificate is
23  important, but he says the lack of modern written
24  scholarly opinion by a recognized del Sarto or
25  Italian painting experts, and a lack of literature

Page 117

1  and exhibition history outside of the commercial
2  training house exhibition is an additional
3  deterrent.
4        Did I read that correctly?
5    A  You did.
6    Q  And you don't disagree with that
7  statement, do you?
8    A  I don't disagree with that, no.
9    Q  And you looked at the Freedberg
10  endorsement, correct?
11    A  I did, yes.
12    Q  And that's the handwritten letter, right?
13    A  Yes.
14    Q  That was never published publicly, was it?
15    A  Not to my knowledge, no.
16    Q  Okay.  So the public at large doesn't even
17  know about the Freedberg endorsement, does it?
18    A  No.
19        MR. NIKAS:  Objection.  As of what time?
20        MR. PRESS:  The reference to --
21        MR. NIKAS:  Sorry.  I have an objection.
22  He asked a question as to whether the public knows
23  about the letter and --
24        MR. PRESS:  He already answered.
25        MR. NIKAS:  And I objected to the

Page 118

1    question.
2        ARBITRATOR KRAMER:  Can you rephrase the
3    question and put a timeframe on it, please.
4    BY MR. PRESS:
5        Q  Okay.  Well, in 2020 -- strike that.
6        In the year 2021, the public didn't have
7    any knowledge concerning the Freedberg
8    endorsement, correct?
9        A  The sale of the picture was in 2022,
10    right?
11        Q  That's correct.
12        A  So in 2021, there was no publication where
13    Freedberg's letter would have been mentioned,
14    that's true.
15        Q  Okay.  And now, further down it says in
16    that next paragraph, it says, Andrea del Sarto's
17    works are almost exclusively on panel and no
18    explanation is available as to the fact that this
19    work is on canvas.
20        Do you see that?
21        A  I do see that.
22        Q  Do you agree with that statement?
23        A  Not necessarily.
24        Q  Have you seen an explanation for why this
25    work is on canvas?

Page 119

1        A  I don't know how you'd find an explanation
2    for that, but it's not true to say that -- whilst
3    it's true to say that most of del Sarto's works on
4    panel, they're not all on panel.  There are works
5    on canvas.  The famous picture in the national
6    gallery, the portrait of the man, that's on
7    canvas.  I don't even need to be there.  I mean,
8    this is on canvas as well.  It's perfectly
9    understandable.  It's rare, but it's not unknown.
10        Q  Okay.  Further down in this paragraph is a
11    statement that you eluded to in your direct
12    testimony that there have been several campaigns
13    of restoration on this work leading to a question
14    as to whether the condition may be more complex
15    than is presented.
16        Do you see that?
17        A  I do see that.
18        Q  And you mentioned that yourself before,
19    correct?
20        A  Did I?  I can't remember what context, but
21    I don't have a problem with that.  That's a
22    perfectly acceptable statement to make.
23        Q  And the question -- this -- he's saying
24    this raises a further question as to the
25    attribution and authenticity of the work, correct?

Page 120

1        A  Well, I think it raises the question on
2    the condition which is a separate question from
3    the authenticity.
4        Q  Okay.  Well, doesn't it also go to the
5    authenticity to the extent that del Sarto's works
6    might be expected to be done on wood panel rather
7    than on canvas?
8        A  No.  I think this is a false argument.
9    The fact that it's on canvas does not lead me, or
10    should not lead anyone to therefore think the
11    picture is inauthentic because it is known that
12    del Sarto did use canvas on occasions.
13        Q  Okay.
14        A  Art, historically, that's just not
15    consistent.
16        Q  But he said that it raises questions,
17    that's fair to say, correct?
18        A  Yes, but they're questions -- they're art
19    historical questions.  Why did del Sarto use a
20    canvas here rather than a panel?  That's a
21    question to ask.  It doesn't pertain authenticity.
22        Q  Okay.  Turning to the next page of the
23    report.
24        A  Yes.
25        Q  At the top, the first paragraph says, Geza

Page 121

1    says, more research is necessary before the
2    attribution settlement.  More expert opinions need
3    to be sought, and ideally, significant scholars
4    should publish subject work.
5        Do you see that?
6        A  Yes.
7        Q  You don't disagree with that statement, do
8    you?
9        A  I don't disagree with that.
10        Q  Okay.  And he's saying that the expert
11    opinions and the publication is needed in order to
12    condition the public to accepting the painting as
13    a legitimate work of del Sarto, right?
14        A  When you say "public," what do you mean
15    specifically?
16        Q  Okay.  I am saying -- withdraw the
17    question.
18        Are you saying that the expert opinions in
19    scholastic work would help to authenticate the
20    work to the art-buying public, correct?
21        A  Yes, correct.
22        Q  And there's also a reference to an
23    exhibition on the page before at New York Trinity
24    House?
25        A  Yes.

Arbitration
October 26, 2022

Page 122

1     Q  Are you familiar with that exhibition
2  space?
3          ARBITRATOR KRAMER:  Where is that
4  reference, please?
5          MR. PRESS:  It's in the middle of page 8.
6          ARBITRATOR KRAMER:  We're back to page 8?
7          MR. PRESS:  Yes.
8          THE WITNESS:  I haven't visited it, but I
9  know it's on the end of the first paragraph of the
10  note.  I'm aware of them.  I haven't visited it,
11  but I know it's a commercial gallery.
12  BY MR. PRESS:
13     Q  And are you aware that that gallery is
14  affiliated with Virginia Anne Bonito?
15     A  I didn't -- I don't know that, no, but she
16  mentioned it to me in my discussions with her, you
17  know, back in 2015 or so.  She mentioned that the
18  Jacopo Sansovino that she was trying to get me to
19  loan against was also in Trinity House.
20     Q  Okay.
21     A  So I knew there was f some connection.
22     Q  Okay.  And other than Trinity House which
23  has some affiliation with Ms. Bonito, the painting
24  hadn't been exhibited anywhere?
25     A  That's correct.

Page 123

1     Q  Okay.  Now, in on page --now, back to
2  page 9.
3     A  Yes.
4     Q  Okay.  There is a discussion entitled
5  value; do you see that?
6     A  Yes, I do.
7     Q  Okay.  And we'll get to the comps in a
8  moment, but it says in 2015 this painting was
9  appraised by another appraiser at 30 million for
10  both fair market value and retail replacement
11  value is chiefly based on the price of $37 million
12  achieved by Raphael's portrait of Lorenzo de
13  Medici.  Do you see that?
14     A  Yes, I do.
15     Q  Now, we looked at -- you understand this
16  to be a reference to Anne Frances Moore's
17  appraisal?
18     A  Yes, I do.
19     Q  We looked at that appraisal, we can look
20  at it again, but that appraisal, in fact, was just
21  a retail replacement value appraisal, correct?
22     A  That's my understanding, and that's what
23  it says on the front page of that appraisal.
24     Q  That wasn't a fair market value appraisal,
25  was it?

Page 124

1     A  I didn't think so.
2     Q  Okay.  And it says, continuing on page 9,
3  it says the Raphael painting was regarding by all
4  the main authorities as autographed.  However, the
5  prices of Raphael's paintings are in a different
6  league than those under del Sarto.  The prices are
7  exponentially higher than del Sarto.
8          Do you see that?
9     A  Yes.
10     Q  And you agree with that statement,
11  correct?
12     A  I partially agree with that statement.
13     Q  Okay.  You testified yourself that Raphael
14  is the more prized artist than del Sarto, correct?
15     A  That's correct, yes.
16     Q  And so you don't dispute the -- Geza's
17  statement that the Raphael painting was regarded
18  by all the main authorities as autographed,
19  correct?
20     A  Well, we did discuss this painting among
21  the comparables that I used, and that painting --
22  questions had been asked about that painting in
23  the past, but it's true to say that today all main
24  authorities do not --
25     Q  Okay.  Now, Geza continues, he says

Page 125

1  there's little or comparable value among the works
2  of del Sarto in a period of auction.
3          Do you see that?
4     A  Yes.
5     Q  And he discusses the chalk head study that
6  you mentioned?
7     A  He does, yes.
8     Q  And he said the next highest price is for
9  an oil, Madonna child, which sold at Sotheby's for
10  $1.1 million; do you see that?
11     A  Yes.
12     Q  And that was also something that you
13  included in your comps?
14     A  Correct.
15     Q  And then you said that several
16  attributable works recently failed to sell; do you
17  see those two?
18     A  Correct, yes.
19     Q  And those are the two that you mentioned
20  that were bought in that were among your comps,
21  correct?
22     A  That's correct.
23     Q  And so then he concludes, so this would
24  suggest that even if documented was fully
25  autographed by noted scholars of the subject, a

Page 126

1  fair market value in the range of two to three
2  million for the work would be appropriate.
3       Do you see that?
4       A  I do see that.
5       Q  Okay.  And he continues, that the fact
6  that much work still needs to be done, would mean
7  that the present fair market value is somewhat
8  less than this range.  Therefore, the appraiser
9  signed has signed a fair market value with current
10 scholarship of 1.5 million.
11      Do you see that?
12      A  I do, sir.
13      Q  Okay.  So he's signing it based on the
14 current scholarship and the condition of the work;
15 fair to say?
16      A  Yes.
17      Q  Okay.  He is -- he did not find the
18 Raphael painting as a persuasive comp, did he?
19      A  No, he didn't.
20      Q  All right.  If you could turn to pages 12
21 and 13 of the 2019 report.
22      A  Yes.
23      Q  It looks at five comps; do you see those?
24      A  Yes.
25      Q  Okay.  There's the Raphael that we

Page 127

1  discussed before, and then it's the head of
2  St. Joseph, that's the drawing that you
3  considered, correct?
4       A  Correct.
5       Q  And then it's the -- it's really two other
6  works, three auctions, but two other works,
7  correct?
8       A  Correct.
9       Q  And I think as you said on the second
10 page, on page 13, that's the Madonna child when it
11 sold for -- I'm sorry, Item 3, when it sold for
12 1.1 million, correct?
13      A  That's correct.
14      Q  Okay.  And then items four and five were
15 put up for auction, but were bought in?
16      A  That's correct.
17      Q  Okay.  So they didn't sell?
18      A  That's correct.
19      Q  Now, Geza did not include the other comps
20 that you chose to include in your 2021 appraisal,
21 correct?
22      A  He didn't include that.
23      Q  Okay.  And looking at these, the -- we'll
24 do this on another page.
25      Okay.  Just actually turning to page 15 of

Page 128

1  Exhibit 2.
2       A  Yes.
3       Q  There's a discussion that says market
4  conditions for midlevel and entry level material
5  mix.
6       Do you see that?
7       A  I do.
8       Q  Okay.  It says, as one commentator wrote,
9  the market is increasingly bifurcated between the
10 very finest and all the rest.
11      Do you see that?
12      A  I do.
13      Q  And it states, thus, middle and lower
14 levels of the market particularly works familiar
15 auctions for those in less than exceptional
16 conditions remains difficult.
17      Do you see that?
18      A  I do.
19      Q  Do you agree with those statements?
20      A  It's a generalization, but yes, in
21 general, yes.
22      Q  Now, let's now move back to Exhibit 17,
23 your 2021 appraisal.
24      Now, we discussed the conflict check that
25 you testified that Winston Art Group performed in

Page 129

1  connection with the submission of the appraisal
2  assignment?
3       A  Yes.
4       Q  But did you yourself make any affirmative
5  efforts to determine whether the painting had been
6  appraised Winston Art Group before?
7       A  What time scale are we talking here?
8       Q  I'm talking about -- well, after you
9  were -- did there come a time where you were
10 approached to do an appraisal of the del Sarto,
11 involved in this arbitration?
12      A  Sorry, what was the question again?
13      ARBITRATOR KRAMER:  When were you first
14 approached to provide an expert opinion on the
15 appraisal.
16      THE WITNESS:  Oh, I see.  November, the
17 fall 2021.
18      ARBITRATOR KRAMER:  November 2021?
19      THE WITNESS:  When I was asked to do the
20 valuation of this picture?
21 BY MR. PRESS:
22      Q  Correct.
23      A  Yes, I think it was November of 2021.  I
24 need to check, but it was autumn of 2021.
25      Q  Okay.  And you knew you would need to

Page 130

1  certify that you hadn't previously -- that Winston
2  Art Group, rather, hadn't previously appraised the
3  work in the past three years, correct?
4      A  That's correct.
5      Q  Okay.  So my question is, what affirmative
6  efforts did you make to determine whether Winston
7  Art Group had previously appraised that painting
8  within the past three years?
9      A  Well, I would have relied on the fact that
10 I know Winston would to their conflict checks, and
11 they would tell me if it had come up.  There was
12 nothing else I could do.  I didn't have any
13 records of this other appraisal in my files.  I
14 don't keep those kind of records, and I don't have
15 access to Winston's database so I couldn't do
16 these checks.  I relied on Winston Art Group to do
17 the checks for me.
18     Q  Okay.  Turning to -- turn to page 5 of
19 your report.
20     A  Yes.
21     Q  At the bottom it says that -- it says, the
22 appraiser is given adequate time to research the
23 property.
24        Do you see that paragraph at the bottom?
25     A  Yes, I do.

Page 131

1      Q  It says, the information and material, it
2  says, is maintained in the work file at the
3  offices of Winston Art Group and is available upon
4  request.
5        Do you see that?
6      A  Yes, I do.
7      Q  Okay.  And to your knowledge, is the work
8  file still available at Winston Art Group for this
9  appraisal?
10     A  As far as I know it is, yes.
11     Q  Okay.  And to your understanding, the work
12 file in connection with the 2019 appraisal would
13 also be available in the office of Winston Art
14 Group?
15     A  As far as I know, yes.
16     Q  Okay.  Now turning to page 6.
17     A  Yes.
18     Q  There's a discussion of extraordinary
19 assumptions.
20     A  Yes.
21     Q  Now, an extraordinary assumption is an
22 assumption of a fact which is uncertain to an
23 appraiser, correct?
24     A  Yes.
25     Q  Okay.  That's actually definition in the

Page 132

1  USPAP rules, correct?
2      A  That's correct.
3      Q  Okay.  And there's also something called a
4  hypothetical assumption.
5        Do you know what that is?
6      A  Yes, I do.
7      Q  Okay.  And a hypothetical assumption is an
8  assumption of facts which is known to be contrary
9  to the state of facts, correct?
10     A  That's correct.
11     Q  And in your expert report, you made some
12 extraordinary assumptions?
13     A  I did.
14     Q  Okay.  And those are the assumptions
15 that -- and you said that if false, an
16 extraordinary assumption would alter your opinion
17 and conclusions, correct?
18     A  That's correct.
19     Q  And that's true about this report as well?
20     A  That's true of all USPAP reports, yes.
21     Q  So if any of the assumptions that you made
22 as extraordinary assumptions were not correct that
23 would change your conclusion, correct?
24     A  Yes, that's correct.
25     Q  And the assumptions that you've made were

Page 133

1  in -- this is on page 6 of your report?
2      A  Yes.
3      Q  You said there's no dispute as to type,
4  correct?
5      A  Well, the ownership comes into the
6  hypothetical conditions -- the hypothetical
7  assumptions.  That's where I discuss -- that's
8  where I disclose the ownership issue, but under
9  the extraordinary assumptions, I think it's the
10 condition, the attribution.
11     Q  Well, let's just go through it here.  It
12 says for purposes of this assignment at the
13 instruction of the client, the appraiser has made
14 the following extraordinary assumption.
15        Do you see that?
16     A  Yes.
17     Q  Okay.  And so you made these assumptions
18 at the direction of Gary Greenberg, correct?
19     A  Yes, through counsel, yes.
20     Q  Okay.  Now, to the extent that an
21 extraordinary assumption has to be something
22 that's uncertain, correct?
23     A  That's correct.
24     Q  Okay.  So if you knew something to be
25 otherwise, then you can't make that an

Arbitration
October 26, 2022

Page 134

1  extraordinary assumption, correct?
2      A  That would be a hypothetical condition.
3      Q  Okay.  Let's just go through these
4  assumptions you made.
5      A  Yes.
6      Q  You said -- I'm just looking at the
7  middle -- there's no dispute with respect to
8  title.
9        Do you see that?
10     A  Yes.
11     Q  And you assume the work is authentic?
12     A  Yes.
13     Q  Okay.  It says the work as the provenance
14  described by the faction.
15        Do you see that?
16     A  Yes.
17     Q  The work as good condition?
18     A  Yes.
19     Q  Okay.  And the work has not been offered
20  to the market, i.e., fresh to the market?
21     A  Yes.
22     Q  The sitter is properly identified as
23  Ottaviano de Medici?
24     A  Yes, correct.
25     Q  Okay.  And there's no literature

Page 135

1  exhibition citation except what's indicate in the
2  materials provided by the client?
3      A  Yes.
4      Q  And the work was unknown on the market
5  prior to the Freedberg examination?
6      A  Yes.
7      Q  Okay.  And you assumed all of these
8  assumptions to be accurate for purposes of your
9  report?
10     A  That's correct.
11     Q  Now, on page 7 of the report you said that
12  you were unable to -- in the method of the
13  research, okay, it mentions that, at the bottom,
14  that you were limited in being able to go and
15  visit certain works to the ongoing travel and
16  health restrictions imposed by COVID-19.
17        Do you see that?
18     A  Yes.
19     Q  Okay.  In fact, the COVID-19 pandemic at
20  that time was limiting a lot of people's travel,
21  wasn't it?
22     A  It was, yes.
23     Q  All right.  All right.  Turning to page 9
24  of your report.
25     A  Yes.

Page 136

1      Q  There is a -- well, just at the top,
2  there's a -- it says, WAG, hash tag, I guess, and
3  there's a number there.
4        What is that number?
5      A  That's the appraisal number.  Every
6  appraisal is given a number at Winston.
7      Q  Okay.  How does that work?  There's a --
8  the first number is that like the client and then
9  the matter number or --
10     A  No, the appraisal number of this
11  particular appraisal is 16089.  That's the unique
12  appraisal number.  So I would -- that's how I
13  would log it in my logbook.  Whenever I refer to
14  an appraisal, for security reasons, we don't use
15  people's names.  We don't say the del Sarto
16  appraisal; we just use the number.  So that's the
17  easy way of doing it.
18        The second number, I'm not sure what that
19  number is actually, but the appraisal number for
20  this appraisal is 16089.
21     Q  Okay.  Now, the description of the
22  painting, you describe it as a gentleman, possibly
23  Ottaviano de Medici, correct?
24     A  That's correct.
25     Q  So you also acknowledge that the sitter in

Page 137

1  the painting might not be Ottaviano de Medici?
2      A  Yes.  I mean, it's one of the assumptions
3  of the appraisal that it is, but even then I'm
4  being ultra cautious and saying it's possibly him.
5      Q  Now, you state -- as to the authenticity,
6  you say the definitive attribution to Andrea del
7  Sarto was made by Sydney Freedberg.
8        Do you see that?
9      A  Yes.  I don't say that.  I'm quoting from
10  the documentation the client provided.
11     Q  Okay.  And so the documentation that the
12  client provided to you did you understand that to
13  be written by a Virginia Bonito?
14     A  No, I didn't know that.
15     Q  If the condition report and the other
16  documentation were written by the painting's
17  owner, would that affect your reliance on that
18  report?
19     A  If it was written by the owner, yes, I
20  wouldn't give much credence to that, but I
21  didn't -- I don't know that these were written by
22  the owner.
23     Q  Okay.  So if you learn that the condition
24  report and the attribution, all that work was done
25  by Bonito herself, that would impact your

Arbitration
October 26, 2022

Page 138

1  valuation, wouldn't it?
2       MR. NIKAS:  Objection to form.
3       ARBITRATOR KRAMER:  What's the nature of
4  your objection?
5       MR. NIKAS:  The assumptions that he's
6  asking the witness to make, the assumptions should
7  be that the information was provided by the
8  respondents was truthful, and that's what the
9  claimants believed, and if that was not truthful,
10  then his appraisal would have assumed the
11  respondents were being truthful and were providing
12  information about it and, therefore, shouldn't
13  impact that opinion.  He's asking about
14  assumptions --
15      MR. PRESS:  This is -- I didn't ask him
16  those questions.
17      ARBITRATOR KRAMER:  It's overruled.  Go
18  ahead.
19      THE WITNESS:  Okay.  So Mr. Press, I
20  gather you're asking me if an owner provides you
21  with an authenticity document and a condition
22  report, unless they were a qualified restorer,
23  then, yes, it would be highly compromised.
24  BY MR. PRESS:
25      Q  Now, let's turn to your comps.

Page 139

1      A  Yes.
2       ARBITRATOR KRAMER:  Turn to what?
3       MR. PRESS:  The comps, the comparables.
4  BY MR. PRESS:
5      Q  That was on page 28?
6      A  Yes.
7      Q  Now -- so on -- you added in addition to
8  the del Sarto sales and buy-ins that Geza had
9  considered in the 2019 appraisal, you've added it
10  looks like five additional paintings?
11      A  I did.
12      Q  Okay.  And he didn't consider those
13  paintings?
14      A  Not that I'm aware.
15      Q  Okay.  Now, the Botticelli, as a painter,
16  Botticelli is in a whole different league from the
17  del Sarto; is that fair to say?
18      A  I wouldn't say that.
19      Q  No.  Okay.  And the painting, though, was
20  in excellent condition, correct?
21      A  Yes.  They were talking about the portrait
22  of the young man with the rounder.
23      Q  Yes.
24      A  Yes, it was in very good condition
25  considering its age.

Page 140

1      Q  And that was on wood, correct?
2      A  Correct.
3      Q  Okay.  And it's fair to say wood is a more
4  prized median for painting than canvas?
5      A  No, I don't agree with that, and I saw
6  that in your brief.  I don't know where this comes
7  from, but you have to judge a work of art on its
8  individual unique merits.  Some are on panels,
9  some are on canvas.  It doesn't -- I mean, Titian
10  hardly ever painted on panel, but you wouldn't say
11  they worth less because they're on canvas or
12  they're on panel.  I mean, Titian doesn't paint on
13  panel.
14      Q  Okay.  All things being equal, sales on
15  panels fetch higher prices than sales on canvas;
16  isn't that fair to say?
17      A  No, I don't think that's fair to say.
18      Q  Okay.  The Bronzino was another piece that
19  was in excellent condition, correct?
20      A  No, it wasn't.  I gave my testimony
21  earlier, and I suspect that this picture was
22  compromised in its condition.  It had cracks in
23  the panel.  One crack went through the face, so I
24  think that's one limiting conditions may meant
25  that it didn't make more money than it might have

Page 141

1  done.
2      Q  You placed the most emphasis in your
3  comparables on the Fra Bartolomeo piece?
4      A  No.  I said that the three most important
5  ones were the Bronzino, the Fra Bartolomeo, and
6  this del Sarto drawing.
7      Q  Okay.  The Raphael piece at the bottom of
8  page 28 --
9      A  Yes.
10      Q  -- a portrait of Lorenzo de Medici.
11      A  Yes.
12      Q  That was a piece that was relied on by
13  Frances Anne Moore, correct?
14      A  Correct.
15      Q  And Geza dismissed that piece as a
16  comparable, correct?
17      A  He didn't think it was relevant, no.  It's
18  on canvas, by the way, that picture.
19      Q  Now, the COVID-19 pandemic did have impact
20  on artwork, didn't it?
21      A  Inevitably, yes.  That had an impact on
22  every aspect of life.
23      Q  Okay.  If you turn to page 31 of your
24  report.
25      A  Yes.

Arbitration
October 26, 2022

Page 142

1    Q   You say, overall sale totals are
2    dramatically down from the previous year.
3         Do you see that?  That's the first line of
4    the market overview.
5    A   Yes.  I'm not sure what date that specific
6    date refers to because in 2021, the first auction
7    houses to report this huge prices, huge sales, but
8    yes, I think in the beginning of the -- in 2020,
9    the sales totals were down, yes.
10   Q   Well, this report, if you look at the
11   bottom, it was issued as of October of 2021?
12   A   2021.
13   Q   2021.  And April 30, 2021, correct?
14   A   Yes.
15   Q   Okay.  And you said dealer sales had been
16   particularly badly hit mainly due to the closure
17   of the world's art fairs.
18        Do you see that?
19   A   Yes.
20   Q   And to the extended restrictions on world
21   travel, therefore hit this market particularly
22   hard.
23        Do you see that?
24   A   Yes.
25   Q   And then in the -- you were speaking

Page 143

1    before about the auction, the Sotheby's auction,
2    in which the Botticelli sold for 92 million; do
3    you recall that?
4    A   Yes.
5    Q   And I think it was sold by my ex-boss
6    Sheldon Solder, I didn't know if you knew that?
7    A   Yes, I did actually.
8    Q   But that accounted for I think you said
9    80 percent of the sales in that auction?
10   A   That's correct.  The COVID-19 pandemic
11   didn't effect the sell of that picture, but that
12   was an exceptional picture in that sale, that's
13   for sure.
14   Q   In fact, if you look at the numbers on
15   page 31, I think 14 million sold in that auction
16   aside from the Botticelli.
17   A   No, I think it was about 22 million.  Take
18   the Botticelli out, it's about 22 million.
19   Q   Yes, 22 million.  Off by ten.
20        In the next paragraph down it says, at
21   Christie's London, in December 2020, the sale of
22   47 Lots, 86, although it's overall total of 22
23   million pounds was balled down on previous years.
24        Do you see that?
25   A   Yes.

Page 144

1    Q   And the fact is that in 2020 and 2021, the
2    art market was still impacted by the pandemic,
3    right?
4    A   Well, be careful because I think that was
5    2020, but in 2021, as I recall, Sotheby's posted
6    the highest turnover ever.  I mean, so it did
7    bounce back in 2021.  So you necessarily, one has
8    to look backwards when you're watching these
9    generalizations on the market, so this would have
10   been pertaining to the year 2020 and the beginning
11   of 2021.  I think 2021 overall was -- actually,
12   the auction houses had quite a successful year.
13   It's a bit counterintuitive, I know.
14   Q   Now, did you watch or attend the Sotheby's
15   auction in which the painting sold in
16   January 2022?
17   A   I did not, no.
18   Q   Did you watch it online?
19   A   I watched the January 2021 one when the
20   Botticelli sold.  I didn't watch the January 2022
21   sale, no, I didn't.
22   Q   Okay.  And I think when you testified
23   before you said that 2.198 million figure was
24   inclusive buyers premium?
25   A   Yes, that's correct.

Page 145

1    Q   And would it accord with your
2    understanding that the hammer price of that sale
3    was 1.8 million?
4    A   That sounds right to me, yes.
5    Q   Okay.  Now, you're not aware of any
6    changes in the painting between Geza's valuation
7    of the painting in 2019 and your valuation in
8    2021, are you?
9    A   I'm not aware of any.  I haven't -- I've
10   got no information on it, to be honest.
11   Q   Okay.  And the art market itself was worse
12   after 2019 than in 2019 itself; is that fair to
13   say, the market for Old Master paintings?
14   A   In general, the totals were down in 2020
15   because of COVID, yes.
16   Q   Now, you were asked some questions about
17   whether a filed lawsuit could have impact on the
18   market price that was attained in the Sotheby's
19   auction, correct?
20   A   Correct.
21   Q   Okay.  And counsel showed you a complaint
22   filed three days before the auction; do you recall
23   that?
24   A   Yes.
25   Q   And you don't have any knowledge

Arbitration
October 26, 2022

Page 146

1  concerning whether participants in the art market
2  were even aware of that lawsuit, do you?
3      A  Well, Sotheby's were aware.  They had to
4  be aware.
5      Q  But you're not aware of whether any buyers
6  or bidders in the market had any knowledge about
7  that lawsuit, correct?
8      A  Well, from my experience at Christie's, if
9  you knew that there was a lawsuit pending on a
10  painting, you would be duty bound to inform anyone
11  interested in that painting.
12      Q  The point here is, you don't have any
13  personal knowledge of anybody who was aware of
14  that lawsuit?
15      A  No, I don't.
16      Q  Now --
17      ARBITRATOR KRAMER:  How much more do you
18  have?
19      MR. PRESS:  Maybe just a couple minutes.
20      ARBITRATOR KRAMER:  I'm getting hungry.
21      MR. PRESS:  Why don't we take a two-minute
22  break.  My client want to take to me for a second,
23  and then I'll wrap up.  It'll be no longer than a
24  bathroom break.
25      ARBITRATOR KRAMER:  Take all the time you

Page 147

1  want.
2      MR. PRESS:  Okay.  That's very good.
3      (Whereupon, a break was taken at
4  1:15 p.m.)
5      ARBITRATOR KRAMER:  Back on the record.
6  BY MR. PRESS:
7      Q  So Dr. Hunter, you said -- strike that.
8      You've mentioned that Sotheby's published
9  an essay by Linda Wolk Simon that -- it says a
10  good essay concerning the painting, correct?
11      A  Yes.
12      Q  And that was a marketing effort by
13  Sotheby's, correct?
14      A  Yes, it was.
15      Q  Okay.  And you're not aware of what other
16  marketing effort Sotheby's did in connection with
17  the painting in 2021 and 2022, are you?
18      A  Correct, I don't know.
19      Q  You don't know either way?
20      A  Well, if it had come to London, I would
21  have seen it.  So I know they didn't send it to
22  London.  They didn't -- I do look out for
23  forthcoming sales, information about sales, and it
24  didn't come past my, you know, my attention, so I
25  would say to that extent I wanted to, but, no, I

Page 148

1  don't know what they did, if anything.
2      Q  In discussing the April 2020 Christie's
3  sale, you mentioned a painting by Sebastiano del
4  Piombo?
5      A  Yes, I did.
6      Q  Okay.  And you said that was roughly
7  comparable to the del Sarto?
8      A  Well, as an artist he's comparable, but,
9  yes, he's a similarly important high renaissance
10  artist.
11      Q  And that painting sold for around three
12  million, right.
13      A  That's right.
14      Q  Okay.  I think you testified that Virginia
15  Bonito reached out to in or around 2015 when you
16  were working at Falcon -- what was the name of
17  your firm?
18      A  Falcon Fine Art.
19      Q  And did you remember the painting from
20  when she reached out to you back then?
21      A  The answer is no because, you see, the
22  initial contact with Professor Bonito was about a
23  sculpture by San Sabino, and she made quite a big
24  play on this, and I remember seeing an image of it
25  and discussing it with her, but the part of the

Page 149

1  criteria we used at Falcon Fine Art was you needed
2  to at least two artworks to do financing.  So I
3  told her no matter how since the San Sabino is,
4  you need another piece.  Then she said, oh, I'll
5  get back to you on that.  There was a bit of
6  to'ing and fro'ing, and then she came back to me
7  and told me, I do remember, she said she's got a
8  fantastic portrait by Andrea del Sarto.  I said,
9  well, that sounds interesting.  But the moment she
10  mentioned that it was jointly owned, or there was
11  an ownership, a complicate ownership, we pulled
12  the plug on it.  So I never got to the point where
13  we contemplated it, so I didn't go through a
14  search, I didn't look at the picture, I didn't go
15  see it.  I mean, it never happened.
16      So the answer is I had a fleeting
17  awareness of a del Sarto that Bonito had, but I
18  didn't really know much about it.
19      Q  And was it in connection with that
20  approach by her that she provided you with an Anne
21  Frances Moore appraisal?
22      A  Well, I can't remember, it's possible.
23  It's possible, but I can't remember.  It's a long
24  time ago, and I don't remember.  It didn't really
25  come up again.

Page 150

1    Q  Okay.  And your testimony is that it
2    didn't -- well, it occurred to you in 2019 to be
3    careful of a painting that was associated with
4    Virginia Bonito, but it didn't occur to you in
5    2021 to be careful of a painting that had been
6    associated with Virginia Bonito?
7          MR. NIKAS:  Objection.  There's no
8    foundation that he know it was from Bonito in
9    2021.
10          ARBITRATOR KRAMER:  He can answer that
11    question first.
12          In 2021, did you understand that the
13    painting that you were appraising had some
14    relationship to Virginia Bonito?
15          THE WITNESS:  No, because I was asked to
16    assume that there was no title issue, and Bonito's
17    name didn't come up in the -- see, Bonito's name
18    would have raised -- would have immediately come
19    up with Winston, so when they did the check, it
20    didn't feature.
21    BY MR. PRESS:
22          Q  But you're testifying that you didn't --
23    although two years earlier, it gave you pause that
24    Bonito was associated with the painting.  You're
25    saying two years later, same painting, you had no

Page 151

1    recollection of it?
2          A  The name Bonito rang the bell with me when
3    I was talking to Geza about it.  The painting -- I
4    didn't remember the painting, no.
5          In connection -- when I was given this
6    assignment that didn't -- it didn't ring those
7    bells.
8          If Bonito's name had appeared --
9          ARBITRATOR KRAMER:  I think you've
10    answered the question.
11    BY MR. PRESS:
12          Q  When you received the assignment in 2021
13    to do the appraisal, did that come to you
14    directly, or did that come through Winston and get
15    sort of farmed out to you?
16          A  Oh, it definitely comes through Winston.
17          Q  Okay.  And did that come through Elizabeth
18    von Habsburg?
19          A  Ordinarily, it wouldn't come from
20    Elizabeth.  It would come from one of the more
21    junior people, but on this occasion, I do remember
22    Elizabeth being involved here.  Yes, I think it
23    came to me directly from Elizabeth, yes.
24          Q  Okay.  All right.  Thank you, Dr. Hunter.
25    I appreciate your time.  I have no further

Page 152

1    questions.
2          ARBITRATOR KRAMER:  Anything before we
3    break for lunch.
4          MR. PRESS:  I have some minimal redirect.
5    It'll be ten minutes.
6          ARBITRATOR KRAMER:  I have a question.
7          Now, that you've the 2019 appraisal by a
8    colleague that you respect, Mr. Von Habsburg, and
9    it appears, to me anyway, that some of your
10    extraordinary assumptions in your 2021 appraisal
11    are not justified.  You were asked if they were in
12    good condition, would you today having seen the
13    2019 appraisal and the condition report, would
14    that cause you to a change your appraisal?
15          THE WITNESS:  Well, the things that have
16    changed, clearly the title issue, the ownership
17    issue is a problem, and condition seems to be more
18    complicated than I was assuming, I was asked to
19    assume.  So those two factors, yes, they would
20    have an impact on the price.  I think I would,
21    therefore, have -- well, not certainly be as low
22    as $1.5 million, but I would have tempered the
23    valuations, yes.
24          MR. NIKAS:  May start, sir?
25          ARBITRATOR KRAMER:  Go ahead.

Page 153

1          R E D I R E C T - E X A M I N A T I O N
2    BY MR. NIKAS:
3          Q  Now, we talked about assumptions Mr. Press
4    asked you about and then Mr. Kramer did too.  I
5    want you to assume -- well, Mr. Press asked you
6    whether fair market value changes in a litigation.
7          Now, Mr. von Habsburg, when he prepared
8    that report, was he providing it in the context of
9    a litigation?
10          A  No.
11          Q  Okay.  Were you?
12          A  Yes.
13          Q  Now, I want you to assume that the legal
14    rule that governs this litigation is that
15    Mr. Kramer is required to put the claimants in the
16    position they would have been in if the
17    respondents performed their contract, that is, the
18    authenticity, the representations were truthful,
19    the sitter representations were truthful, the
20    condition report that they provided to the
21    claimants were truthful, and the other information
22    that they provided about the sale expectations
23    were truthful.  I want you to assume that.
24          A  Yes.
25          Q  I also want you to assume that the

Arbitration
October 26, 2022

Page 154

1  respondents in the litigation are not allowed to
2  take advantage of the fact that their conduct
3  prevented you from accessing a painting.
4       Would those assumptions and rules, which
5  govern a litigation, impact the fair market value
6  of a particular work of art, which you can ask or
7  repeat --
8       MR. PRESS:  I'm going to object.  This is
9  argumentative.
10      ARBITRATOR KRAMER:  You may be right.
11 Let's get an answer.
12      MR. PRESS:  Okay.
13      MR. NIKAS:  If I may, sir, the assumptions
14 are ones that he's challenged.
15      ARBITRATOR KRAMER:  I understand.  Let's
16 get an answer.
17      THE WITNESS:  So I'm not entirely clear
18 what the question is, sorry.
19 BY MR. NIKAS:
20      Q  Sure.  So I've asked you to assume that
21 you're in a litigation as opposed to a non
22 litigation --
23      A  Yes.
24      Q  -- like Mr. von Habsburg?
25      A  Yes.

Page 155

1       Q  Now, in a litigation I want you to assume
2  that there are legal rules that apply.
3       A  Yes.
4       Q  And I want to you assume that one of those
5  legal rules is that the arbitrator is required to
6  assume that when respondents make contractual
7  promises like a work is authentic, the sitter is
8  correct, the condition report provided in
9  connection with the settlement is accurate,
10 whether those type of assumptions can change the
11 fair market value of a work for purposes of
12 litigation?
13      MR. PRESS:  Same objection.
14      ARBITRATOR KRAMER:  Overruled.
15      THE WITNESS:  Yes.  They underpinned my
16 valuation for 15 million.
17 BY MR. NIKAS:
18      Q  Do you have any reason to think that
19 Mr. von Habsburg was operating on any of those
20 assumptions for litigation?
21      A  Well, quite contrary.  He was acting in a
22 totally different capacity with different
23 assumptions and it's a different purpose.
24      Q  Now, Mr. Press, noted that
25 Mr. von Habsburg's report identified certain

Page 156

1  comparables; do you recall that?
2       A  Yes.
3       Q  Do you recall that Mr. Von Habsburg had
4  not included a handful of comparables that you
5  have described as very important to value?
6       A  I saw that, yes.
7       Q  Do you believe that his report was
8  mistaken, deficient by excluding comparables that
9  you believe to be important?
10      A  Well, I hesitate to criticize Geza's
11 report.  I mean, he used the comparables that he
12 thought were relevant; I used the comparables that
13 I believed were relevant.  I happened to do a few
14 more comparables than he did.  Maybe I'm slightly
15 more familiar with this market than he is, I don't
16 know.
17      Q  Do you believe that your comparables are
18 appropriate for inclusion in your report?
19      A  I certainly do, and I went to explaining
20 why I thought they were.
21      Q  Now, Mr. Press read a section of the
22 market description in your report; do you recall
23 that?
24      A  Yes, I do.
25      Q  You read the first paragraph that said

Page 157

1  that the sales are down; do you recall that?
2       A  Yes, I do.
3       Q  And the second paragraph talked about how
4  auction sales had a slightly different story; do
5  you recall your language there?
6       A  Yes, I do.
7       Q  Now, did your $15 million appraisal
8  account for the state of the market as you
9  described it in your report?
10      A  Yes, definitely, yes.
11      Q  Now, Mr. Press, referenced one artist from
12 the Christie's sale who you said was a comparable
13 artist to del Sarto; do you recall that?
14      A  Correct.
15      Q  Now, I heard you testify that the work was
16 not comparable to the del Sarto here.
17      Could you tell us why not?
18      A  Could we get the work up on the --
19      Q  Sure.
20      A  I think it was in the respondents
21 exhibits.  We're looking at the April sale, aren't
22 we.  There are no images on those, sadly.
23      Q  There isn't?
24      A  I make a Tab 3 in the respondent's
25 exhibit.  There is the Christie's sale, but there

Arbitration
October 26, 2022

Page 158

1  are no images sadly.
2      Q  If you could just take a look at Tab 3 to
3  find the work?
4      A  The del Piombo is lot 23.  A religious
5  work, also on canvas.  It's hard to explain when
6  you can't see an image of it.  I mean, I don't
7  recall this picture particularly, but Sebastiano,
8  del Piombo isn't exactly contemporary of del
9  Sarto's.  It's a rival of Raphael's most
10  successful, but a rival nonetheless.  He was
11  working in Rome largely and, you know, he had a
12  comparable artist, and this is another high
13  Renaissance artist.  I don't regard this religious
14  work as comparable to very, very rare portrait by
15  del Sarto that we're discussing.  It's not same
16  league, but it's a significant work.  It made $3.1
17  million in a Christie's sale.
18      Q  In connection with the report that you
19  prepared, did you look at the results from the
20  Christie's April 2021 sale?
21      A  Well, in as much as I was asked to give an
22  appraisal of the April date, yes, I looked at the
23  sales of that date, yes.
24      Q  When you looked at those lots, did you
25  determine that any of them had comparable works to

Page 159

1  the del Sarto at issue here?
2      A  In this sale at Christie's?
3      Q  Yes, correct.
4      A  There was nothing as good as the del
5  Sarto.  It would have been the star lot in that
6  sale.
7          MR. NIKAS:  I have no further questions.
8          MR. PRESS:  One question.
9          R E C R O S S - E X A M I N A T I O N
10  BY MR. PRESS:
11      Q  Dr. Hunter, do you know whether Sotheby's
12  or another auction house guaranteed the
13  authenticity entitled of the work as part of the
14  sale?
15      A  Well, they -- my understanding is that
16  they don't guarantee authenticity, but if you buy
17  a work from a Christie's or Sotheby's auction, and
18  within five years it turns out to be not as they
19  described it, not by the artist, then -- and you
20  can prove that, then they will refund you your
21  money.  So they warrant it to that extent, but I
22  don't think they give an unlimited warranty that
23  their works are a hundred percent accurate, no.
24      Q  Okay.  But when they sell a painting, they
25  warrant, to the extent you described, authenticity

Page 160

1  in title, correct?
2      A  I think that for a limited period, I think
3  they do, yes.
4          MR. PRESS:  Okay.  No further questions.
5  Thank you.
6          ARBITRATOR KRAMER:  Is there a claim that
7  the assumption, the extraordinary assumption, that
8  Dr. Hunter made that the painting was authentic is
9  inaccurate?
10          MR. PRESS:  Yes.
11          ARBITRATOR KRAMER:  Notwithstanding the
12  representation in the settlement agreements, but
13  needs to be briefed.
14          MR. PRESS:  I'm happy to explain it.
15          ARBITRATOR KRAMER:  We'll have that in the
16  brief.
17          MR. PRESS:  Okay.
18          ARBITRATOR KRAMER:  Let's have lunch.
19          (Whereupon, a break was taken at
20  1:35 p.m.)
21          ARBITRATOR KRAMER:  Back on the record at
22  2:20 p.m.
23          Would you swear in the witness, please.
24  G A R Y  G R E E N B E R G, called as a witness,
25    having been duly sworn by a Notary Public, was

Page 161

1      questioned and testified as follows:
2          D I R E C T - E X A M I N A T I O N
3  BY MR. NIKAS:
4      Q  Would you, please, tell us your name.
5      A  Gary Greenberg.
6      Q  Mr. Greenberg, are you a claimant in this
7  case?
8      A  I am, yes.
9      Q  Now, leading up to the settlement of your
10  initial dispute with Ian Peck and the respondents,
11  did he propose using the Andrea del Sarto work
12  that we've been talking about today in
13  consideration for the settlement?
14      A  Yes.
15      Q  Did Mr. Peck tell you that the work was
16  authentic?
17      A  Yes.
18      Q  Did you Mr. Peck tell you that the work
19  was in good condition?
20      A  Yes.
21      Q  Did you ask Mr. Peck for documents
22  reflecting diligence that had been done on the
23  work?
24      A  Yes.
25      Q  Did he you provide you documents?

Arbitration
October 26, 2022

Page 162

1    A  Yes.
2    Q  Go to Exhibit 17, Tab 17 in the premarked
3 exhibit list, please.  That's the report of
4 Dr. Hunter.
5        ARBITRATOR KRAMER:  You're looking at
6 Dr. Hunter's report?
7        THE WITNESS:  Yes.
8 BY MR. NIKAS:
9    Q  If you would, please, turn to page 13 of
10 Dr. Hunter's report.  There's an Appendix A that
11 says information provided by clients; do you see
12 that?
13    A  Yes.
14    Q  Are you the client referenced here?
15    A  Yes.
16    Q  Now, this appendix has, if you will turn
17 to page 14, a fact sheet; do you see that?
18    A  I see it, yes.
19    Q  The fact sheet says, under authentication,
20 the definitive Andrea del Sarto was made by Sydney
21 Freedberg?
22    A  Yes.
23        MR. PRESS:  Can we have this in a less
24 leading way?  This is direct-examination.
25        ARBITRATOR KRAMER:  These are great

Page 163

1 background questions.  It's not really leading.
2 Leading typically doesn't wear on the jury.
3        MR. PRESS:  Okay.
4 BY MR. NIKAS:
5    Q  Under the authentication section it says,
6 both the attributions that Andrea del Sarto an the
7 data have been universally accepted by those
8 experts in the arena of Italian renaissance
9 artwork.
10        Do you see that language?
11    A  Yes.
12    Q  Where did this document come from?
13    A  Ian Peck.
14        ARBITRATOR KRAMER:  How did you get it?
15        THE WITNESS:  By e-mail.
16 BY MR. NIKAS:
17    Q  Did -- was this in response to your
18 request for the diligence documents?
19    A  Yes.
20    Q  The next page --
21        ARBITRATOR KRAMER:  Was it redacted when
22 you got it?
23        THE WITNESS:  Yes, sir.
24        ARBITRATOR KRAMER:  Okay.
25 BY MR. NIKAS:

Page 164

1    Q  We can stick to this page for a minute.
2 The authentication sections says the painting has
3 never been offered on the art market; do you see
4 that?
5    A  Yes.
6    Q  Now, when you read this fact sheet did you
7 believe it to be true?
8    A  Yes.
9    Q  Mr. Peck tell you the documents he was
10 providing were --
11        ARBITRATOR KRAMER:  Why don't you ask him
12 what Mr. Peck told him.
13        MR. NIKAS:  Sure.
14 BY MR. NIKAS:
15    Q  What did Mr. Peck tell you about the
16 documents he was providing to you?
17    A  Mr. Peck told me that the documentation I
18 call due diligence, he represented that the due
19 diligence was true.
20    Q  Now, if you'll turn to page 18 and page 19
21 of Dr. Hunter's report, this is a two-page letter
22 with S. J. Freedberg on the top; do you see that?
23    A  Yes.
24    Q  Did Mr. Peck provide you with this
25 information as well?

Page 165

1    A  Yes, he did.
2    Q  Did he tell you why he was giving you a
3 letter by Sydney Freedberg?
4    A  Yes.
5        ARBITRATOR KRAMER:  What did you tell you?
6        THE WITNESS:  Sydney Freedberg is one of
7 the experts in connection with Andrea del Sarto.
8 BY MR. NIKAS:
9    Q  Did Mr. Peck say anything else about the
10 Freedberg letter?
11    A  Mr. Peck indicated that it was of high
12 importance.
13    Q  Now, on the Document 4 introductory
14 remarks, there's a number of references to
15 Ottaviano de Medici?
16        ARBITRATOR KRAMER:  What page are you on?
17        MR. NIKAS:  This is 16 and 17.
18 BY MR. NIKAS:
19    Q  It says, for example, the stately demeanor
20 of Ottaviano in our portrait elegantly consumed in
21 a rich, but unadorned an silk jacket and fine wool
22 mantel, et cetera.
23        Do you see the reference to Ottaviano de
24 Medici?
25    A  Yes.  It's in the remarks section of the

Arbitration
October 26, 2022

Page 166

1  diligence.
2      Q  Now, did Mr. Peck tell you why he was
3  providing a document describing Ottaviano de'
4  Medici?
5      A  Yes, the significance of the sitter was of
6  high importance.
7      Q  Did he tell you why, or no?
8      A  The subject of a portrait is of high
9  importance.  I don't know if he specifically told
10 me that exactly, but I know that a sitter of a
11 portrait is of high importance.
12     Q  And did Mr. Peck tell you who the sitter
13 was in this portrait?
14     A  Yes.
15     Q  And what did he tell you?
16     A  He told me that he believed that it was
17 Ottaviano de' Medici.
18     ARBITRATOR KRAMER:  Who prepared the
19 introductory remarks?  Was that something
20 Dr. Hunter prepared or was that something that was
21 given to you by Mr. Peck, or someone else?
22     THE WITNESS:  It was something that was
23 given to me by e-mail from Mr. Peck.
24     ARBITRATOR KRAMER:  And you sent it on to
25 Dr. Hunter?

Page 167

1      THE WITNESS:  All the diligence I had, I
2  provided to my counsel.
3      ARBITRATOR KRAMER:  Okay.  But this page
4  that we're looking at was provided to you by -- in
5  an e-mail from Mr. Peck; is that correct?
6      THE WITNESS:  That is correct, yes.
7  BY MR. NIKAS:
8      Q  And let me just clarify, that Appendix A
9  is information provided by clients.
10     Is this entire appendix information
11 provided to you by Ian Peck?
12     You can look through it.
13     A  Yes, give me a minute.  Everything all the
14 way through page 23 from page 14, which you
15 identified as Appendix A was provided to me by
16 Mr. Peck via e-mail.
17     Q  There's a Wikipedia entry, it looks like
18 it's referring to David Franklin.  That completes
19 Appendix A, a few pages.
20     Do you know what that is?
21     A  I believe that in my research I was
22 looking for any other experts, and I found this on
23 the web myself.
24     Q  So you've told us about the summary of
25 fact sheet that you received from Mr. Peck, the

Page 168

1  introductory of remarks you received from
2  Mr. Peck, the Freedberg letter from Mr. Peck, now
3  we're on page 20 and 21.  It has two photographs.
4      Did Mr. Peck tell you what these
5  photographs were of and why he was providing them?
6      A  He told me that these photographs, which
7  are in paper, but I received on the Internet, so
8  they were digital, they were two versions of the
9  same thing.  They were this -- both of them were
10 the sitter, the portrait of the sitter, one was
11 the clean state, which is the one on page 21.  The
12 clean state, as Dr. Hunter had described, is where
13 the strip off the seal and the varnish and any
14 restoration.  And page 20 was the digital image
15 that I received of the state before they stripped
16 off the varnish, if it were varnish.  I don't know
17 what it was that they covered it with, but...
18 restart state, I guess, would be the best way to
19 describe it.
20     Q  So were you told that the work was
21 restored?
22     A  Yes.
23     Q  Were you told by Mr. Peck the outcome of
24 that restoration?
25     A  No.  I think it's mentioned in the

Page 169

1  condition report that's in these documents.
2      Q  Now, if we go to page 23.
3      ARBITRATOR KRAMER:  Tell me which?
4      MR. NIKAS:  23.
5  BY MR. NIKAS:
6      Q  It's the condition report regard that
7  Dr. Hunter testified about.
8      ARBITRATOR KRAMER:  I remember that.
9  BY MR. NIKAS:
10     Q  Did Mr. Peck send you this document?
11     A  Yes, he did.
12     Q  Did he send it to you with the redactions
13 reflected on this page?
14     A  Yes, he did.
15     Q  Now, this refers to the Andrea del Sarto.
16 It says, the painting is in fine and stable
17 condition.  It has undergone restoration over the
18 past year, and then refers to the restoration
19 having been successful.
20     Did you read this condition report in
21 advance of settling the case with Mr. Peck and the
22 respondents?
23     A  Yes.
24     Q  Did it lead you to form a view about the
25 condition of the work?

Arbitration
October 26, 2022

Page 170

1    A  It was of high importance to me.
2    Q  And how so?
3    A  If you're settling for anything of value,
4  you want to know what the condition is.  Having a
5  condition report is of very high importance in my
6  view.
7    Q  And did you have any reason to doubt that
8  this condition report was accurate?
9    A  No.
10    Q  Did you believe that Mr. Peck was being
11  deceptive when he provided this report to you?
12    A  No.
13    Q  Did you believe it was truthful?
14    A  I did, yes.
15    Q  And did Mr. Peck tell you, consistent with
16  this report, that the condition of the work was
17  good?
18    A  Yes.
19    ARBITRATOR KRAMER:  I want to move on.
20  What is the photo on page 22?
21    THE WITNESS:  This is a comparable.
22    ARBITRATOR KRAMER:  And who sent that to
23  you?
24    THE WITNESS:  Mr. Peck.
25    ARBITRATOR KRAMER:  Did Mr. Peck send that

Page 171

1  to you?
2    THE WITNESS:  Yes.
3    ARBITRATOR KRAMER:  Do you know who the
4  comparable was by?
5    THE WITNESS:  I apologize.
6    ARBITRATOR KRAMER:  Don't apologize.
7    THE WITNESS:  I don't remember right now.
8    ARBITRATOR KRAMER:  That's okay.
9    THE WITNESS:  I can think about it if you
10  want me to.
11    ARBITRATOR KRAMER:  That's okay.
12  BY MR. NIKAS:
13    Q  Now, speaking of comparables, did Mr. Peck
14  tell you whether he had an idea of how much the
15  work was worth?
16    A  Yes.
17    Q  And what did he tell you?
18    A  He told me that it could -- there's a
19  range of values.  It could possibly go as high as
20  20, $25 million.
21    Q  Did he give you a lower range than that?
22    A  Yes.
23    Q  And what did he talk about?
24    A  It could be lower.  I think he was saying
25  five, six million, something like that.

Page 172

1    Q  Okay.  So as low as five or six, as high
2  as 25; is that accurate?
3    A  Yes, uh-huh.
4    Q  Now, in addition to this condition report
5  the summary fact sheet on page 14 said that Sydney
6  Freedberg examined the painting in person, and he
7  had concluded that it is a portrait of very high
8  quality and an unusually handsome subject; do you
9  see that?
10    MR. PRESS:  Once again, this is getting to
11  be very leading testimony.  It's basically
12  Mr. Nikas testifying.  Can we do it some other
13  way?
14    ARBITRATOR KRAMER:  What's the question?
15  Answer the question.
16    Objection overruled.
17    THE WITNESS:  I'm sorry.  Please restate
18  the question.
19  BY MR. NIKAS:
20    Q  Sure.  This summary of fact sheet says, in
21  his letter -- well, it says Mr. Freedberg examined
22  the painting in person, and says he further notes
23  it's a portrait of very high quality of an usually
24  handsome subject.
25    Do you see that language?

Page 173

1    A  Yes.
2    Q  Did you read that language before settling
3  this case?
4    A  Yes.
5    Q  Did that language have any impact
6  whatsoever on your view of the del Sarto?
7    A  Yes.  Sydney Freedberg is -- he's a
8  professor at Harvard University and a curator at
9  National Gallery of Art in Washington, D.C., a
10  very qualified expert.
11    Q  Now, after you received what you've called
12  this diligence from Ian Peck, did you enter into a
13  settlement agreement to resolve your initial
14  dispute with Mr. Peck and the respondents?
15    A  Yes.
16    Q  Return to Tab 1, please.
17    A  Okay.
18    Q  Would you tell us what this document is?
19    A  This is an execution copy of a settlement
20  agreement signed by myself and Ian Peck on behalf
21  of the entities that are in the recital section,
22  and myself personally and Ian Peck personally,
23  known as the parties to the agreement.
24    Q  Okay.  And this settlement agreement has a
25  number of provisions that govern the resolution of

Arbitration
October 26, 2022

Page 174

1    that matter?
2        A  Yes.
3        Q  Now, on page 2, Section 1-A-2, the
4    provision says, GB has the right to terminate this
5    agreement in its sole discretion if auctioneer
6    provides a low-end estimate for the work that is
7    less than $4 million unless the auctioneer obtains
8    a minimum guarantee for the work equal to or
9    greater than $4 million.
10       Do you see that provision?
11       A  Yes, I see it.
12       Q  Did Mr. Peck agree to that provision as
13   part of the settlement?
14       A  Yes, he did.
15       Q  Why is there a $4 million provision saying
16   you're allowed to terminate the agreements if the
17   work comes in at less than $4 million on an
18   estimate?
19       A  Sure.  The reasons, but first, GB, in this
20   agreement, it represents my entities and myself,
21   so that's GB.  GB has the right to terminate this
22   agreement.  Why?  What are the reasons?  Several
23   reasons.  I believe that Mr. Peck owed GB a lot
24   more than $4 million.  I was willing to accept an
25   estimate of a minimum of $4 million from an

Page 175

1    auctioneer, and I didn't want to end up after the
2    settlement agreement with a work of art that was
3    worth less than the estimate by the auctioneer for
4    a million dollars.  Why?  Well, because I was
5    weighing whether the debt that I believe that
6    Mr. Peck owed me, and the claims that I had
7    against Mr. Peck for breach and fraud, if I didn't
8    get a minimum of pennies on a dollar as I was
9    looking at it, then I would just sue him.
10       Q  Did Christie's or a comparable auction
11   house ever provide an estimate for this work?
12       A  No.
13       Q  Why not?
14       A  The work was never delivered to
15   Christie's, nor any auctioneer that I'm aware of.
16       Q  Now, the why is already the subject of
17   Mr. Kramer's summary judgment decision that they
18   were breached.  I won't get into that.
19           ARBITRATOR KRAMER:  Good.
20   BY MR. NIKAS:
21       Q  So I will move on.  In Section 1-A-3 it
22   says at ACG election, ACG shall have the right to
23   pay GB the sum of $3.6 million at any time within
24   60 days of the execution of this agreement, or the
25   day before the auction or sale of the work under

Page 176

1    paragraph 1A or some days later, as long as the
2    date occurs before the day of the auction -- the
3    advance payment.
4        Do you see that language?
5        A  Yes, I do.
6        Q  Was the discounted accelerated payment
7    that Mr. Peck agreed to make in this paragraph at
8    his discretion, was that ever paid to you?
9        A  No, it was not paid.
10       Q  Now, Section 1C has a number of different
11   tiers, which I'll call the "waterfall" reflecting
12   how the sales proceeds were paid.
13           Who came up with this formula in Section
14   1C?
15       A  I believe it was initially proposed by
16   Mr. Peck and then negotiated.  So I would say as
17   it shows up in this agreement that it was a
18   negotiated waterfall.
19       Q  Now, the 1C Romanette one refers to sales
20   expenses that were being deducted from the
21   proceeds and paid to Mr. Peck.
22           Were there any sales expenses incurred in
23   connection with this work that you're aware of?
24       A  No, there are no sales expenses in
25   connection with this work that I'm aware of.

Page 177

1        Q  Was there ever a sale of the work by
2    Mr. Peck?
3        A  I am aware of no sale by Mr. Peck of this
4    work.
5        Q  Now, if you could --
6            ARBITRATOR KRAMER:  Can you tell me
7    something about negotiation of the waterfall.  Why
8    was the figure of $30 million selected?
9            THE WITNESS:  Yes.  Good question.
10           ARBITRATOR KRAMER:  Thank you.
11           THE WITNESS:  I calculated that.  I had a
12   low minimum amount, 4.1 million, that I would
13   settle for if the estimate on the work of art
14   equated to that number; that's the low end.  But I
15   wanted to participate in the upper amount should
16   the work of art sell for higher because I believe
17   there was a possibility.  I was hearing that
18   there's a possibility that this work of art could
19   sell for higher, so I was negotiating for the
20   right to participate if it went above the
21   4.1 million.
22           ARBITRATOR KRAMER:  Tell me about -- where
23   you heard that it might -- what did you base your
24   view that it might be worth as much as
25   $30 million?  Conversations with people or what?

Arbitration
October 26, 2022

Page 178

1    THE WITNESS:  So conversations with
2  people, and also from Artnet which is the online
3  auction results for any genre of art that you
4  would elect to do your research on.  It could be
5  contemporary, in this case, Old Masters, and I was
6  familiar with Old Masters in that they could reach
7  a sale, according to conversations that I had with
8  Christie's, according -- I heard from Mr. Peck
9  himself that it might go as high as.  He wasn't
10  guaranteeing it, but -- you can't guarantee a sale
11  that never happened -- but that it could go as
12  high as 20, $25 million.
13    ARBITRATOR KRAMER:  Could you just very
14  quickly give me a five-minute background on how
15  you participate in the art markets?  Are you a
16  buyer?  Are you a dealer?
17    THE WITNESS:  Yes, yes.  What's my
18  participation in the art market?
19    ARBITRATOR KRAMER:  Yes.
20    THE WITNESS:  So I have a company called
21  Loans on Fine Art.  It loans money on fine art.
22  So my background is -- I'm going to 71 in a few
23  days.  I've done deals for 46 years.  I've had my
24  own broker-dealer, and I've done a lot of dollars
25  of transactions, and when I was going to college I

Page 179

1  worked at a pawn shop, so the -- it was very
2  interesting to me that loaning on high-end fine
3  art would be the equivalent to the business model
4  of a pawn shop.  You take possession of the work,
5  you loan at pennies on a dollar, if you don't get
6  paid you take the work of art and you sell it.
7  And then if you got paid off on your loan, then
8  you would make a return on your money.  It's that
9  simple.
10    ARBITRATOR KRAMER:  But you don't have a
11  background in art history, particularly an
12  academic background in art history?
13    THE WITNESS:  No, and that's not unusual.
14  I always rely upon third parties, appraisers, and
15  experts in whatever the asset class it is.  It's
16  arms length to me.
17    ARBITRATOR KRAMER:  Do you loan in any
18  other area besides fine art as part of your
19  business?
20    THE WITNESS:  I have a housing development
21  in Santa Barbara, California.  That's real estate.
22  I've done private money lending on real estate.
23    ARBITRATOR KRAMER:  Okay.  I think I
24  understand now.  Thank you.
25  BY MR. NIKAS:

Page 180

1    Q  Now, you said that Mr. Peck came up with
2  this waterfall.  Is he the one who put $30 million
3  on the upper register of this waterfall?
4    If you look on page 3 of the settlement
5  agreement.
6    A  I can't say for sure.  I know that he --
7  he was representing to me that it could go as high
8  as up to 25 million.
9    So if you look at the increments, they
10  were going up, you know, you had six-million-ten,
11  15, and then you jump to 20, so that's five
12  million -- four million, five million, and then it
13  jumped ten million.  That covers -- it
14  bracketed -- it brackets the 25 million.  It's
15  right in the middle.  What would happen if it
16  sells for a little over 25 million?  So we wanted
17  an outside number.
18    Q  And so this was a product of a discussion?
19    A  It was a negotiation.
20    Q  Okay.  And you've already testified about
21  why the minimum, we just talked about the maximum,
22  so this provision contemplates a work being sold.
23  If you could go to section --
24    ARBITRATOR KRAMER:  Let me just ask a
25  question while we're on that page.

Page 181

1    What is the deduction of 25 percent owing
2  to a third party mean?
3    THE WITNESS:  You see that in all five
4  sections of the waterfall, there's a 25 percent to
5  a third party.  Peck represented to me that he had
6  other partners, and they were undisclosed to me.
7  I didn't know who they were, so that's why they're
8  called third parties.
9    ARBITRATOR KRAMER:  Okay.
10  BY MR. NIKAS:
11    Q  Now, Section 1E says, if the work remains
12  unsold after being offered at a second auction or
13  private sale, GB has the right to permit further
14  sales efforts or to receive full, unencumbered
15  title to the work as consideration under this
16  agreement, which shall be deemed to have a
17  valuation of $2 million by virtue of such prior
18  history.
19    Do you see that language?
20    A  I do, yes.
21    Q  Did the work get offered for sale twice?
22    A  As far as I know the work was never
23  offered for sale by Mr. Peck.
24    Q  Why not?
25    A  Peck denied the opportunity of any sale

Page 182

1    because the work was never delivered.
2        Q  Do you believe under this provision you're
3    entitled to the work itself?
4        A  I'm sorry.  Somebody's -- can you repeat
5    the question?
6        Q  Sure.  Under this provision do you believe
7    you're entitled to the work itself?
8        A  Yes.
9        Q  Why?
10       A  Under the conditions of the E, it states
11   that if the work is offered at a second auction or
12   private sale, meaning it had a first sale, and
13   then a second sale, then I have the right to
14   permit no further sale or receive the full
15   unencumbered title.  That means I get the title to
16   the work.  The literal interpretation of what it
17   says.  And it's consideration under the agreement.
18       Q  Now, Mr. Peck doesn't own the work, are
19   you aware of that?
20       A  After we entered into the settlement
21   agreement, and it was several months later that
22   after we brought this action that I learned that
23   Peck never owned the work.
24       Q  Now, this section references a $2 million
25   figure; do you see that?

Page 183

1        A  Yes.
2        Q  Why was that figure inserted?
3        A  So the context is important to answer your
4    question.  So what is the context?  So if you have
5    a work of art that goes unsold, or as we learned
6    from Dr. Hunter's testimony, it goes to auction
7    and there's no bidders, it's "body" and that means
8    it unsold.  It gets exposed to the market.  Once
9    it's exposed to the market and there are no
10   buyers, then -- there a term that's used in art
11   and high-end fine art.  It's called the work is
12   "burnt."  It went for sale two times; no one
13   bought it.  It's been exposed; no one wants it;
14   it's burnt.  So for purposes of valuation for
15   ACG's books, should work have been offered two
16   times and it never got sold and I got the title
17   for transfer purposes for the books of ACG, we
18   agreed that even though it would be worth more
19   should I hold it for a few years, which is --
20   typical what happens with these works, the work is
21   burnt, you hold it for a few years, you bring it
22   back to the market, it's rehabilitated.  It's
23   brought back to the market and the value goes back
24   up.  This has happened -- traditional is what can
25   happen.

Page 184

1        So the number was a valuation that ACG
2    would use for its books under the conditions that
3    the work was burnt, and I would hold it for a few
4    years and then bring it back to the market.
5        Q  So $2 million is the burnt value
6    basically?
7        A  $2 million was the burnt value.  That's
8    the short answer.  Sorry it's such a long answer.
9        Q  Now, Section 6C says, to the knowledge of
10   ACG, the work is not subject to any claims or
11   rights either potential, threatened, or pending
12   that could prevent ACG from performing the terms
13   of this agreement, or that could result in a
14   claw-back from any proceeds through GB under the
15   terms of this agreement.
16       Do you see that?
17       A  I do see it.
18       Q  Did Mr. Peck agree to this as part of the
19   settlement?
20       A  Yes, he did.
21       Q  Representation E in this section says, the
22   work is an authentic work of art by Andrea del
23   Sarto as described above in Section 1A; do you see
24   that?
25       A  Yes, I do.

Page 185

1        Q  Section 1A says, Andrea del Sarto, title,
2    Ottaviano de' Medici, and then describes other
3    features of the work; do you see that?
4        A  Section 1 you say?
5        Q  1A?
6        A  1A, yes, I see it.
7        Q  So Mr. Peck agreed to these terms as part
8    of the settlement agreement?
9        A  Yes.  These are -- you're talking about
10   the representations that Mr. Peck is making to me
11   to induce me into this agreement.
12       Q  Did Mr. -- did you believe these
13   representations when they were put in this
14   contract?
15       A  I absolutely did at the time.
16       Q  Were they important to you?
17       A  They were critical.  Without them, there
18   would be no settlement.  I want to say it.  It
19   turned out to be a lie.
20       ARBITRATOR KRAMER:  Let's wait for
21   questions.
22   BY MR. NIKAS:
23       Q  Now, you're talking about 6D and C being a
24   lie?  I want to understand what you're referring
25   to.

Page 186

1    A  Yes.
2    Q  Okay.  Now, Section 13 of this agreement,
3  on page 7, says, five lines down, the parties
4  shall share equally in the cost of such
5  arbitration, and then continues, each party shall
6  pay their own attorney's fees, and so forth.
7        Do you see that?
8    A  Yes.
9    Q  Has Mr. Peck paid any of the costs that
10  this provision says he shall share equally in?
11    A  Mr. Peck has not paid one penny of the
12  costs in connection with this arbitration
13  proceeding, not a penny.
14    Q  Now, if we go down after it says the
15  parties shall share equally in the costs, there's
16  a next section is not in all caps.  It says, in
17  such an arbitration, if either party fails to pay
18  an invoiced arbitration by the 30-day due date for
19  such payment, the other party may provide notice,
20  and that if payment is not made by the other party
21  within 15 days of such notice, that the notifying
22  party shall exercise its option to terminate the
23  arbitration and to pursue the adjudication of the
24  dispute in state or federal court.
25        Do you see that?

Page 187

1    A  I do see it.
2    Q  Why did that -- who negotiated that
3  language in this section?
4    A  I negotiated that language.
5    Q  How did that end up in there?  Why?
6    A  So the reason why it's in here is that I
7  wanted to ensure that I can hold Peck accountable
8  should he not pay his arbitration fees.  I started
9  thinking as a business decision, if someone would
10  think about the hypothetical scenarios that could
11  evolve if the settlement agreement went bad, what
12  would happen if I was in a situation and the
13  settlement agreement was breached and I -- in --
14  and I took this literally that I may -- it was my
15  choice to go to arbitration, that Peck could not
16  prevent me from holding him accountable by him not
17  paying his fees.  It was known to me this one of
18  Peck's litigation strategies.  I wanted to prevent
19  that.  I wanted to take that away from him.  If
20  I'm going to enter into the settlement agreement
21  that I would get stuck in, what's the point?  I
22  wanted to be able to proceed.
23    Q  Did you believe that Mr. Peck was required
24  to pay half the fees under this provision?
25    A  Yes.

Page 188

1    Q  Did you believe that you were required to
2  file a state court case if Mr. Peck failed to pay?
3    A  Not required, an option.  An option is not
4  an obligation.  It's not required.  It's in the
5  sole -- in my sole discretion should I want to
6  pursue this in civil or federal court, I would.
7  But what's the point of that?  I have JAMS.  I
8  figured that JAMS was efficient.  I figured that
9  JAMS would take less time.  I figured that JAMS
10  would be less expensive, so what would be the
11  point?
12        ARBITRATOR KRAMER:  Okay.  I hope you
13  haven't been disappointed because I've slowed down
14  things a couple of times.
15  BY MR. NIKAS:
16    Q  Now Section 2 on page 3.
17    A  Section 2?
18    Q  Page 3.  It says "releases."
19    A  Section 2, page 3, okay.  Section 2.
20    Q  It says, an exchange for and consideration
21  of the promises in the agreement set forth herein,
22  upon execution of this agreement, GB on the one
23  hand, ACG on the other, and then goes to list a
24  long provision that under which the parties
25  release to each other for claims.

Page 189

1        Do you recall entering the agreement with
2  that provision in it?
3    A  I do.  I do recall that.  Yes, I see it.
4    Q  Now, are you aware that Mr. Kramer found
5  that the respondents' counterclaims against you
6  and the other claimants must be dismissed under
7  the terms of this release?
8    A  Yes.
9    Q  Did you pay legal expenses to defend
10  against those claims?
11    A  Absolutely.
12    Q  Now, I read earlier testimony that
13  Mr. Peck gave at the preliminary injunction
14  hearing where he said it would be important to
15  sell this work under consignment agreement where
16  Christie's had spent a lot of money marketing the
17  work, giving the work PR, publicity, traveling the
18  work wherever it needed to travel to show to
19  important collectors.
20        Do you agree that that was an appropriate
21  way to handle the sale of this work?
22        MR. PRESS:  Object to form.
23        ARBITRATOR KRAMER:  Overruled.
24        THE WITNESS:  Yes.
25  BY MR. NIKAS:

Arbitration
October 26, 2022

Page 190

1    Q  And had you discussed that plan with
2  Christie's after the settlement was reached --
3  excuse me.  Leading up to settlement.  We already
4  talked about Christie's afterwards.
5        Leading up to the settlement, did you talk
6  with Christie's about that approach to the sale?
7    A  I spoke with Christie's in detail about
8  the business plan in terms of marketing the -- I
9  call it the Sarto, the work of art, the subject
10  work of art.  I talked with them, yes.
11    Q  Now, did you receive any pushback in those
12  discussions when you talked about approaching the
13  sale in that manner?
14    A  Pushback from?
15    Q  From Christie's?
16    A  Oh, from Christie's?  Quite the contrary.
17        ARBITRATOR KRAMER:  Why don't you describe
18  your conversation with Christie's leading to the
19  marketing -- potential marketing of the del Sarto.
20        THE WITNESS:  Christie's opinion in terms
21  of -- in what they were prepared to do in terms of
22  marketing the Sarto.  They intended to do several
23  things.  First thing, is they -- they were going
24  to --
25        MR. PRESS:  I'm sorry.  I just need to

Page 191

1  object to the hearsay.
2        ARBITRATOR KRAMER:  Pardon me?
3        MR. PRESS:  I'm objecting on the grounds
4  of hearsay.  He's talking about what Christie's
5  told him.  Christie's isn't here.
6        ARBITRATOR KRAMER:  Right.  Overruled.
7        THE WITNESS:  Christie's was going to make
8  preparations for the literature, first of all, and
9  it was going to be approved, and then with the
10  literature they were going to -- this during
11  COVID -- they were going to fly it around, all
12  over the world, and set up a private viewings
13  in -- what did we use to call it?  In safe-masked
14  environments, controlled environments, and show
15  the works of art individually with all their known
16  collectors around the world.  They were going to
17  produce a banner that would go on the side of the
18  Rockefeller Center of the portrait.  They were
19  talking in the range of spending a significant
20  amount of money, 500, 600, 700, $800,000 just to
21  market it.
22  BY MR. NIKAS:
23    Q  And who did you have that conversation
24  with?
25    A  Josh Glazer.

Page 192

1    Q  Was that leading up to the settlement
2  agreement that you entered into?
3    A  Yes.
4        MR. NIKAS:  I have no further questions.
5        ARBITRATOR KRAMER:  Mr. Press?
6        MR. PRESS:  Yes, I have some questions.
7        THE WITNESS:  You want me on the other
8  side?
9        ARBITRATOR KRAMER:  Yes, I do.
10        C R O S S - E X A M I N A T I O N
11  BY MR. PRESS:
12    Q  All right, Mr. Greenberg, you testified
13  just now that that Mr. Peck e-mailed you some
14  materials concerning the painting that ended up
15  appearing in the Hunter expert report; do you
16  recall that?
17    A  Yes.
18    Q  Okay.  And in discovery in this case, you
19  recall that the respondents sought e-mails and
20  other communications of yours prior to the date of
21  the settlement agreement?
22    A  I produced one or two e-mails, if memory
23  serves, that you requested of me.
24    Q  Okay.  And you didn't produce any e-mail
25  in which Mr. Peck sent you those materials, did

Page 193

1  you?
2    A  You asked for e-mails in a certain time
3  frame, and the e-mails I got from Mr. Peck were
4  outside of that time frame, if I recall correctly.
5    Q  Sitting here today, in this room, you
6  don't have a transmittal e-mail that shows
7  Mr. Peck sending you these materials, do you?
8    A  Are you asking me to look in my phone?
9        ARBITRATOR KRAMER:  He's asking you do you
10  know whether you have somewhere in your file your
11  e-mail that transmitted the materials in the
12  appendix.
13        THE WITNESS:  I don't know how far back my
14  e-mail records go because that was second -- it's
15  a little fuzzy -- second quarter of 2019, third
16  quarter of 2019, something like that.
17  BY MR. PRESS:
18    Q  Okay.  Now, isn't true that you actually
19  hired Dr. Robert Simon who's here today as your
20  expert in order to assess the condition and other
21  factors concerning the painting, correct?
22    A  I didn't pay Dr. Simon.
23        ARBITRATOR KRAMER:  The question is
24  whether you retained him.  Did you hire him
25  regardless of whether you paid him.

Arbitration
October 26, 2022

Page 194

1    THE WITNESS: Okay. Yes.
2    BY MR. PRESS:
3    Q  Okay. You selected Dr. Simon among other
4    potential experts as an expert you wanted to use,
5    correct?
6    A  Yes.
7    Q  And what you wanted to do is use him to
8    appraise and analyze the painting, correct?
9    A  Yes.
10   Q  And isn't a fact that the materials that
11   found their way into the Hunter report actually
12   came to you through Dr. Simon?
13   A  No.
14   Q  No, okay. And now, the reason you wanted
15   an independent expert to review and analyze the
16   painting was so that you wouldn't have to rely on
17   materials from the owner, correct?
18   MR. NIKAS: Objection to the word
19   independent. There is no foundation that this was
20   independent of Mr. Peck.
21   MR. PRESS: Okay.
22   ARBITRATOR KRAMER: Reask the question.
23   MR. PRESS: Sure.
24   BY MR. PRESS:
25   Q  Okay. The reason you wanted a person

Page 195

1    independent of the paint's owner to analyze the
2    painting is so that would you have an independent
3    opinion, correct?
4    MR. NIKAS: Same objection.
5    ARBITRATOR KRAMER: Overruled.
6    BY MR. PRESS:
7    Q  You can answer.
8    A  Yes, I wanted an independent opinion from
9    an expert because I'm not an expert.
10   Q  Right. And you respected Dr. Simon,
11   correct?
12   A  Yes.
13   Q  And you thought that he could do a fair
14   and accurate appraisal of the painting?
15   A  Yes.
16   Q  And you're aware that Dr. Simon actually
17   went and viewed the painting on one occasion,
18   right?
19   A  Two times that I'm aware of.
20   ARBITRATOR KRAMER: When did you know that
21   Dr. Simon went to look at the painting?
22   THE WITNESS: He went a couple of times
23   between approximately July of 2019 and December,
24   something like that, 2019.
25   BY MR. PRESS:

Page 196

1    Q  Okay. And Dr. Simon communicated to you
2    what his findings were from those visits, right?
3    A  They were not conclusionary.
4    Q  Okay. Yes or no, he did communicate to
5    you, right?
6    A  He told me that they weren't
7    conclusionary.
8    Q  Okay.
9    A  Basically.
10   Q  Okay. And what he said is -- you say --
11   first of all, let's just get this out of the way.
12   He talked to you about his visits at the painting,
13   yes or no?
14   A  Yes.
15   Q  And as to -- and he didn't -- as you say,
16   he didn't reach conclusions, but did you tell
17   facts that he observed when he viewed the
18   painting?
19   A  He gave me hearsay, and it means nothing
20   to me.
21   Q  Okay.
22   A  We hired him for a written appraisal which
23   never materialized.
24   Q  Okay. You say he gave you hearsay. What
25   did he tell you?

Page 197

1    A  He saw the painting twice. The second
2    time he had brought Diane Modestini with him, and
3    they required the work to be delivered to Diane
4    Modestini's laboratory before he would put a
5    report -- put anything in writing.
6    Q  Okay. And Diane Modestini, she was an art
7    conservator, correct?
8    A  I believe she was. I think she still is.
9    I don't know if she's still practicing, but...
10   Q  All right. And you understood that her
11   role was to take the painting to a laboratory and
12   examine its condition, correct?
13   A  Yes.
14   Q  And in fact, Dr. Simon told you that the
15   condition of the painting was in question,
16   correct?
17   A  He had questions about the condition,
18   that's why we brought her in.
19   Q  Okay. And do you recall Dr. Simon was not
20   satisfied with representations that the owner had
21   made concerning the restoration of the work?
22   A  He had questions, that's why he wanted
23   Diane Modestini involved.
24   Q  At some point you became frustrated with
25   this process and decided to use Christie's to

Arbitration
October 26, 2022

Page 198

1   value work instead, right?
2       A  Yes.
3       Q  So that's when you reached out to somebody
4   at Christie's?
5       A  Yes.
6       Q  And you actually reached yourself to Josh
7   Glazer, didn't you?
8       A  Yes.
9       Q  Okay.  And you said that you had extensive
10  discussions with Josh Glazer?
11      A  Yes.
12      Q  Okay.  And you said you told them your
13  business plan for -- you discussed a business plan
14  for sale of the painting, right?
15      A  Yes.
16      Q  You told him that you wanted to sell the
17  painting quickly, didn't you?
18      A  I asked him when the best time to sell it
19  would be.  I didn't instruct him.  He's the
20  expert.
21      Q  You wanted to get money quickly in
22  settlement of the dispute you had with Mr. Peck;
23  fair to say?
24      A  I wasn't interested in cutting my nose off
25  to spite my face selling it too quick for too

Page 199

1   cheap.  I was asking him when the right time to
2   sell it was.
3       Q  In negotiating the settlement agreement,
4   in the time period of the settlement agreement,
5   you want to ensure that the painting was sold very
6   soon or after the agreement itself, correct?
7       A  As soon as Josh Glazer would advise.
8       Q  And Josh Glazer, he also told you that he
9   needed to see the painting firsthand in order to
10  evaluate of its condition?
11      A  Yes.
12      Q  And he told you that the condition was a
13  very important factor in valuing that painting,
14  right?
15      A  Yes.
16      Q  Now --
17      A  He also said that unless a truck ran
18  through it or someone put a fist through it, that
19  the digital images -- if it showed up like digital
20  images, that the business plans would be executed.
21      Q  Okay.  And the business plan involved
22  selling the painting in the April 2021 Christie's
23  auction in New York, correct?
24      A  He advised that he had a stable of Old
25  Masters collectors and investors that he was

Page 200

1   targeting in particular here in New York, and
2   April 2021 was a perfect to sell it.
3       Q  Right, but the agreement, the settlement
4   agreement which we looked at, Exhibit 1, that has
5   a timeline on it, correct?
6       A  Yes.
7       Q  And you negotiated for that timeline,
8   right?
9       A  Yes.
10      Q  And you wanted the painting to sell in
11  that April Christie's sale?
12      A  Which is in line with what Josh Glazer had
13  advised.
14      Q  Okay.  You were not interested in taking
15  time to have further restoration work done on the
16  painting and having it sold at a later time; fair
17  to say?
18      A  If the work would have been delivered to
19  Josh Glazer and said it needs further restoration,
20  I would defer to his opinion.  The work was never
21  delivered.
22      Q  Okay.  And you knew prior to the
23  settlement agreement that Mr. Peck was in
24  contract, or one of his entities was in contract
25  to buy the painting, correct?

Page 201

1       A  Yes.
2       Q  Okay.  Now, directing your attention to
3   the settlement, Exhibit 1?
4       A  I need to look it up.
5       Q  Yes, take your time.  I know you moved,
6   so...
7       A  It's Exhibit 1?
8       Q  Yes.
9       A  What section do you need me to be on?
10      Q  I'd like you to turn to the second page.
11      A  Second page, okay.
12      Q  Now, your counsel showed you Section 1A,
13  Romanette two, the little ii, okay.  "GB" this is
14  the part where -- the one where you point out that
15  you were GB; do you remember that?
16      A  Yes.
17      Q  Okay.  So GB has a right to terminate this
18  agreement and sole discretion if the auctioneer
19  provides a low-end estimate of less than four
20  million; you got that?  Do you remember that?
21      A  I do, and I see it.
22      Q  Yes.  And the reason you put that in was
23  because you had not yet obtained a definitive
24  finding on the condition of the painting, and you
25  wanted help if the painting was an important

Arbitration
October 26, 2022

Page 202

1  issue; fair to say?
2      A  For whatever reason, if the estimate, any
3  of the due diligence criteria that an expert would
4  use to weigh such as all of the criteria that the
5  Dr. Hunter had already testified to, if any of
6  those things were incorrect, and that impacted the
7  value to make it less than $4 million, I wanted
8  the right to get out.
9      Q  Right.  So you negotiated yourself a way
10 to get out of the deal if there were
11 representations that turned out to be incorrect
12 concerning the value of the painting?
13     A  Yes.
14         MR. NIKAS:  Objection.
15 BY MR. PRESS:
16     Q  And turning the page to -- actually,
17 turning the page to page 2, I guess we're on page
18 2.  The bottom of page 2, Section 1C, that's the
19 waterfall, correct?
20     A  That's the beginning of the waterfall.
21     Q  That's right.  In the waterfall, the first
22 item, there's a ten percent that came off the top
23 payable to ACG; do you see that?
24     A  Yes.
25     Q  Okay.  And that came off the top no matter

Page 203

1  what level the sales price went to; fair to say?
2      A  Yes.
3      Q  And looking down at Section 1E, you gave
4  some testimony about this -- the reason for that
5  provision; do you remember that?
6      A  1E, the reason for that provision, yes, I
7  testified to that.
8      Q  That's right.  And you said that, in fact,
9  the painting was not -- did not fail to sell two
10 times, correct?
11     A  Yes.
12     Q  And I understand that's because Mr. Peck
13 was never able to deliver the painting to
14 Christie's or another auctioneer, right?
15     A  No.  Wait a second.  Can you ask that
16 again, sorry.
17     Q  Sure, sure.  You testified that -- I don't
18 believe it's controversial -- Mr. Peck was never
19 able to deliver the painting to Christie's or
20 another auctioneer, right?
21     A  Yes.
22     Q  Okay.  And you now understand that because
23 Virginia Bonito didn't deliver the painting,
24 right?
25     A  Now I do.

Page 204

1      Well, wait a second.  I didn't have an
2  agreement Virginia Bonito.  I had an agreement
3  with Mr. Peck.
4      MR. PRESS:  Move to strike as
5  nonresponsive.  That's not the question.
6  BY MR. PRESS:
7      Q  Returning to E, it's a fact that the work,
8  the painting, did not remain unsold after being
9  offered at a second auction or private sale,
10 right?
11     A  I don't understand the question.
12     Q  Okay.  The I'll ask it again.  Isn't it a
13 fact that the work did not remain unsold after
14 being offered at a second auction or private sale?
15     A  That doesn't make sense to me.
16     Q  No?
17         ARBITRATOR KRAMER:  Well, I think what
18 he's asking this paragraph was never triggered
19 because the painting was never auctioned or
20 offered twice.
21         THE WITNESS:  Yes, that I understand.
22         ARBITRATOR KRAMER:  I think that's his
23 question.
24 BY MR. PRESS:
25     Q  So you agree that provision was never

Page 205

1  triggered, right?
2          MR. NIKAS:  Objection.
3          THE WITNESS:  Yes.
4  BY MR. PRESS:
5      Q  Turning to Section 6 that we looked at
6  before and you did with your counsel.  Those are
7  the representations by ACG, right?
8      A  Yes.
9      Q  Okay.  And if we look at some of them, you
10 said that -- so representation 6A says ACG has the
11 right to consign the work to the auctioneer for
12 sale consistent with the terms in this agreement,
13 and the right to perform all obligations set forth
14 in this agreement.
15         Do you see that?
16     A  Yes.
17     Q  Okay.  And your position in this case that
18 was a false representation, right?
19     A  Yes, it was a lie.
20     Q  Okay.  And then in 6B, it says, ACG has
21 the right to pay GB the proceeds of the sale of
22 the work consistent with the terms of the
23 agreement.
24         Do you see that?
25     A  Yes.

Arbitration
October 26, 2022

Page 206

1    Q  And that's another provision that you said
2  turned out to be false, correct?
3    A  Yes.
4    Q  Okay.
5    A  False.
6    Q  And were those representations materially
7  false to you?
8    A  Now?  Sitting here today, yes, they're
9  still false.
10   Q  Okay.  Now, directing your attention to
11  the paragraph at the end of Section 6.  It says,
12  in the event any such representation is materially
13  false, GB shall have the option to cancel this
14  agreement and pursue all legal claims against ACG
15  in binding arbitration before JAMS under the
16  arbitration provision set forth in Section 13
17  below.
18        Do you see that?
19   A  Yes.
20   Q  Okay.  You didn't exercise that option,
21  correct?
22   A  Are you asking me if I canceled this
23  agreement?
24   Q  Correct.  Did you cancel the agreement?
25   A  I don't think so.

Page 207

1    Q  Okay.  And -- well, in fact, you didn't
2  cancel the agreement; you're suing to enforce the
3  agreement, aren't you?
4    A  Yes.
5    Q  And so you made that choice as a business
6  decision, correct?
7        MR. NIKAS:  Objection.  Based on
8  privilege, he was advised as to why he exercised
9  the strategic course he took.
10       MR. PRESS:  I'm not asking about
11  privileged communication.
12  BY MR. PRESS:
13   Q  I'm just asking you made a business
14  decision to sue under the contract rather than
15  cancel the contract, right?
16       MR. NIKAS:  I have the same objection.
17       ARBITRATOR KRAMER:  That's sustained.  He
18  did it on instruction based on legal advice.
19       MR. PRESS:  Okay.
20  BY MR. PRESS:
21   Q  Now, looking at one paragraph up,
22  Section 6E.  I think you looked at this with your
23  counsel.  The work, an authentic work of art by
24  Andrea del Sarto as described above in Section 1E.
25       Do you see that?

Page 208

1    A  Yes.
2    Q  Okay.  There is no similar representation
3  about any other aspect of the painting in this
4  agreement, is there?
5    A  I may have to read this.
6    Q  Have a look.
7    A  There is a representation about the
8  artist, the title, the medium, the size, the date.
9    Q  Where is that?
10   A  It's under 1A.
11   Q  Okay.  And there's no representation as
12  to -- concerning the condition of the painting, is
13  there?
14   A  That representation was in the diligence,
15  I believe.  Without thoroughly going through this
16  agreement and combing through here to see if your
17  question is true or false, the -- I accepted the
18  work based on the diligence, the promises that
19  everything in the diligence was correct, and that
20  was the inducement for me to enter into this
21  agreement.
22   Q  Okay.  And directing your attention to
23  page 8 of this document.
24   A  Eight?
25   Q  Eight, yes.

Page 209

1    A  I'm there.
2    Q  And Mr. Nikas was your counsel in
3  connection with negotiating this agreement,
4  correct?
5    A  Yes.
6    Q  Okay.  And you had access to him to get
7  legal advice concerning the agreement?
8    A  Yes.
9    Q  Okay.  And directing your attention to
10  paragraph 16.  It says, entire agreement, okay,
11  and I'll just read it into the record.  It says,
12  this agreement constitutes the entire agreement
13  and understanding of the parties with respect to
14  the subject matters hereof and thereof, and
15  supersedes all prior agreements and
16  understandings, both written or oral, of the
17  parties regarding the subject matter hereof and
18  thereof.
19        Do you see that?
20   A  Yes.
21   Q  Do you understand this to be what's called
22  an integration clause?
23   A  What do you call it?
24   Q  Withdrawn.
25        You understood then that anything that was

Arbitration
October 26, 2022

Page 210

1  not actually represented in the body of this
2  agreement, you were -- were superseded by the
3  contents of this agreement; did you understand
4  that?
5           MR. NIKAS:  Objection.
6           MR. PRESS:  You can answer.
7           ARBITRATOR KRAMER:  He can answer if he
8  understands it.  The question was if Mr. Peck had
9  made a lot of representations that didn't find
10  their way into this agreement, you understand that
11  paragraph 16 would bar you from relying on those?
12           THE WITNESS:  Yes.
13  BY MR. PRESS:
14      Q  Now, turning to paragraph 13, which is on
15  page 7, dispute resolution.  I believe you looked
16  at it with your counsel.
17      A  I'm sorry?
18      Q  Paragraph 13.
19      A  Paragraph 13, I'm there.
20      Q  That was the one where five lines down it
21  says, the parties shall share equally in the costs
22  of such arbitration, and each party shall bear
23  their own attorney's fees and costs, and it says,
24  clarity, the arbitration award shall not award
25  attorney's fees or cost to the prevailing party.

Page 211

1           Do you see that?
2      A  Yes.
3      Q  Okay.  And despite that provision, are you
4  seeking an award of attorney's fees and costs from
5  ACG and the respondents?
6      A  I'm seeking damages and an award in
7  connection with Mr. Peck's share of JAMS and for
8  breaching the release provision in which he filed
9  counterclaims that were set aside or denied by the
10  arbitrator.
11      Q  So you are seeking an award of legal fees
12  in connection with the counterclaim in this
13  proceeding?
14      A  Yes.
15      Q  Okay.  But you see here that the provision
16  says that each party -- each side will bear their
17  own attorney's fees and costs; do you see that?
18      A  Yes.
19      Q  Okay.  And in fact, it even says for
20  clarity, the arbitration award shall not award
21  attorney's fees or costs to prevailing party; do
22  you see that?
23      A  That's the prevailing party in terms of
24  the breach, but not in terms of -- there's two
25  claims in my view.  One is for the releases, the

Page 212

1  frivolous counterclaims that you brought that were
2  already precluded under this agreement that you
3  partly offered, and the other is for Peck's --
4  Mr. Peck's share of the JAMS fees that he didn't
5  pay.
6      Q  Okay.  Well, let's start with the
7  arbitration -- the attorney's fees.  Can you show
8  me anything in this agreement that requires the
9  respondents, or either side, the losing part to
10  pay attorney's fees of any kind?
11           MR. NIKAS:  Objection.  The source of the
12  claim is the agreement.  There's no foundation for
13  that question.
14           ARBITRATOR KRAMER:  Overruled.
15           MR. PRESS:  So can he answer?
16           ARBITRATOR KRAMER:  I think the answer is
17  that the only thing that applies to attorney's
18  fees is in this paragraph 13.
19           THE WITNESS:  It looks that way.
20           ARBITRATOR KRAMER:  And whether it's
21  appropriate for me to award attorney's fees on
22  this other claim is an issue for me.
23           MR. PRESS:  Okay.
24           ARBITRATOR KRAMER:  And in interpreting
25  the contract.

Page 213

1           MR. PRESS:  Okay.  I'll leave it at that.
2  BY MR. PRESS:
3      Q  Finally, as to -- well, not finally, but
4  you looked with your counsel at the provision at
5  the end of paragraph 13 that you said you
6  specifically negotiated; do you recall that?
7      A  Yes.
8      Q  And that was the provision that would
9  allow you in the event that the respondents didn't
10  share equally in the arbitration costs to provide
11  notice, and then if within 15 days of such notice
12  that if the other half of the fees weren't paid,
13  you had the option to terminate the arbitration
14  and pursue adjudication in the state and federal
15  court; do you recall that?
16      A  Yes.
17      Q  Okay.  And you testified the respondents
18  didn't pay their fair share of the arbitration
19  costs, right?
20      A  Yes.
21      Q  And -- but you didn't exercise this
22  option?
23      A  I'm trying enforce this option because the
24  respondents didn't pay their share.
25      Q  You didn't exercise the option to take the

Arbitration
October 26, 2022

Page 214

1  case out of arbitration --
2      A  Oh, that part?
3      Q  Yes.
4      A  That's correct.
5      Q  We're here now?
6      A  Yes.
7      Q  Okay.  And you did that for reasons
8  sufficient to yourself, correct?
9      A  Yes.
10     Q  Okay.  But you still want the respondents
11 to pay half of the arbitration costs?
12     A  Yes.
13     Q  Now, are you aware the painting sold in
14 the Sotheby's Old Masters auction on January 27,
15 2022, right?
16     A  Yes.
17     Q  Okay.  Did you watch that auction?
18     A  No.
19     Q  No.  Are you aware that painting was
20 prominently featured on the Sotheby's website?
21     A  No.
22     Q  You're aware that the painting was subject
23 of a video that put the work alongside the
24 Botticelli that sold for $45 million, right?
25     A  I -- you're talking about Christie's

Page 215

1  publicizing the work for sale at auction?
2          ARBITRATOR KRAMER:  I think he's talking
3  about Sotheby's.
4  BY MR. PRESS:
5      Q  I'm talking Sotheby's.
6      A  I'm sorry, Sotheby's.
7          ARBITRATOR KRAMER:  On January 23rd.
8          THE WITNESS:  Yeah, I learned about it
9  after the sale.
10 BY MR. PRESS:
11     Q  So you didn't follow that auction?
12     A  No.
13     Q  And you don't know how Sotheby's marketed
14 the painting at all, do you?
15     A  No.
16     Q  You don't know whether it took the paint
17 on tour?
18     A  No.
19     Q  You don't know about any scholarship
20 Sotheby's did on the painting to promote it?
21     A  No.
22     Q  Okay.  You don't know about -- strike
23 that.
24        Okay.  And are you aware that the -- in
25 the auction, the painting sold for a hammer price

Page 216

1  of 1.8 million?
2      A  I learned about it after the auction.
3      Q  Okay.  Now, you saw earlier today that
4  your expert, Winston Art Group, appraised the
5  painting in 2019 for 1.5 million; do you recall
6  that?
7      A  Yes.
8      Q  When is the first time you learned about
9  the prior appraisal by Winston Art Group?
10     A  When my attorney made me aware of it.
11     Q  Okay.  I don't want to get into
12 attorney-client communications, but I'd like to
13 know the approximate date that you learned about
14 it.
15     A  If you can tell me when the discovery was,
16 that's when I learned about it.  I think you
17 admitted it into discovery, the respondents did.
18 I don't know when that was.  I've lost track of
19 time.  We started in May of 2021, we brought the
20 claim, and we're here in October of 2022, and you
21 did discovery -- discovery was closed after the
22 preliminary hearing sometime at the end of 2021, I
23 think.  I'm just guessing here.  It's when you
24 brought into discovery, the respondents brought it
25 into discovery, that was the date.

Page 217

1      Q  Okay.
2          MR. PRESS:  Okay.  I have no further
3  questions.
4          MR. NIKAS:  Just a few for me.
5      R E - R E D I R E C T - E X A M I N A T I O N
6  BY MR. NIKAS:
7      Q  Mr. Greenberg, Mr. Press asked you about
8  the fact that you retained Robert Simon well
9  before the settlement agreement had been entered
10 into.
11        Do you recall him asking you that
12 question?
13     A  Yes.
14     Q  Do you find it problematic as an ethical
15 matter that someone you retained in connection
16 with this work would show up at a litigation and
17 testify against you?
18         MR. PRESS:  Objection; leading.
19         ARBITRATOR KRAMER:  Sustained.
20 BY MR. NIKAS:
21     Q  Did Mr. Peck also retain Mr. Simon with?
22     A  Yes.
23     Q  Both of you at the same time?
24     A  Yes.
25     Q  Did Mr. Peck provide Mr. Simon with any

Arbitration
October 26, 2022

Page 218

1  documents about the work?
2      ARBITRATOR KRAMER:  If you know.
3      THE WITNESS:  I don't know.
4  BY MR. NIKAS:
5      Q  Now, you said that Mr. Simon saw the work
6  of twice, but that he never delivered a final
7  report and you became frustrated with the process.
8      Do you recall giving that answer?
9      A  Yes.
10     Q  Why did you become frustrated with the
11  process?
12     A  So when I was advised by Dr. Simon that
13  Diane Modestini wanted the work to go to her lab
14  at the university, Mr. Peck was advised, and it
15  seemed like I was in a loop.  The loop was -- it
16  started out that the work was going to be
17  delivered to Diane Modestini's laboratory.  Okay,
18  when?  Never showed up.  When?  Never showed up.
19  When?  Never showed up.  When?  I think it was
20  three or four months, the work never showed up at
21  the laboratory.  Got frustrated.  Everyone has
22  their limit.  Three of the four months, when
23  someone says something is going to happen in a
24  week, I think I was patient enough.
25     Q  And after that, is that when you turned to

Page 219

1  Christie's for their view of the work?
2      A  Yes, I turned to Christie's after that.
3      Q  Now, in the month leading up to the
4  settlement, did you have any reason to doubt that
5  the work was in good condition?
6      A  No.
7      Q  Now, just one final question.  Mr. Press
8  asked you about the provision in the agreement,
9  1E, that says that if the work is offered for sale
10  twice, it doesn't sell, then you get title to the
11  work.
12     Do you recall him asking you about that
13  provision?
14     A  I do recall that, yes.
15     Q  Were the respondents required to offer the
16  work for sale?
17     A  Yes.
18     Q  And in the event that they -- strike that.
19     Why didn't they offer the work for sale?
20     A  Well, as it turns out, the representations
21  that the respondent had control and had the
22  ability and the right was a lie, and now it's
23  seems like they want to take advantage of a lie.
24  It doesn't make sense to me.
25     MR. NIKAS:  I have no further questions.

Page 220

1      MR. PRESS:  I'm done.
2      ARBITRATOR KRAMER:  Thank you, Mr.
3  Greenberg.  Show we take our afternoon break?
4      MR. NIKAS:  That's fine.
5      (Whereupon, a break was taken at
6  3:45 p.m.)
7      ARBITRATOR KRAMER:  Back on the record.
8      Swear in the witness, please.
9  I A N  P E C K, called as the witness, having been
10  duly sworn by a Notary Public, was questioned
11  and testified as follows:
12     ARBITRATOR KRAMER:  State your full name
13  for the record, please.
14     THE WITNESS:  Ian Peck.
15     D I R E C T  E X A M I N A T I O N
16  BY MR. NIKAS:
17     Q  Mr. Peck, you signed a settlement
18  agreement with Mr. Greenberg and various entities,
19  correct?
20     A  Yes.
21     Q  If you could, please, turn to Tab 1 for
22  me.  Is that the settlement agreement that you
23  signed to resolve your initial dispute with Mr.
24  Greenberg and various entities?
25     A  Yes.

Page 221

1      Q  On pages 9 and 10, do you recognize the
2  signatures executed in this agreement?
3      A  Yes.
4      Q  And on page 10, are those your signatures?
5      A  Those are my signatures on behalf of the
6  various respondents.
7      Q  And then the first one is you personally,
8  correct?
9      A  Yes.
10     MR. NIKAS:  I don't know if we've done
11  this yet, but I offer Exhibit 1, the settlement
12  agreement into evidence.
13     MR. PRESS:  Okay.
14     ARBITRATOR KRAMER:  Received.
15  BY MR. NIKAS:
16     Q  Mr. Peck, Section 1-A-2 gave GB the right
17  terminate the agreement in its sole discretion if
18  the auctioneer provided a low-end estimate that
19  was less than $4 million; do you see that?
20     A  I'm sorry.  It's one --
21     ARBITRATOR KRAMER:  And two.
22     THE WITNESS:  Yes.
23  BY MR. NIKAS:
24     Q  Now, an estimate was never provided for
25  this work, correct?

Page 222

1    A  There was never a formal estimate, no.
2    Q  And that's because it wasn't delivered to
3  Christie's for an estimate to be provided,
4  correct?
5    A  Well, I don't know the ultimate reason,
6  but there was never an estimate provided.
7    Q  And 1-A-3 says that ACG had the right to
8  pay $3.6 million at any time within 60 days of
9  execution of the agreement, i.e., in advance of
10  the auction.
11       Do you see that language?
12    A  Yes.
13    Q  And ACG never paid that $3.6 million,
14  correct?
15    A  We've never exercised that provision, no.
16    Q  Section 1C, it's the waterfall that was to
17  be applied for allocating sales proceeds for the
18  artwork that was the consideration for this deal,
19  right?
20    A  Yes.
21    Q  And the waterfall required that the first
22  4.15 million of proceeds be paid to GB, correct?
23    A  I'm sorry, what was the number again?
24    Q  $4.15 million.
25    A  Right, minus the sales -- the ten percent

Page 223

1  sales expense number.
2    Q  And there was no sales of the work, right?
3    A  Not at Christie's, no.
4    Q  And not under this agreement, right?
5    A  I don't -- I mean, that's the debatable,
6  I think, but it sold at Sotheby's in January
7  of 2022.
8    Q  And the sale expenses that were incurred
9  in connection with that auction weren't yours
10  under this agreement, right, that somebody else's?
11    A  I wouldn't concede that, no.
12       ARBITRATOR KRAMER:  What was your answer,
13  please.
14       THE WITNESS:  I wouldn't concede that.  I
15  don't agree with that.  The expenses -- we
16  incurred many expenses related to that effort.
17  BY MR. NIKAS:
18    Q  In connection with the sale of the work
19  under this agreement?
20    A  Well, I'm not sure I understand then what
21  you mean by this agreement.  Can you clarify that?
22    Q  Sure.  This settlement agreement has a
23  waterfall provision that we're looking at right
24  now, right?
25    A  Yes.

Page 224

1    Q  And under that waterfall provision, in the
2  event the work gets sold, pursuant to this
3  agreement, then sales expenses come off the top,
4  right?
5    A  Understood.
6    Q  And is that never happened?
7    A  Correct.
8    Q  The upper limit of this waterfall was --
9  threshold in terms of payment or proceeds was
10  $30 million sale would -- above that result in no
11  additional payment beyond what had been stated
12  before, correct?
13    A  When you say no "additional payment," what
14  do you mean?
15    Q  Sure.  So the waterfall provides that the
16  first 4.15 million go to GB, and then it allocates
17  sales proceeds from a sale all the way up to
18  $30 million, correct?
19    A  Yes.
20    Q  And then it stops?
21    A  Well, then there's no change to percentage
22  splits.
23    Q  Right.  The increase stops as you continue
24  to increase?
25    A  Yes, it's within the ladder.

Page 225

1    Q  And you negotiated this waterfall with
2  Mr. Greenberg, correct?
3    A  And yourself and my counsel, yes.
4    Q  The principals were you and Mr. Greenberg,
5  yes?
6    A  Yes.
7    Q  Now, under Section 1E, immediately after
8  the waterfall provision it says that if the work
9  remains unsold after two efforts then GB has the
10  right to permit further sales efforts or take
11  unencumbered title to the work; do you see that?
12    A  Yes.
13    Q  Now, you were required to make sales
14  efforts to try to sell the work under this
15  agreement, right?
16    A  Well, we had to have the work to do sell
17  to make those effort, yes.
18    Q  And you had represented that you had the
19  work to sell under Section 6, right?
20    A  I don't agree with that.  I think we
21  represented that we were in contract to have the
22  work, and then unfortunately our counter-party had
23  misrepresented itself and that's the problem.
24    Q  Well, that's already been subject of a
25  summary judgment decision, so I'll simply ask the

Arbitration
October 26, 2022

Page 226

1  work was not offered for sale ever by you,
2  correct?
3      A  No.
4      Q  You did not offer it for sale because you
5  did not have it to sell?
6      A  Well, I had it in contract, and I had the
7  right to own it in full and pass title, but I
8  never was able to -- I didn't offer it for sale at
9  any time during the period here in question.
10     Q  In fact, when this dispute arose, you
11  didn't know where the work was, right?
12     A  Not precisely, no.
13     Q  Not precisely?  You didn't know
14  precisely --
15     A  Well, I know what I was told.  I was told
16  where it was, but I don't know if that was
17  accurate or not.
18     Q  Okay.  Now, under Section 6A through D,
19  you made all those representations in this
20  settlement agreement, correct?
21     A  I'm sorry, where are you?
22     Q  Sure 6A through D.  You made each of these
23  representations as part of the settlement, yes?
24     A  We did, yes.
25     Q  Now, 6E says the work is an authentic work

Page 227

1  of art by Andrea del Sarto as described above in
2  Section 1A.
3      A  Yes.
4      Q  And you made that representation in this
5  agreement that you signed?
6      A  Absolutely.
7      Q  And Section 1A describes the work as an
8  Andrea del Sarto with a title of Ottaviano
9  de' Medici, correct?
10     A  Yes.
11     Q  And you represented that description was
12  accurate, correct?
13     A  Yes.
14     Q  Now, Section 13, a dispute resolution
15  provision that says the parties shall share
16  equally in the cost of such arbitration.
17         Do you see that?
18     A  Yes.
19     Q  And you have not paid any costs of this
20  arbitration, correct?
21     A  It gets into conversations I've had with
22  my counsel, but the answer is no, we have not.
23     Q  You didn't pay JAMS anything, right?
24     A  The respondents have not paid JAMS yet.
25     Q  You said yet.  As of right now, you

Page 228

1  haven't paid a dollar to JAMS?
2      A  That's correct.
3      Q  Now, I want to talk about the del Sarto
4  that you represented was accurate and authentic as
5  described in Section 1A.
6         MR. PRESS:  Objection to form.
7         ARBITRATOR KRAMER:  Mr. Nikas, move on to
8  the next question.
9  BY MR. NIKAS:
10     Q  You represented that the work was not
11  subject to any claims or rights, potential or
12  threatened, that could prevent you from performing
13  your obligation under this agreement, correct?
14     A  Yes.
15     Q  Now, after this settlement agreement was
16  signed, you engaged an individual named Nicholas
17  Hall, correct?
18     A  Yes.
19     Q  Now, you did that around March of 2021,
20  right?
21     A  We started conversations with Nicholas
22  Hall in January of 2021.
23     Q  If you could turn to Exhibit 16 in your
24  binder for me.
25         Are you there, Mr. Peck?

Page 229

1      A  Yes.
2      Q  This is the engagement letter, consulting
3  agreement that you entered into with Nicholas
4  Hall?
5      A  Yes, I believe so.
6      Q  And you entered into this agreement before
7  you were sued in this arbitration, correct?
8      A  I don't recall the precise dates when this
9  arbitration commenced, but my recollection was
10  that it was earlier than this or just about the
11  same time.
12         ARBITRATOR KRAMER:  Why don't you
13  represent when the arbitration started.
14  BY MR. NIKAS:
15     Q  The arbitration started on you April 29,
16  2021, to give you an exact date.
17     A  Okay.  That sounds about right.
18     Q  So you engaged him before the arbitration
19  started, correct?
20     A  Yes.
21         MR. NIKAS:  Now, I'd like to offer Exhibit
22  16, Mr. Hall's consulting agreement.
23         MR. PRESS:  I'm just going to object
24  because I don't see how this is related to
25  damages.  I think we are having a damages hearing.

Arbitration
October 26, 2022

Page 230

```
1   I mean, if you want to open up the question of
2   liability, I'm absolutely open to it.
3        ARBITRATOR KRAMER:  Let's just find out
4   where we're going.
5        MR. PRESS:  Okay.
6        MR. NIKAS:  I'll connect it directly to
7   damage, sir.
8   BY MR. NIKAS:
9     Q   Mr. Peck, in this consulting agreement you
10  agreed to pay Mr. Hall five percent of the net
11  profit of the sale up to a sales price of $10
12  million, correct?
13    A   Yes.
14    Q   Three percent of the net profit from the
15  sale price between ten to $15 million, correct?
16    A   Yes.
17    Q   And two percent net of the sale profit
18  above a sale price of $15 million, correct?
19    A   Yes.
20    Q   Now, when entering into this engagement
21  with Mr. Hall, you believed at the time that he
22  was one of the world's most significant experts in
23  Old Master work?
24    A   Well, Nicholas Hall is considered one of
25  the top experts, and particularly with this type
```

Page 231

```
1   of a situation, which is what we wanted him for,
2   which was to help us negotiate with the auction
3   house or make another recommendation as to what
4   the best course of action would be to get the most
5   value out of the painting.
6     Q   Okay.  Now, you and Mr. Hall then talked
7   about the del Sarto, right?
8     A   Yes.
9     Q   And Mr. Hall told you that he liked the
10  work, right?
11    A   Well, he liked the name, and I think he
12  liked the image of the work, but he, like others,
13  wanted to get more details about the condition and
14  background of the piece.
15    Q   Okay.  But he told you that he likes the
16  work, right?
17    A   Yes.
18    Q   And, in fact, your lawyer on your behalf
19  represented that to the respondents in writing,
20  right?
21        ARBITRATOR KRAMER:  To whom?  To the
22  respondents?
23        MR. NIKAS:  To respondents that Mr. Hall
24  like the work.
25        MR. PRESS:  Objection.
```

Page 232

```
1        ARBITRATOR KRAMER:  I'm not sure I
2   understand the question.
3        MR. NIKAS:  Sure.
4        ARBITRATOR KRAMER:  The question is
5   whether Mr. Hall --
6        MR. NIKAS:  I said did Mr. Hall tell you
7   he liked the work, and then he said yes.  And I
8   said, in fact, your counsel represented to us that
9   Mr. Hall liked the work.
10       ARBITRATOR KRAMER:  You said "respondent."
11  You're a claimant.
12       THE WITNESS:  Mr. Hall liked the work.
13  BY MR. NIKAS:
14    Q   Now --
15    A   He hadn't seen the work in person.
16    Q   He hadn't seen it in person?
17    A   No.
18    Q   And based on what Mr. Hall knew about the
19  work that you had told him, you and Mr. Hall
20  discussed the value of the work, correct?
21    A   Well, we discussed the potential of value
22  if a certain course of action was taken.  He felt,
23  as you know from his letter, very strongly that
24  the April Christie's sale was not a place where
25  the painting should go.  He felt it was a very
```

Page 233

```
1   minor sale and that the result would be bad for
2   the painting.  And he recommended, as did Robert
3   Simon, a different course, which was to have the
4   piece sent to Italy, restored by one of the top
5   restorers in the world and re-present it to the
6   marketplace with additional scholarship, articles
7   written, possibly getting in an museum, a
8   multiple-year strategy to get to a point where you
9   can sell it to an important collector for a bigger
10  number.
11    Q   In the course of the conversations before
12  or in March of 2021, Mr. Hall had told you a
13  specific range of value he thought for this work,
14  correct?
15    A   Well, he said if the condition is very
16  good that the numbers could be, you know, in the
17  three, four, five million range, or more.  If it
18  was mediocre or bad, it would be less.  So he was
19  quite clear about that.
20    Q   So you said Mr. Hall told you three, four,
21  five million, that was the specific range that we
22  talked about?
23    A   If the piece was in, you know, phenomenal
24  condition.
25    Q   So after you consulted with Mr. Hall in
```

Arbitration
October 26, 2022

Page 234

```
1   March of 2021, you gave testimony in a preliminary
2   injunction hearing, correct.
3       A  Yes.
4       Q  And that testimony came after you
5   consulted with Mr. Hall about the range of values
6   for the work, correct?
7       A  Yes.
8       Q  And in your testimony after consulting
9   with Mr. Hall about the range of values for the
10  work, you testified that the range of value was
11  ten to 15 million, correct?
12      A  If this course of action was adopted, yes,
13  potentially.  It's a potential.  It's not a
14  guarantee, if you know what I mean.  I mean, you
15  could put a painting at auction and say, yes,
16  well, it's one to $3 million.  You could hit a
17  home run and it sells for ten, you know.  The
18  point is it's not an exact science, right.  I
19  mean, the market is going to determine the value
20  ultimately.
21      Q  And the value that you gave under oath to
22  the arbitrator in this case was ten to
23  $15 million, correct?
24          MR. PRESS:  I'm going to object.  This
25  misrepresents the transcript.
```

Page 235

```
1          ARBITRATOR KRAMER:  Show him the
2   transcript.
3          MR. PRESS:  And when you hear this,
4   Mr. Arbitrator, I really think that you should
5   admonish the claimant to not leave out the
6   important language from the testimony.
7          ARBITRATOR KRAMER:  Well, that's why we're
8   going to show the transcript, and then you have an
9   opportunity to show if it's accurate under your
10  examination.
11         MR. NIKAS:  Page 278.
12         ARBITRATOR KRAMER:  Does Mr. Peck have it?
13         MR. NIKAS:  It's on Exhibit 5.
14         ARBITRATOR KRAMER:  Page number?
15         MR. NIKAS:  It's 278.
16         THE WITNESS:  Okay.
17  BY MR. NIKAS:
18      Q  You were asked about your conversation
19  with Mr. Hall:
20          "QUESTION:  He had no idea at that point
21  what the specific value of the work was, correct?
22          "ANSWER:  To the extent that there's a
23  specific value, he had a range of what he thought
24  would work, yes.
25          "QUESTION:  But he didn't know what the
```

Page 236

```
1   real number was as he later puts it in an e-mail,
2   correct?
3           "ANSWER:  He gave us a range of value as
4   it was dependent on several factors."
5           Do you see that?
6       A  Yes.
7       Q  You gave that testimony.  And the several
8   factors were the ones you just referenced earlier,
9   right?
10      A  Yes.
11      Q  Now, go to Exhibit 6, page 73.  Your
12  counsel asks you, page 73, line 19:
13          "QUESTION:  And what do you believe the
14  painting might be worth?
15          "ANSWER:  I believe the painting could be
16  worth somewhere around the ten to $15 million if
17  it's properly handled."
18          Do you see that?
19      A  Yes.
20      Q  And by properly handled you're referring
21  to the various activities that you described a
22  moment ago, yes?
23      A  The multi-year plan that the experts were
24  recommending.
25      Q  And Mr. Hall wrote that it should be
```

Page 237

```
1   offered in the fall, right?
2       A  Well, he said that if you had to auction
3   it, he was recommending that you at least wait
4   until the next important auction, which would have
5   been -- I think would have been Sotheby's,
6   actually.
7       Q  Now, when you gave this testimony you knew
8   that the claimants had pursued a lawsuit that was
9   seeking damages against you, correct?
10      A  I don't understand the question.
11      Q  Sure.  You were testifying in an
12  arbitration proceeding, you understood that,
13  right?
14      A  Yes.
15      Q  And you understood that that arbitration
16  proceeding had been initiated by an arbitration
17  demand filed by the claimants?
18      A  Yes.
19      Q  And you understood that that arbitration
20  demand requested damages for the breaches it
21  alleged you had committed under the settlement
22  agreement, right?
23      A  Yes.
24      Q  And that arbitration demand sought damages
25  in connection with those breaches, that would be
```

Page 238

1   subject to a trial, yes?
2       A  Yes.
3       Q  And at the time you gave that testimony
4   you knew that the core question would be what
5   damages were incurred as a result of the failure
6   to sell this work, right?
7       A  Well, I wouldn't have known that
8   necessarily.
9       Q  Your counsel took that position in the
10  preliminary injunction proceeding, are you aware
11  of that?
12      A  You're asking if I knew that this trial
13  would ultimately be about damages, how could I
14  know that?  I mean...
15      Q  Do you recall at the arbitration your
16  counsel at the preliminary injunction of this
17  arbitration, where your counsel took the position
18  that the claimants were seeking essentially money
19  damages because this contract is for the payment
20  of a sum of money in various forms?
21      A  I don't recall that specifically, no.
22      Q  So when you gave the testimony that the
23  value of the work could be between ten to 15
24  million if it were properly handled, in fact, you
25  had an incentive to decrease that number because

Page 239

1   you weren't in arbitration where the value of the
2   work was the amount of damages, right?
3       A  Well, no.  We very much wanted to complete
4   our contract and close.  We were prevented from
5   doing so by the preliminary injunction, but we had
6   property incentive per the waterfall to -- we
7   could have done very well if the painting sold for
8   a lot of money.
9       Q  And when you testified that it was --
10  could be worth ten to $15 million if properly
11  handled, you were telling the truth?
12      A  Well, I was saying what several experts
13  had told me at that point if we followed a very
14  specific course of action, which did not involve
15  the auctions then we could achieve that result;
16  that's what they were saying.
17         Now, again, it was still speculative as
18  to -- no one was guaranteeing what the results
19  were going to be, and no one knows for sure.  This
20  is a very rarified area of the market.
21      Q  You could never be sure, but you were
22  hearing to ten to 15 was a possibility?
23      A  Other less than one if things went in a
24  different direction.  For example, they wanted to
25  send this to a specific restoration studio in

Page 240

1   Italy that has done work on Leonardo da Vinci and
2   other major works.  And what the restorers would
3   do, and I'm not a restorer, but I've worked with
4   many, is they would have taken the picture back
5   down to the original, you know, state, similar to
6   the picture that you saw, and then they would have
7   redone the whole thing, to fix whatever problems
8   there were with the restoration.  That's a process
9   that could take a year or a year and a half, and
10  you don't know what you're going to find when you
11  take the paint layers off.  There could be other
12  problems that people didn't realize.
13         So it is all speculative, but that was the
14  advice we were getting at that time from Nick
15  Hall, Robert Simon, and others.
16      Q  So it's speculative, but ten to $15
17  million was a range that was reasonable --
18      A  I would call that the home run scenario if
19  you took this multi-year plan, yes.
20      Q  And the reason none of the multi-year plan
21  components happened is because you didn't own the
22  work and you couldn't offer it, correct?
23      A  No.  I couldn't close on the work because
24  the preliminary injunction prevented me from doing
25  so, the company rather.  And as you can see from

Page 241

1   the litigation we had with Virginia Bonito, we
2   clearly had rights to purchase the work.  We had a
3   lien on the work.  We had everything needed to
4   deliver -- to close and deliver on the work, but
5   at the moment that we were trying to do that, we
6   were restrained from doing that.
7       Q  Do you recall -- you didn't own the work;
8   isn't that true, sir?
9       A  Well, no.  We owned a portion of the work
10  at that time, and we had the contractual right to
11  own the entire work.  We were trying to close on
12  that, and we were up front with Gary and
13  Christie's about that.  The record shows that.
14      Q  You didn't have the work in your
15  possession, correct?
16      A  We always said we had to get it delivered,
17  and that's where the problem occurred.
18      Q  The reason this multi-year plan didn't
19  happen is because you breached the provisions in
20  the settlement agreement under which you
21  represented that the work was not subject to any
22  claims, threatened claims or other interests or
23  contracts that you were violating by entering this
24  agreement?
25         MR. PRESS:  Objection.

Page 242

1    THE WITNESS: We relied on a counter-party
2 that we had a contractual relationship with, and
3 that counter-party breached certain
4 representations, and that's what happened, so...
5    ARBITRATOR KRAMER: Did you at that time
6 own a percentage of the painting?
7    THE WITNESS: Yeah. We had a pro rata
8 share.
9    ARBITRATOR KRAMER: Which was documented
10 how?
11    THE WITNESS: In an agreement. When we
12 advanced money against the purchase -- so we had a
13 purchase agreement and a right to purchase the
14 entire work, we had advanced deposits along the
15 way against the purchase price, and there's a lien
16 that was filed that captured, you know, as a
17 right, and also language in the agreement that
18 said we were pro rata owner.
19    MR. NIKAS: And Mr. Kramer, this is the
20 subject. Two things, number one, there's a
21 summary judgment decision, and number two, that
22 was an unsigned agreement that Arbitrator Francis
23 reviewed and found no evidence --
24    MR. PRESS: Are you testifying?
25    ARBITRATOR KRAMER: Agreed. Let's --

Page 243

1    MR. NIKAS: I'm talking about the subject
2 of the decision.
3    ARBITRATOR KRAMER: Let's move on.
4 BY MR. NIKAS:
5    Q Mr. Peck, you didn't ultimately undertake
6 the plan that your own experts told you needed to
7 be undertaken for this work, right?
8    A We were unable to.
9    Q You didn't; isn't that right?
10    A No, we didn't.
11    Q And that has nothing to do with Gary
12 Greenberg breaching this agreement, correct?
13 There's been no finding of breach against him?
14    A Look, I'm not a lawyer, but I'm just
15 saying it's a practical matter. We couldn't
16 complete our side of the transaction with a
17 preliminary injunction in place.
18    Q That had all been resolved before. You
19 mentioned the lawsuit. You sued Bonito three days
20 before the work was sold to Sotheby's, correct?
21    A The company that was in contract with her
22 as seller, Empire Chesapeake, for example, was the
23 buyer, and Chelsea Arts Holdings was the buyer,
24 they both had certain contractual rights, and they
25 brought an action just, you know, a day or tow

Page 244

1 before the Sotheby's auction.
2    Q You were the one that signed the
3 verification for that complaint, correct?
4    A Yes.
5    Q And in that complaint you alleged that
6 Sotheby's had no right to sell the work, correct?
7    A Well, I think we alleged -- I'd have to
8 see the complaint to know verbatim.
9    MR. PRESS: Why don't you show him the
10 complaint.
11    MR. NIKAS: If I could conduct the
12 examination.
13    ARBITRATOR KRAMER: Maintain nice for most
14 of the day.
15    THE WITNESS: So your question again,
16 please.
17 BY MR. NIKAS:
18    Q Sure. In the complaint you alleged that
19 Sotheby's had no right to sell the work, correct?
20    A I said that there was a -- that we had
21 certain rights, or the company had that was in
22 contract with the seller had certain rights that
23 were being trampled, yes.
24    Q And that Sotheby's did not have right to
25 sell the work, right?

Page 245

1    ARBITRATOR KRAMER: Does it say that in
2 the complaint?
3    MR. NIKAS: It does.
4    ARBITRATOR KRAMER: Okay. Do you recall
5 where it specifically said that Sotheby's doesn't
6 have the right --
7    THE WITNESS: In sum or substance we were
8 saying Sotheby's -- guys, we're over here. You
9 can't sell it without out rights being protected.
10 BY MR. NIKAS:
11    Q So let's look at the complaint then. It's
12 Exhibit 7. Go to the last page of the document
13 first, please.
14    That's your signature on the verification
15 for the complaint?
16    A Yes.
17    Q And if you'll go back one page, that's
18 your counsel, Mr. Press, signing the complaint,
19 correct?
20    A Yes.
21    Q Now, if you go to the beginning of the
22 complaint, it's on page 3 of 23 at the bottom
23 right-hand corner. Empire Chesapeake Holdings and
24 Chelsea Art Holdings; do you see that?
25    A Yes.

Arbitration
October 26, 2022

Page 246

1    Q  Against Virginia Anne Bonito and Bottom
2  Line Exchange Company?
3    A  Yes.
4    Q  Now, you're a director, and had some
5  interest in the two plaintiff's; is that right?
6    A  Director, yes.
7    Q  And you authorized the filing of this
8  verified complaint?
9    A  Yes.
10    Q  And your verification verified that to
11  your knowledge it was an accurate complaint,
12  right, it was truthful?
13    A  Yes.
14    Q  All right.  No9w, paragraph 5 on page 5 of
15  23, states that in October or November of 2021,
16  you put Bonito, Bottom Line, and Sotheby's on
17  notice of your alleged claims and rights, correct?
18    A  Yes.
19    Q  And it further alleges that you had liens
20  against the painting and right of first refusal,
21  right?
22    A  Yes.
23    Q  And you accused Bonito and Bottom of
24  pretending or hoping to sell the painting and
25  abscond the proceeds?

Page 247

1    A  Well, not only the right of first refusal,
2  but we also have the exclusive right to purchase
3  the painting.
4    Q  Okay.  You alleged that in paragraph 5?
5    A  Yes.
6    Q  And you put this in a public document
7  filed in New York Supreme Court?
8    A  It was filed, yes.
9    Q  Now, if you'll, please, go to
10  paragraph 52, a letter dated November 29, 2021.
11    Do you see that paragraph?  Let me know
12  when you're there.
13    A  Yes, okay.
14    Q  It references a letter that you sent to
15  Sotheby's on November 29, 2021; do you see that?
16    A  Yes.
17    Q  And in that November 29, 2021, letter to
18  Sotheby's, you wrote, in 2020 and 2021, Empire
19  Chesapeake advanced certain amounts to Virginia
20  Bonito towards the purchase of the work, and
21  incurred certain expenses.  The amounts are
22  secured by the attached UCC lien on the work as
23  part of the agreement based upon the amounts
24  already advanced.  Ms. Bonito granted Empire
25  Chesapeake a pro rata direct ownership interest,

Page 248

1  and you continue on describing your alleged
2  interest in the work.  And then you say in the
3  last paragraph that you objected to Sotheby's sale
4  of the work in any auction or private transaction,
5  right?
6    A  Well, we object until our rights are taken
7  into account.
8    Q  Now, you have experience in the art world,
9  correct?
10    A  Some.
11    Q  You worked at Christie's?
12    A  I worked at Sotheby's.
13    Q  You were the master of fine art at
14  Christie's?
15    A  Yes.
16    Q  And you have some experience in the Old
17  Masters department at Sotheby's; is that right?
18    A  Yes.
19    Q  Now, from your experience in the art world
20  you know that in essence what you're saying is I
21  own this work, or at least a right to it, and
22  Sotheby's can't sell it, right?
23    A  Well, look, first of all, Sotheby's
24  guarantees tile when it sells something at
25  auction.  They guarantee authenticity as well, so

Page 249

1  they have to be sure if there's any doubt or
2  dispute or if anyone raises a question, they have
3  to run that ground.  All we were doing was saying
4  we're getting ignored by our counter-party
5  contractually, you're about to sell something
6  where there is a legitimate claim from a
7  third-party, that's us, and that's all we said.
8    Q  And in other words, they don't have a
9  right to sell it when your claim isn't being
10  respected?
11    A  Well, you know, obviously, you know, when
12  I was working at the auction house, I saw things
13  that were sold, and then subsequently there were
14  claims on that.  But if the claim is made aware to
15  them ahead of time, then they have to deal with
16  it.
17    Q  And wouldn't you agree that dealing with a
18  claim on title, lien on title like this, it'd make
19  it hard for a seller to sell a work in the wake of
20  an allegation like that?
21    A  Well, I think the public -- the buying
22  public would be relying on Sotheby's to do what
23  they did, which was to run it to ground and ensure
24  that when they did sell the work that it was free
25  and clear, and that their representations that it

Page 250

1  was free and clear were true.
2      Q  But don't you think it would be hard for a
3  seller to sell a work at maximum price when you're
4  claiming that someone else owes you these
5  obligations?
6      A  Not necessarily, no.
7      Q  Do you remember in your preliminary
8  injunction testimony being asked the following
9  questions, on page 208, and you can follow along,
10  Exhibit 5.  Question on line 10, tell me with
11  you're there.
12      A  Page 208?
13      Q  208.
14      A  Okay.
15      Q  Line 10, you were asked:
16      "QUESTION:  So if you closed on the work
17  today under the terms of the documents your lawyer
18  has presented to this tribunal, is it your
19  testimony you can consign the work for sale?
20      You answered:  If we were able to
21  successfully close on the work, then we could
22  potentially consign it for sale.
23      "QUESTION:  If you don't close on the
24  work, then the owner could sell the work to
25  someone else, correct?

Page 251

1      "ANSWER:  Well, they would have a hard
2  time doing that because of the obligations they
3  have to our company."
4      Do you see that?
5      A  Yes.
6      Q  And do you agree with that answer that you
7  gave?
8      A  I do.
9      Q  Okay.
10      MR. NIKAS:  I have no further questions.
11      MR. PRESS:  All right.  I don't have any
12  questions in redirect.
13      ARBITRATOR KRAMER:  Right.
14      MR. PRESS:  Now, I do have Mr. Peck as a
15  witness of mine, but I think at this point, you
16  know, it's almost five o'clock, and I prefer to
17  just do him tomorrow.
18      ARBITRATOR KRAMER:  That means tomorrow we
19  would have Mr. Peck for how much time.
20      MR. PRESS:  So what I would probably do
21  is, I'd really want to get Mr. Simon in and out,
22  who's tired, so let's not do that now.  So I
23  suggest we do Mr. Simon, and Mr. Peck is stuck
24  here anyway, so we would just do him afterwards.
25  I don't have -- it's a hard to say.  I have

Page 252

1  some -- I have more -- I think I have more with
2  Mr. Peck than -- and you would have time for with
3  cross and redirect.  That's why I was suggesting
4  it.
5      ARBITRATOR KRAMER:  So we're starting at
6  9:30 tomorrow morning with Dr. Simon?
7      MR. PRESS:  That would be my suggestion.
8      ARBITRATOR KRAMER:  Any objection to that
9  schedule?
10      MR. NIKAS:  No.  The only request that I'd
11  make is that because Mr. Peck has just giving
12  testimony that he not be allowed to confer with
13  Mr. Press about his testimony he's going to be
14  giving.
15      ARBITRATOR KRAMER:  Sure.  I'm sure
16  Mr. Press knows his ethical obligations.
17      MR. PRESS:  I'm happy to not talk to
18  Mr. Peck about it.  I may have to talk to him
19  about some other things, but I will not discuss
20  this --
21      ARBITRATOR KRAMER:  I always assume that
22  the lawyers do right thing.
23      You can go off the record.
24      (Whereupon, the proceedings concluded at
25  4:46 p.m.)

Page 253

1      --oo0oo--
2
3
4      C E R T I F I C A T E
5
6      I, Leonora L. Walker, a Notary Public, the
7  officer before whom the foregoing deposition was
8  taken, do hereby certify that the foregoing
9  transcript is a true and correct record of the
10  testimony given; that said testimony was taken by
11  me stenographically and thereafter reduced to
12  typewriting under my supervision; that reading and
13  signing was not requested; and that I am neither
14  counsel for or related to, nor employed by any of
15  the parties to this case and have no interest,
16  financial or otherwise, in its outcome.
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand and affixed my notarial seal this 26th day of
19  October 2022.
20      My commission expires May 17, 2024.
21
22      _Leonora L. Walker_
23      NOTARY PUBLIC IN AND FOR THE
24      STATE OF NEW YORK
25      Notary Registration No. 01WA6109670