JAMS ARBITRATION TRIBUNAL
NEW YORK, NEW YORK

---

GARY GREENBERG, ART FUND III LLC, COLORADO ART HOLDINGS LLC, GB FUND LLC, LOANS ON FINE ART LLC, AND LOTUS INVESTMENT CORP.,

                Claimants,

-against-

IAN S. PECK, ACG ARRANGEMENT SERVICES LLC, ACG CAPITAL COMPANY, LLC, MODERN ART SERVICES, LLC, PATRIOT CREDIT COMPANY LLC, AND PEGASUS CREDIT COMPANY LLC,

                Respondents.

JAMS Ref No. 1425034873

---

## RESPONDENTS' PRE-HEARING MEMORANDUM OF LAW

**PRESS KORAL LLP**
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 922-1111
Facsimile: (347) 342-3882
mpress@presskoral.com

# CONTENTS

I.   INTRODUCTION ................................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................................. 2

   A.   The Settlement Agreement ..................................................................................... 2

   B.   ACG is Unable to Meet the Original Evaluation, Consignment and Auction Deadlines ................................................................................................................ 5

   C.   Nicholas Hall Advises Against Selling the Painting in the Christies Auction ........... 5

   D.   The Christie's Auction ............................................................................................ 6

   E.   Claimants' Obtain a TRO, Preventing Respondents from Acquiring the Painting  6

   F.   The Painting is Sold in the Sotheby's January 27, 2022 Old Masters Auction for $1.8 Million ............................................................................................................ 7

III. ARGUMENT ..................................................................................................................... 8

   A.   The Expert Report and Testimony of Dr. Timothy Hunter Should be Precluded ... 9

   B.   Claimants Have Failed to Adduce Any Proof of Their Alleged Damages .............. 14

   C.   Claimants Failed to Mitigate Their Claim to One Half of the Costs of the Arbitration ............................................................................................................. 15

IV.  CONCLUSION ................................................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 727 F. Supp. 2d 256, 286–87 (S.D.N.Y. 2010) ................................................................................................................. 8

*Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974) ............................................................................................................................... 8

*Hughes v. Sprauve*, No. 14 CV 4152 BMC, 2014 WL 6674590, at *2 (E.D.N.Y. Nov. 25, 2014) 8

*King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5237195, at *12 (S.D.N.Y. Nov. 9, 2021) ..... 13

*Mack Cali Realty, L.P. v. Everfoam Insulation Sys., Inc.*, 110 A.D.3d 680, 682, 972 N.Y.S.2d 310, 312 (2nd Dep't 2013) ............................................................................................... 8

*Oleg Cassini, Inc. v. Electrolux Home Prod.*, Inc., No. 11 CIV. 1237 LGS JCF, 2014 WL 1468118, at *8 (S.D.N.Y. Apr. 15, 2014) ............................................................................ 13

*Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ............................... 8, 14

**Treatises**

§ 22:10. DATE OF THE BREACH, 28A N.Y. PRAC., CONTRACT LAW § 22:10 .............................. 8, 14

§ 22:12. AMOUNT OF DAMAGE, 28A N.Y. PRAC., CONTRACT LAW § 22:12 .................................... 8

§ 22:17. GENERALLY, 28A N.Y. PRAC., CONTRACT LAW § 22:17 ............................................ 8, 16

Respondents Ian Peck, ACG Arrangement Services, ACG Capital Company, LLC, Modern Art Services, LLC, Patriot Credit Company LLC and Pegasus Credit Company LLC (collectively, "Respondents" or "ACG"), by and through their undersigned attorneys, submit this pre-hearing memorandum of law in advance of the hearing on damages claimed by Claimants Gary Greenberg, Art Fund III LLC, Colorado Art Holdings LLC, GB Fund LLC, Loans on Fine Art LLC and Lotus Investment Corp. (collectively, "Claimants" or "Greenberg").

## I.   INTRODUCTION

In the Decision on Claimant's Motion for Summary Disposition, dated July 1, 2022, the arbitrator found that ACG breached certain terms of the Settlement Agreement on three specific dates—January 20, 2021, February 12, 2021 and February 19, 2021—and ordered the present hearing on Claimants' alleged breach of contract damages.

Under New York law, Claimants' alleged damages must be computed based upon a hypothetical sale of the Painting on the date of the breach under distribution waterfall in § 1(c) of the Settlement Agreement. In his expert report, Claimant's damages expert, Dr. Timothy Hunter, of Winston Art Group, purports to value the Painting at $15 million on April 30, 2021, May 31, 2021 and October 31, 2021—none of which is a breach date found by the arbitrator. In any case, in violation of the Ethics Rule of the Uniform Standards of Professional Appraisal Practice, Dr. Hunter and Winston Art Group deliberately concealed the fact that less than two years earlier, on October 4, 2019, they valued the same Painting at only $1,500,000. The prior expert report also found that the Painting was not in good condition and that much work needed to be done to confirm that the work was by Andrea Del Sarto—facts assumed away or ignored in Dr. Hunter's present report. Had ACG not independently learned of the prior appraisal, Claimants and Dr. Hunter would have continued to conceal it from ACG and this arbitration tribunal. For this reason, as well as on

grounds of grave flaws in the methodology of the report itself, Dr. Hunter's expert report and testimony should be precluded.

Absent Dr. Hunter's testimony, Claimants have not adduced any reliable proof of their alleged damages on any of the breach dates identified by the arbitrator. While the Painting ultimately was sold by Sotheby's on January 27, 2022, for a hammer price of $1.8 million, that sale was the product of a single irrevocable bid made prior to the auction. There was no other bid on work in the auction itself. The unique facts and circumstances of that sale did not exist on any of the breach dates, which were at less auspicious times in the art market. Accordingly, there is no reliable evidence upon which to establish Claimants' alleged damages.

Finally, while the parties agreed in § 13 of the Settlement Agreement to share the costs of this arbitration proceeding equally, Claimants made a deliberate choice not to terminate the arbitration on grounds of non-payment of costs by ACG—and not to move the dispute to state or federal court, where no such arbitration costs would be incurred—and thus took on the full costs of the arbitration to themselves.

## II.    STATEMENT OF FACTS

### A.    The Settlement Agreement

Under the Settlement Agreement, Exhibit 1, ACG agreed to provide Greenberg a profit share in the sale of Portrait of a Nobleman, by Andrea Del Sarto (the "Painting"), according to a heavily negotiated distribution waterfall.

In § 6(e) of the Settlement Agreement, ACG represented that it understood the Painting to be "an authentic work of art by Andrea Del Sarto, as described above in Section 1(a)." Otherwise,

ACG made no representation of any kind concerning the Painting itself, including concerning the condition of the Painting.[1]

Section 1(a) of the Settlement Agreement establishes three specific deadlines for performance by ACG: (1) an evaluation of the Painting by Christie's or a comparable firm (the "Auctioneer"), on or before **February 12, 2021**; and (2) a consignment agreement with the Auctioneer on or before **February 19, 2021**; and (3) the Painting be delivered to the Auctioneer and auctioned or sold by private sale on or before **May 31, 2021**. However, §1(a) also provides that "the evaluation, consignment and auction dates are subject to scheduling changes by the Auctioneer and advice regarding the sale date from the Auctioneer, or front Robert Simon or another comparable expert."[2]

Upon the sale of the Painting, § 1(c) of the Settlement Agreement—the distribution waterfall—provides that, the proceeds would be allocated as follows:

a. First, at any price level, each and every dollar collected from the Sales Price shall be applied to pay sales expenses ("Sales Expenses"), calculated at ten percent of gross Sales Price, **which shall be payable to ACG**;

b. Second, after Sales Expenses, first $4.150 million of sales proceeds is **payable to GB**, paid directly by the Auctioneer;

c. Third, sales proceeds up to $6 million (plus Sales Expenses) shall be **paid to ACG**;

---

[1] In any case, any prior representation concerning the Painting by ACG would be superseded under the merger clause in § 16 of the Settlement Agreement.

[2] Section 1(a) states in full: "ACG will arrange evaluation of the below artwork (the "Work") by Christie's or a comparable firm (the "Auctioneer"), on or before February 19, 2021, which evaluation the Auctioneer will send directly to GB, followed by the entry of a consignment agreement with the Auctioneer on or before February 19, 2021, that requires the Work to be delivered to the Auctioneer and auctioned or sold by private sale on or before May 31, 2021, and that requires the Auctioneer to pay directly to GB all proceeds due to GB under this Agreement; provided, however, that the evaluation, consignment and auction dates are subject to scheduling changes by the Auctioneer and advice regarding the sale date from the Auctioneer, or from Robert Simon or another comparable expert."

    d. Fourth, any amount in excess of $6 million plus Sales Expenses ($6.6 million), **GB shall receive** the following amounts, as set forth in the accompanying spreadsheet in Exhibit B, **with the remainder to ACG**:

        i. $6.0 million plus Sales Expenses to $9.99 million plus Sales Expenses: $150,000 + 30% of net profits, after deduction of 25% owed to third party.

        ii. $10 million plus Sales Expenses to $14.99 million plus Sales Expenses: 22% of net profits, after deduction of 25% owed to third party.

        iii. $15 million plus Sales Expenses to $19.99 million plus Sales Expenses: 11% of net profits, after deduction of 25% owed to third party.

        iv. $20 million plus Sales Expenses to $29.99 million plus Sales Expenses: 5% of net profits, after deduction of 25% owed to third party.

        v. $30 million plus Sales Expenses and up: No additional payment beyond above profit sharing.

In the event of any dispute between the parties, § 13 of the Settlement Agreement provides that, as an initial matter, the dispute would be adjudicated by a single arbitrator at JAMS. In connection with such an arbitration, § 13 provides: "THE PARTIES SHALL SHARE EQUALLY IN THE COSTS OF SUCH ARBITRATION AND EACH PARTY SHALL BEAR THEIR OWN ATTORNEY'S FEES AND COSTS (FOR CLARITY, THE ARBITRATION AWARD SHALL NOT AWARD ATTORNEY'S FEES OR COSTS TO THE PREVAILING PARTY)." However, § 13 further provides, "[i]n such an arbitration, if either party fails to pay its invoiced arbitration fees by the thirty-day due date for such payment, the other party may provide notice that if payment is not made by the other party within fifteen days of such notice, that the notifying party shall exercise its option to terminate the arbitration and to pursue the adjudication of the dispute in state or federal court."

### B. ACG is Unable to Meet the Original Evaluation, Consignment and Auction Deadlines

After the execution of the Settlement Agreement, ACG sought to obtain the Painting and provide it for evaluation by an Auctioneer—but was unable to do so before February 12, 2021. As a result, ACG was unable to enter into a consignment agreement with an Auctioneer on or before February 19, 2021. As the April 22, 2021, Christie's Old Masters Auction (the "Christie's Auction") favored by Greenberg was approaching, ACG continued its efforts to obtain the Painting. However, ACG was unable to do so before the date of the Christie's Auction, and thus was unable to make payment to Greenberg pursuant to the distribution waterfall in §1(a) of the Settlement Agreement on or before May 31, 2021.[3]

### C. Nicholas Hall Advises Against Selling the Painting in the Christies Auction

In February and March 2021, ACG consulted with Nicholas Hall, an esteemed expert in old master paintings who previously ran the Old Masters department at Christie's. Throughout this period, Hall was unequivocal on his advice that the Painting should not be sold in the Christie's Auction, which took place before Covid-19 vaccines were available in the United States—except to the oldest and most vulnerable—and when virtually nobody was fully-vaccinated.

In an email, dated March 29, 2021, Exhibit 2, Hall explained his reasoning as follows:

> I would like to confirm that it is my strong advice that you do not consign the Andrea del Sarto portrait to Christie's April sale. There are several reasons for this.
>
> 1) There is no time to do the necessary marketing to maximise the value of the Painting.
>
> 2) The auction market, while strong in Asia and Post War and Contemporary is still recovering for Old Masters. Buyers will not be

---

[3] As set forth below, Claimants commenced the instant proceedings on April 29, 2021, over a month before the payment deadline, and obtained a TRO on May 4, 2021.

> able to, or want to, travel to New York to see the Painting in person this April.
>
> 3) My understanding of the April sale as it now stands is that there is nothing remotely close to the del Sarto portrait in terms of value. This would leave it exposed. Conversely, one wants to put a painting with good upside in a sale with other works of high value, though not in direct competition.
>
> In conclusion, I think you should take your time to develop a more long term sale strategy. Putting the painting in Christie's April sale is not going to achieve your objectives. I would reiterate what I told Terence, that I am not questioning Christie's ability to get a good price for the painting, I just think that the April sale is far too soon.

Hall was not aware of the dispute between ACG and Greenberg, and stated this opinion based exclusively on his knowledge and wealth of experience in the art market, and specifically the market for Old Masters paintings.

### D.   The Christie's Auction

After the Christie's Auction took place, Hall advised ACG that the auction went terribly, as expected, and that ACG was wise to avoid a sale under those circumstances. Auction results publicly released by Christie's on its website indicate that many offered lots did not sell and the total sale price for all lots was less than $18 million. *See* Exhibit 3 and 4. Only six of sixty-three offered lots sold for more than $1 million, and the highest sale price of any individual work was $3.15 million. *See id.*

### E.   Claimants' Obtain a TRO, Preventing Respondents from Acquiring the Painting

On April 29, 2021—over a month before the May 31, 2021 payment deadline in § 1(a) of the Settlement Agreement—Claimants commenced the instant proceeding, seeking a TRO prohibiting Respondents from moving, selling, relocating, assigning or pledging the Painting. On May 4, 2021, the Emergency Arbitrator granted the TRO. Thereafter, following a preliminary

injunction hearing, on May 27, 2021, granted a preliminary injunction likewise prohibiting Respondents from moving, selling, relocating, assigning or pledging the Painting.

In April and May 2021, Respondents still sought to complete the acquisition of the Painting. Respondents still hoped to obtain the Painting and perform their obligations under the Settlement Agreement but could not do so because the TRO—and later the preliminary injunction—prohibited any encumbrance of the Painting.

### F. The Painting is Sold in the Sotheby's January 27, 2022 Old Masters Auction for $1.8 Million

After the preliminary injunction, ACG sought to negotiate an amendment of the Settlement Agreement with Greenberg which would enable ACG to obtain the Painting and put it up for sale or auction, but Greenberg insisted on costly penalties that made the effort economically unfeasible. As a result, ACG lost any remaining opportunity to acquire the Painting.

ACG later learned that Virginia Bonito, the owner of the Painting, and another partner, consigned the Painting for sale by Sotheby's in its January 27, 2022, Old Masters auction (the "Sotheby's Auction")—the preeminent Old Masters auction in the industry. Prior to the auction, Sotheby's obtained an irrevocable bid on the Painting in the amount of $1.8 million. At the auction itself, on January 27, 2022, there were no other bids on the Painting and it was sold to the irrevocable bidder for a hammer price of $1.8 million. See Exhibit 5.[4]

Unlike the Christie's Auction, the Sotheby's Auction featured a number of comparable and superior masterworks which would have enticed the right mix of bidders to maximize the sale price of the Painting, with total sales of $90,970,160. *See* Exhibits 6 and 7. Notably, one painting in the Sotheby's Auction, by Botticelli, sold for over $45 million. *See id.* A limestone statue from

---

[4] The public record of the auction, published by Sotheby's on its website, reflects a total price including the hammer price, buyer's premium and costs and expenses of $ 2,198,000.

7

ancient Egypt sold for just under $10 million. *See id.* A painting by Pieter van Mol sold for $5.779 million. *See id.* Twelve works in all sold for over $1 million. *See id.*

### III.    ARGUMENT

Under New York law, it is well-established that breach of contract damages "should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract," measured on the date of the breach. *See, e.g., Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("New York courts are clear that breach of contract damages are measured from the date of the breach."); § 22:10. DATE OF THE BREACH, 28A N.Y. PRAC., CONTRACT LAW § 22:10 ("The proper measure of damages is determined by the loss sustained or gain prevented at the time and place of the breach.").

An "injured party should not recover more from the breach than he would have gained had the contract been fully performed." *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 727 F. Supp. 2d 256, 286–87 (S.D.N.Y. 2010) (quoting *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974)); *Hughes v. Sprauve*, No. 14 CV 4152 BMC, 2014 WL 6674590, at *2 (E.D.N.Y. Nov. 25, 2014) ("It is axiomatic that a plaintiff cannot recover more damages in a breach of contract case than he would have received had the contract been performed.").

At all times, the plaintiff bears the burden of proving the existence and amount of its alleged damages. § 22:12. AMOUNT OF DAMAGE, 28A N.Y. PRAC., CONTRACT LAW § 22:12 ("The plaintiff has the burden of showing the extent of the harm suffered."). In addition, after a breach, the plaintiff has a common law duty to mitigate its damages. *See Mack Cali Realty, L.P. v. Everfoam Insulation Sys., Inc.*, 110 A.D.3d 680, 682, 972 N.Y.S.2d 310, 312 (2nd Dep't 2013); § 22:17. GENERALLY, 28A N.Y. PRAC., CONTRACT LAW § 22:17 ("A party injured by a breach of contract is required to make a reasonable effort to mitigate its damages."). "The plaintiff has a duty to take

8

action to make its damages as light as possible and, if through willfulness or negligence it allows damages to be unnecessarily enhanced, the increased loss will fall upon it." *Id.*

      **A.**    **The Expert Report and Testimony of Dr. Timothy Hunter Should be Precluded**

As an initial matter, the expert report of Dr. Timothy Hunter, of Winston Art Group, and any testimony by Dr. Hunter thereon, should be precluded because it is wholly contradicted by Dr. Hunter's own prior appraisal of the Painting, issued less than two years earlier, on October 4, 2019 (the "2019 Appraisal"). *See* Exhibit 8. In violation of the Uniform Standards of Professional Appraiser Practice ( "USPAP"), Dr. Hunter and Winston Art Group deliberately failed to disclose the prior 2019 Appraisal—which valued the Painting at just ***$1.5 million***, after finding that it was in poor condition—and instead presented an expert report that made a false "extraordinary assumption" the Painting was in good condition and that, based upon that false assumption, valued the Painting at ***ten times Dr. Hunter's prior valuation, or $15 million***.

Had ACG not itself learned of the 2019 Appraisal from other sources, and demanded it in discovery, Claimants would have continued to conceal the 2019 Appraisal from ACG and the arbitration tribunal. Even after ACG demanded the 2019 Appraisal in discovery, Claimants resisted its disclosure, claiming that Dr. Hunter did not rely on the prior report. Having finally obtained the 2019 Appraisal, it is easy to see why.

In his November 5, 2021 expert report (the "2021 Appraisal"), Exhibit 9, Dr. Hunter certifies that "the appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the 2020-2021 Uniform Standards of Professional Appraisal Practice." 2021 Appraisal at 3. The USPAP Ethics Rule provides that "[a]n appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests." Exhibit 10 at 7. Among other things, an appraiser:

9

- must not perform an assignment with bias;

- must not advocate the cause or interest of any party or issue;

- must not agree to perform an assignment that includes the reporting of predetermined opinions and conclusions;

- must not misrepresent his or her role when providing valuation services that are outside of appraisal practice;

- *must not communicate assignment results with the intent to mislead or to defraud;*

- *must not use or communicate a report or assignment results known by the appraiser to be misleading or fraudulent;*

- *must not knowingly permit an employee or other person to communicate a report or assignment results that are misleading or fraudulent;*

*Id.* at 7 (emphasis added). The USPAP Ethics Rule continues:

> If known prior to agreeing to perform an assignment, and/or if discovered at any time during the assignment, *an appraiser must disclose to the client, and in each subsequent report certification*:
>
> . . .
>
> - *any services regarding the subject property performed by the appraiser, as an appraiser or in any other capacity, within the three-year period immediately preceding the agreement to perform the assignment*.
>
> Comment: Disclosing the fact that the appraiser has previously appraised the property is permitted except in the case when an appraiser has agreed with the client to keep the mere occurrence of a prior assignment confidential. *If an appraiser has agreed with a client not to disclose that he or she has appraised a property, the appraiser must decline all subsequent agreements to perform assignments that fall within the three-year period.*

*Id.* (emphasis added). Thus, under the USPAP Ethics Rule, an appraiser has an affirmative duty to disclose any prior appraisal of the same work within the past three years, or else to abstain from issuing an appraisal. *See id.*

In the 2021 Appraisal, Dr. Hunter certifies that "the appraiser has not performed services

10

as an appraiser or in any other capacity for the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment." 2021 Appraisal at 3. But this certification is false. The 2019 Appraisal specifically states that "the Old Masters specialist, Tim Hunter, provided significant personal property appraisal assistance by assisting with the research and valuation for the property that is subject in this report." 2019 Appraisal at 4. Furthermore, the 2019 Appraisal states that "the appraiser made a personal inspection of the property that is the subject of this report." *Id.* at 3.

While Claimants have indicated that Dr. Hunter will claim he simply forgot his "significant" role in "the research and valuation" of the Painting in the 2019 Appraisal, this is claim—by a seasoned art professional—simply is not credible. In any case, the USPAP Record Keeping Rule required Dr. Hunter and Winston Art Group to keep and maintain, for at least five years, sufficient records to enable them to comply with the Ethics Rule. The 2021 Appraisal states that "the Managing Director of Winston Art Group, Elizabeth von Habsburg" participated in the preparing the report. 2021 Appraisal at 4. Compliance with the Record Keeping Rule and professional business intake procedures could not have failed to flag Winston Art Group's prior 2019 Appraisal. Thus, the failure of Dr. Hunter and Winston Art Group to disclose the 2019 Appraisal must be presumed to be intentional.

By concealing the 2019 Appraisal, Dr. Hunter and Winston Art Group sought to justify the 2021 Appraisal's egregious ***tenfold*** increase in valuation, without any known change in the condition or attribution of the Painting itself. As explained by Respondents' expert, Robert Simon, in his rebuttal expert report (the "Rebuttal Report"), the appraisal of old master paintings turns almost entirely upon the physical condition of a work. *See* Exhibit 11, Rebuttal Report at 2-3. In the 2021 Appraisal, Dr. Hunter made certain "extraordinary assumptions," done "at the instruction

of the client," including that "that the work has the provenance as described by the fact sheet, [and] that the work has good condition," 2021 Appraisal at 6.

USPAP defines an extraordinary assumption as an "assignment-specific assumption as of the effective date regarding *uncertain information* used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." But the condition of the Painting was not uncertain. In the 2019 Appraisal, in which Winston Art Group "made a personal inspection" of the Painting, the report described its condition as follows:

> An exhaustive condition report accompanies this work, which notes that the work was originally executed on a finely woven linen cloth called "fiandrina", transferred crudely in the 19th century onto a coarse canvas that "caused warping and imparted its own pronounced texture to the original materials. An examination of the pre-restoration x-ray shows that, apart from the obvious paint losses, only a very thin paint surface survived from the original. There is little in the report about the recent restorations and the newest varnish layer coating the present surface. *In this appraiser's opinion, the subject is not, as stated in the appraisal of Anne Frances Moore, "in excellent condition for its age.*

2019 Appraisal at 8.

In addition, the 2019 Appraisal strongly questioned the attribution of the Painting to Del Sarto, stating: "[u]nfortunately, the list of expert opinions supplied by Dr. Bonito falls short of what serious collectors would require in order to feel that this work is accepted as confirmed to be by the artist in the market." *Id.* at 8. The 2019 Appraisal continued: "Andrea Del Sarto's works are almost exclusively on [wood] panel and no explanation is available on the fact that this work is on canvas." *Id.* Ultimately, the 2019 Appraisal concluded, "[m]ore research is necessary before the attribution is settled. More expert opinions need to be sought, and ideally a significant scholar should publish the subject work." *Id.*

Finally, as to value, the 2019 Appraisal dismissed a biased 2015 appraisal of the Painting by another appraiser, made for only insurance purposes, which was based principally on the

12

valuation of a superior, non-comparable, painting by Raphael. *Id*. at 9. Considering the condition and attribution of the work, and more appropriate comparable sales, the 2019 Appraisal concluded:

> [E]ven if documented as fully autograph by noted scholars of the subject, a Fair Market Value in the range of $2-3 million for this work would be appropriate. ***The fact that much work still needs to be done would mean that the present Fair Market Value is somewhat less than this range. Therefore, the appraiser has assigned a Fair Market Value, with current scholarship, of $1.5 million.***

*Id.* (emphasis added).

In the 2021 Appraisal, Dr. Hunter conveniently ignored the findings of the 2019 Appraisal and simply purported to assume, based upon Greenberg's instruction, that "the subject work is in generally good condition" and that "there is an academic consensus in agreement with Sydney Freeberg's opinion expressed in 1991 that this work is fully attributable to Del Sarto." 2021 Appraisal at 11. Dr. Hunter then purported to compare the Painting against other works that he also did not physically inspect, many, if not all of which, are dated and inappropriate, including works known to be in perfect condition and works on wood that are more valued than works on canvas. *See* Rebuttal Report at 4.

Even without the 2021 Appraisal's egregious violations of the USPAP Ethics Rule, Dr. Hunter's methods and application are—to put it charitably—wholly unreliable. *See King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5237195, at *12 (S.D.N.Y. Nov. 9, 2021) (excluding as unreliable report of expert who, among other things, did not physically inspect works, based valuations upon dated and unreliable market transactions) (Liman, J.);[5] *Oleg Cassini, Inc. v. Electrolux Home Prod*., Inc., No. 11 CIV. 1237 LGS JCF, 2014 WL 1468118, at *8 (S.D.N.Y. Apr. 15, 2014) (excluding as unreliable report of expert who, among other things, did not

---

[5] Notably, in *King*, 2021 WL 5237195, at *12, the court excluded an expert report by Winston that was guilty of many of the same flaws.

13

physically inspect work) (Francis, J.). However, once Claimants' egregious violations of USPAP rules are taken into account, it is clear that Dr. Hunter's expert report and expert testimony should be precluded.

### B. Claimants Have Failed to Adduce Any Proof of Their Alleged Damages

In the Decision on Claimants' motion for summary disposition, the tribunal found that "Respondents breached the Settlement Agreement in at least the following ways: Respondents did not present the painting for evaluation by the date specified in the Settlement Agreement; Respondents did not consign the work for auction by the date specified in the Settlement Agreement; Respondents' representations that they owned or controlled or had a right thereto were false." Decision at 9. Thus, the relevant dates for the determination of damages are the evaluation date of February 12, 2021, the consignment date of February 19, 2021, or the Effective Date of the Settlement Agreement, or January 20, 2021. *See* Settlement Agreement § 1(a).

Claimants' alleged damages must be computed based upon a hypothetical sale on the date of the breach under the distribution waterfall in §1(a) of the Settlement Agreement. *See, e.g., Oscar Gruss & Son*, 337 F.3d at 196; § 22:10. DATE OF THE BREACH, 28A N.Y. PRAC., CONTRACT LAW § 22:10. Under it, the first 10% of the sale proceeds is paid to ACG. *See* Settlement Agreement § 1(c). The next $4.150 million of a sale proceeds, after ACG's 10%, is paid to Greenberg. *See id*. The next $6 million of sale proceeds is payable to ACG. *See id*.

However, Claimants have not presented any expert testimony concerning the value of the Painting on any of the three foregoing breach dates.[6] In any case, as shown above, Dr. Hunter's expert report and testimony is inadmissible. In addition, as Mr. Simon explained in his Rebuttal Report, without an independent professional conservation report, no reliable value can be

---

[6] Dr. Hunter's 2021 Appraisal states that it is effective only as of April 30, 2021, May 31, 2021 and October 31, 2021.

14

established for the Painting. Thus, there is no basis upon which to compute the profit share upon a hypothetical sale on any of the breach dates.

While the Painting ultimately sold for a hammer price of $1.8 million on January 27, 2022, that number cannot simply be attributed to any of the breach dates. The Sotheby's Auction was a superior platform for the sale of the Painting, with many more comparable and superior works to attract potential buyers, with total sales of $90,970,160. The Christie's Auction, on the other hand, took place before widespread Covid-19 vaccination, and garnered total sales of less than $18 million—or less than 20% of the total sales of the Sotheby's Auction. There is no evidence that the $1.8 million price—which was the result of a single irrevocable bid, rather than of live auction bidding—could have been achieved at an earlier date. Indeed, the fact that there were no other bidders for the Painting in the Sotheby's Auction indicates that there was not a strong market for the Painting even in the more favorable circumstances of the Sotheby's Auction. Accordingly, Claimants cannot establish any amount of alleged damages on any of the alleged breach dates.

### C. Claimants Failed to Mitigate Their Claim to One Half of the Costs of the Arbitration

Finally, Claimants are not entitled to an award of on half of the costs of this arbitration. Under § 13 of the Settlement Agreement, the parties agreed to share the costs of the arbitration equally. However, at Claimants' specific request, the parties agreed that "if either party fails to pay its invoiced arbitration fees by the thirty-day due date for such payment, the other party may provide notice that if payment is not made by the other party within fifteen days of such notice, that the notifying party shall exercise its option to terminate the arbitration and to pursue the adjudication of the dispute in state or federal court." Although Respondents have not paid their share of the costs of the arbitration, Claimants deliberately chose not to terminate the arbitration for non-payment and move the dispute to state or federal court, where no such arbitration costs

would be incurred. Claimants thus failed to mitigate their damages and must bear the additional costs that they consciously chose to accept. *See, e.g.*, § 22:17. GENERALLY, 28A N.Y. PRAC., CONTRACT LAW § 22:17.

## IV. CONCLUSION

In view of the foregoing, Respondents respectfully request that the arbitrator preclude the expert report and testimony of Dr. Timothy Hunter and find that Claimants failed to meet their burden of proving any amount of damages flowing from Respondents' alleged breaches of the Settlement Agreement.

DATED:   New York, New York
           October 18, 2022

Respectfully submitted,

PRESS KORAL LLP

By: *Matthew J. Press*
    Matthew J. Press
    Lexington Avenue, 13th Floor
    New York, NY 10022
    Telephone: (212) 922-1111
    Facsimile: (347) 342-3882
    mpress@presskoral.com

*Attorneys for Respondents*